**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **CHANDLER SIGNS HOLDINGS, LLC,** | § | |
| **and CHANDLER SIGNS, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. _____** |
| **JOE MUELLER, PAUL GAMBILL, and** | § | |
| **FIRST & MAIN SIGNAGE FOR** | § | |
| **MODERN BRANDS, LLC,** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT AND
APPLICATION FOR TEMPORARY RESTRAINING ORDER,
<u>PRELIMINARY AND PERMANENT INJUNCTION, AND DAMAGES</u>**

Plaintiffs Chandler Signs Holdings, LLC and Chandler Signs, LLC (jointly, "**Chandler**")

hereby complain of Defendants Joe Mueller, Paul Gambill, and First & Main Signage for Modern

Brands, LLC (individually and collectively, "**Defendants**").

**PARTIES**

1.      Plaintiff Chandler Signs Holdings, LLC is a Delaware limited liability company

with its principal place of business in Tarrant County, Texas.

2.      Plaintiff Chandler Signs, LLC is a Texas limited liability company with its principal

place of business in Tarrant County, Texas.

3.      Defendant Joe Mueller is an individual domiciled in San Clemente, California, and

may be served with process at 17 Calle Pacifica, San Clemente, California 92673, or wherever he

may be found.

4.      Defendant Paul Gambill is an individual domiciled in Colorado Springs, Colorado, and may be served with process at 1570 Gold Hill Mesa Drive, Colorado Springs, Colorado 80905, or wherever he may be found.

5.      Defendant First & Main Signage for Modern Brands, LLC ("**First & Main**") is an Ohio limited liability company with its principal place of business in San Clemente, California, that may be served with process through its registered agent, Philip T. Eckinger, 2340 Shepler Church Ave. SW, Canton, Ohio 44706.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction because this case arises under the laws of the United States.  28 U.S.C. § 1331.  Specifically, this case arises in part under the Defend Trade Secrets Act, 18 U.S.C. § 1836(c).  The Court has supplemental jurisdiction over the non-federal claims.  28 U.S.C. § 1367.

7.      Personal jurisdiction over Mueller exists pursuant to the provisions of the Amended and Restated Company Agreement of Chandler Signs Holdings, LLC (the "**Company Agreement**") and the Subscription and Contribution Agreement, which form, in part, the basis of this lawsuit.  True and correct copies of the Company Agreement and the Subscription and Contribution Agreement are attached as Exhibits 1 and 2, respectively, and fully incorporated herein by reference.

8.      In the Company Agreement and the Subscription and Contribution Agreement, Mueller agreed that any lawsuit based on those agreements:

> shall only be brought in the state or federal courts located in Harris County in the State of Texas and not in any other state or federal courts located in the United States of America.

Mueller also expressly consented to the jurisdiction of the Court:

Each of the parties hereby consents to the jurisdiction of such courts (and the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding that is brought in any such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient forum.

In addition to the mandatory forum-selection provision, personal jurisdiction over Mueller also exists because Mueller is a member of and entered several contracts and other agreements with Plaintiff Chandler Signs Holdings, LLC, which maintains its principal place of business in Texas. Furthermore, Mueller was employed by and entered multiple contracts and other agreements with Plaintiff Chandler Signs, LLC, a Texas limited liability company, with its principal place of business in Tarrant County, Texas. Mueller solicited Gambill and other employees of Chandler Signs, LLC to leave Chandler Signs, LLC and join a competing venture, First & Main. Mueller physically entered the State of Texas and, using Chandler's confidential, proprietary, and trade secret information, solicited current customers to move their business from Chandler Signs, LLC to First & Main. Mueller also formed First & Main, which conducts business in the State of Texas. As a result of the foregoing, Mueller has purposefully availed himself of the benefits and privileges of the State of Texas such that Mueller should have reasonably anticipated being haled into a Texas court.

9.     Personal jurisdiction over Gambill exists because Gambill was employed by and entered multiple contracts and other agreements with Plaintiff Chandler Signs, LLC, a Texas limited liability company, with its principal place of business in Tarrant County, Texas. Gambill solicited employees of Chandler Signs, LLC to leave Chandler Signs, LLC and join a competing venture, First & Main. Gambill solicited current customers to move their business from Chandler Signs, LLC to First & Main, including Chandler Signs, LLC's clients located in Texas. Gambill

downloaded confidential, proprietary, and trade secret information from Chandler's servers in Texas, including information related to one or more Chandler customers in Texas for the purpose of using that information to solicit Chandler customers in Texas and divert business opportunities away from Chandler Signs, LLC and to First & Main.  Gambill also helped form First & Main, which conducts business in the State of Texas.  As a result of the foregoing, Gambill has purposefully availed himself of the benefits and privileges of the State of Texas such that Gambill should have reasonably anticipated being haled into a Texas court.

10.     Personal jurisdiction over First & Main exists because it conducts business in the State of Texas.  Specifically, First & Main, through Mueller and Gambill, solicited Chandler Signs, LLC's employees to leave Chandler Signs, LLC and join First & Main, solicited current customers to move their business from Chandler Signs, LLC to First & Main, including at least one of Chandler Signs, LLC's client located in Texas, and diverted business opportunities away from Chandler Signs, LLC and to First & Main, thereby purposefully availing itself of the benefits and privileges of the State of Texas.

11.     Venue is proper in the United States District Court for the Southern District of Texas, Houston Division, pursuant to the Mandatory Forum-Selection Provision contained in the Company Agreement and the Subscription and Contribution Agreement.

### DISCLOSURE OF RELATED LITIGATION

12.     On February 15, 2019, Mueller and Gambill filed suit against Chandler in the case styled *Paul Bambill* [*sic*] *and Joseph Mueller v. Chandler Signs Holdings, LLC and Chandler Signs, LLC*, in the Superior Court of the State of California, County of San Diego, Case No. 37-2019-00008572-CU-BT-NC (the "**California Lawsuit**").  Because the California Lawsuit raises federal questions, Chandler is filing a Notice of Removal in the California Lawsuit

contemporaneously with the filing of this complaint.  Once the California Lawsuit is removed to federal court, Chandler intends to file a motion to stay, transfer, or dismiss the California Lawsuit since it was filed in the wrong jurisdiction in violation of the mandatory forum-selection provision.

## FACTS

13.     Chandler is a leading provider in the signage industry, providing design, engineering, manufacturing, installation, and maintenance of signs for companies across the nation and overseas.  Chandler's continued success depends on the confidential and proprietary information it has developed and taken great lengths to secure over the last 40 years.

14.     On or around May 28, 1997, Chandler hired Mueller as a salesperson, with the duties of selling additional services to Chandler's national accounts.  Over the years, Mueller was promoted from his initial role with the company, becoming Chandler's Director of Business Development and eventually Chandler's Vice President.  As part of his position within the company, Mueller was entrusted with access to Chandler's confidential and proprietary information.

15.     As a condition of Mueller's employment with Chandler, Mueller agreed to be bound by various policies and agreements.   Mueller entered a confidentiality policy (the "**Employee Confidentiality Agreement**") on February 12, 2009, whereby Mueller agreed:

> [t]o forever keep secret and inviolate all proprietary information and customer information which shall come into his/her possession, and will not disclose the same to any other person or organization for so long as such proprietary information and customer information are not generally known by, or accessible to, the public. [Mueller] further agrees that he/she will not use any proprietary information or customer information for his/her benefit, or directly or indirectly, for the benefit of any person or organization other than the Company and its affiliates.

Under the terms of the Employee Confidentiality Agreement,[1] proprietary information and trade secrets include:

- Sources of purchased goods, services, contracts and their respective prices;
- Customer lists, contract details, and related data;
- Financial statements detailing Company performance and conditions;
- Personnel and payroll records, compensation data;
- Marketing strategies, pending projects and proposals; and
- Conversations between employees relating to any of the above topics.

16.     On May 29, 2012, Mueller also agreed in writing to be bound by the policies contained in Chandler's company policy handbook.  Chandler's Non-Disclosure Policy prohibited Mueller from improperly using or disclosing Chandler's trade secrets or other confidential business information, including, *inter alia*, customer lists, customer preferences, financial information, marketing strategies, pending projects and proposals, proprietary production processes, open jobs, subcontractor information, vendors, and suppliers.

17.     Under Chandler's Internet Usage Policy, Mueller agreed to refrain from (i) using Chandler's time and resources for personal gain, and (ii) sending or posting confidential material, trade secrets, or proprietary information outside of the organization.

18.     Finally, under Chandler's Property Return Policy, Mueller agreed to return all Chandler property on or before his last day of work, including computers, cell phones, client lists, and other materials.

19.     These policies and agreements are part of the methods Chandler uses to ensure the continued confidentiality and secrecy of its business information.

20.     On December 22, 2016, Chandler and Mueller entered a Subscription and Contribution Agreement whereby Mueller agreed to purchase 100,000 Class A Units for $100,000.

---

[1] A true and correct copy of the Employee Confidentiality Agreement is attached as Exhibit 3 and fully incorporated herein by reference.

Of this amount, Mueller paid $20,000 up-front; the remaining $80,000 was payable over a four-year term pursuant to a separate Promissory Note and Security Agreement (the "**Note**").  As of February 8, 2019, Mueller still owed $67,782.76 on the Note, with interest accruing at a rate of 5%, compounded quarterly.

21.    Also on December 22, 2016, Chandler and Mueller entered an amendment to the Company Agreement wherein Mueller agreed to be bound by all of the terms and conditions set forth in the Company Agreement.  A true and correct copy of this amendment is attached as Exhibit 4 and fully incorporated herein by reference.

22.    Under Section 7.6 of the Company Agreement, Mueller agreed to hold in confidence and not disclose any of Chandler's confidential or trade secret information to any person other than another member of the company.

23.    Under Section 11.1(b) of the Company Agreement, Mueller agreed that, while Mueller remained a member of Chandler and for a period of two years after he ceased to be a member of Chandler, he would not, for any reason whatsoever:

(1)    engage in any manner in any Company Business Opportunity [defined as any business opportunity within the scope of marketing, development, creation, or installation of custom signage solutions] other than through [Chandler],

(2)    call upon or otherwise communicate with any person who is, at the time, or was at any time within twelve (12) months prior thereto an employee of [Chandler] for the purpose or with the intent of enticing such employee away from or out of the employ of [Chandler] or directly or indirectly hiring such person as an employee or independent contractor,

(3)    seek to divert from doing or continuing to do business with [Chandler] or any of its subsidiaries, any supplier, customer or any other person that has a business relationship with [Chandler] or with which [Chandler] is actively planning or pursuing a business relationship, or

(4)    assist others in engaging in any of the foregoing actions described in clauses (1), (2), or (3) above.

24.     Mueller and Chandler also entered a side agreement on December 22, 2016, whereby Mueller could be relieved of his obligations under Section 11.1(b) if, upon termination of his employment, Mueller irrevocably relinquished any and all rights to receive, review or have access to Chandler's business records, files, financials, and any other internal information and data of Chandler.   As set forth in more detail below, Mueller clearly did not relinquish access to Chandler's confidential and proprietary information upon his termination.   Rather, Mueller misappropriated Chandler's confidential, proprietary, and trade secret information and used the same to unfairly compete against Chandler.   As a result, Mueller's obligations under Section 11.1(b) remain.   In addition, even assuming that the side agreement relieved Mueller of his obligations under Section 11.1(b), which it did not, Mueller was an officer and is still currently a member of Chandler, and therefore owes fiduciary duties to Chandler, including the duty of loyalty, which independently prohibits Mueller from taking any of the actions prohibited in Section 11.1(b).[2]

25.     On or around May 19, 2008, Chandler hired Gambill as a project manager to oversee all phases of the sales process for certain national accounts.   Like Mueller, Gambill was entrusted with Chandler's confidential and proprietary information and, in exchange, agreed to be bound by various policies and agreements.

26.     As a condition of Gambill's employment with Chandler, on February 10, 2009, Gambill entered the Employee Confidentiality Agreement with Chandler.   On May 25, 2012, Gambill also agreed to be bound by the terms of Chandler's Non-Disclosure Policy, Internet Usage Policy, and Property Return Policy.

---

[2] The side agreement also contains the same mandatory forum-selection provision as the Company Agreement and the Subscription and Contribution Agreement.

27.     In addition, Gambill entered a separate computing systems and internet use policy ("**Computer Systems Agreement**")[3] on May 19, 2008, whereby Gambill agreed to only use Chandler's computing resources for business purposes and to refrain from engaging in several activities, including, *inter alia*:

(3)     Solicit non-company business for personal gain or profit;

\*\*\*

(10)    Reveal or publicize confidential or proprietary information which includes, but is not limited to: financial information, new business and product ideas, marketing plans or strategies, databases and the information contained therein, customer lists, technical product information, computer software source codes, computer/network access codes and business relationships;

\*\*\*

(13)    Waste time on non-Company business.

28.     In or around December of 2018, Mueller embarked on an aggressive and covert scheme to use Chandler's confidential and proprietary information for his own profit and personal gain.  First, on January 10, 2019, "First & Main Signage for Modern Brands, LLC" was formed by Philip T. Eckinger, a colleague and future business partner of Mueller, with the intent and purpose of directly competing with Chandler in the signage industry.  On January 14, 2019, the domain "firstandmainsigns.com" was registered to Jeremy Eckinger.

29.     While still a member and officer of Chandler, Mueller solicited Gambill and potentially other Chandler employees to join his new venture and to assist him in misappropriating Chandler's confidential and proprietary information for that business.

30.     Chandler issued company laptop computers to both Mueller and Gambill for use on business matters during their employment at Chandler.  Both Mueller and Gambill took those

---

[3] A true and correct copy of the Computer Systems Agreement is attached as Exhibit 5 and fully incorporated herein by reference.

laptop computers with them upon their departures from Chandler, and returned them only after written demand from Chandler's counsel.

31.     After receiving its computers from Mueller and Gambill, Chandler authorized a professional forensic audit of the various activities on those machines.  The results of that audit were shocking.  They revealed a protracted, coordinated scheme between and among the Defendants to steal and use Chandler's confidential and proprietary information, including customer lists, cost margins and other pricing information, design drawings, technical product information, marketing strategies, forecasts, and other business records.  Mueller and Gambill stole and used Chandler's confidential and proprietary information to solicit current customers of Chandler, including Shake Shack, Dave and Busters, Lazy Dog, Levi Strauss, and BJ's Restaurant.

32.     Mueller's plan to steal Chandler's confidential information and use that information to compete against Chandler began weeks or months before he left Chandler.  The laptop computer used by Mueller reveals that he began Google-searching how to set up a competing business weeks before he submitted his resignation to Chandler:

| 2 | Record | Search Term | Date/Time |
|---|---|---|---|
| 106 | 2039 | starting a small business in california | 2019-01-15 12:09:00 PM |
| 109 | 160 | starting a small business in california | 2019-01-08 10:51:00 PM |
| 138 | 308 | top reasons people start their own business | 2018-12-14 01:43:45 PM |

33.     Mueller also began conducting research regarding his new business, First & Main, and designing his new business cards, even while still employed and being paid by Chandler:

| 2 | Record | Search Term | Date/Time |
|---|---|---|---|
| 101 | 59 | business card layout ideas | 2019-01-17 09:05:09 AM |
| 102 | 33 | business card layout ideas | 2019-01-17 09:04:24 AM |
| 114 | 655 | first & main signs | 2019-01-04 10:58:58 PM |
| 115 | 310 | first & main signs | 2019-01-04 10:58:39 PM |

34.     On his last day of employment at Chandler, Mueller made sure he knew how to take all of Chandler's customer contact information with him to start his competing business:

| 2 | Record | Search Term | Date/Time |
|---|---|---|---|
| 5 | 957 | transfer contacts and calendar from android to android phone | 2019-01-31 11:52:50 PM |
| 6 | 69 | transfer contacts and calendar from android to android phone | 2019-01-31 11:51:51 PM |

35.     Mueller's laptop also revealed that he had accessed files of dozens of Chandler customers, including Dave & Busters, Shake Shack, Lazy Dog, BJ's Restaurants, Levi Strauss, Case/International Harvester, 24-Hour Fitness, PF Chang's, Perry's, True Food, Harkins Theaters, Union Bank, United Rentals, and Freebirds, among several others.   These files included information about, among many other things, customer designs, prototypes, presentations, samples, examples, standards, surveys, and meetings, much of which is not publicly known beyond Chandler and the customer.

36.     The forensic audit also showed that Mueller attached a number of removable data storage devices to his laptop the days just before his resignation from Chandler and after his departure.  These devices include the following:

| Name of Data Storage Device | Date and Time "Last Removed" from Laptop |
|---|---|
| SanDisk U3 Cruzer Micro USB Device | February 6, 2019 at 4:37 p.m. |
| SAMSUNG Mobile USB Modem | February 1, 2019 at 12:08 a.m. |
| WD My Book 111D USB Device | January 31, 2019 at 12:21 p.m. |

37.     Mueller copied hundreds of Chandler files to these various external devices during his last day of employment.   Just as examples, Mueller copied or downloaded the following Chandler files just before he left:

| 2 | Record | Linked Path | Last Modified Date/Time | Last Accessed Date/Time |
|---|--------|-------------|-------------------------|--------------------------|
| 3 | 285 | C:\Users\jmuell1\Documents\StatusArchives\STATUS2-1-19.xlsx | 2019-02-01 09:15:54 AM | 2019-02-01 09:15:54 AM |
| 4 | 287 | C:\Users\jmuell1\Documents\StatusArchives | 2019-02-01 09:15:54 AM | 2019-02-01 09:15:54 AM |
| 5 | 1942 | C:\Users\jmuell1\Desktop\Stats.xlsx | | |
| 6 | 274 | C:\Users\jmuell1\Desktop\Stats.xlsx | 2019-02-01 09:09:08 AM | 2019-02-01 09:09:08 AM |
| 12 | 23 | E:\backup- calendar.pst | | |
| 115 | 17 | \\csica-server1\groups\Sales\Joe Mueller | | |
| 116 | 1275 | \\csica-server1\groups\Sales\Joe Mueller\stats 3 shared.xlsx | 2019-01-14 04:48:20 PM | 2019-01-14 04:48:20 PM |
| 177 | 1251 | C:\Users\jmuell1\Documents\Personal\Sales Mgr Outline. | 2018-12-09 11:27:43 PM | 2018-12-09 11:27:43 PM |

38.     The audit of the computer used by Gambill revealed that he acted in concert with Mueller, and acted as the "insider" at Chandler after Mueller had already resigned.   Specifically, during the afternoon of February 5, 2019, just before submitting his notice of resignation, he accessed and backed up all of his personal contacts, his Outlook Calendar, his expense reports, and virtually all of Chandler's customer files.   Among the most egregious was Gambill's access of the following Chandler files:

| 293 | 2072 | \\csica-server1\groups\Sales\Joe Mueller | | 2019-01-28 06:05:58 PM |
|-----|------|------------------------------------------|--|-------------------------|
| 2 | Record | Linked Path | | Target File Last Accessed |
| 66 | 3925 | E:\Work\Laptop Backup 2-05-2018\Forecast - New business | | 2019-02-05 03:37:05 PM |
| 68 | 3900 | E:\Work\Laptop Backup 2-05-2018\Collections | | 2019-02-05 03:36:38 PM |

39.     As with Mueller, the audit also showed that Gambill attached a number of

| 688 | 1592 | C:\Users\pgambi1\Documents\Forecast - New business\rptMonthlySalesVolume_12-31-2018.pdf | 2019-01-02 05:03:30 PM |
|-----|------|----------------------------------------------------------------------------------------|-------------------------|

removable data storage devices to his laptop between the date of his notice of resignation and the date he actually left Chandler.   These devices including the following:

|                    Name of Device                    |              Date and Time "Last Removed" from Laptop              |
|------------------------------------------------------|-------------------------------------------------------------------|
|              Seagate Backup Plus Drive               |                    February 8, 2019 at 6:02 p.m.                   |

Seagate BUP Slim BK SCSI Disk Device      February 11, 2019 at 8:25 p.m.

Seagate Portable USB Device      February 11, 2019 at 9:25 a.m.

40.     Chandler was also able to audit Gambill's Seagate Backup Plus Drive, which contains *approximately 50,000 files* of Chandler client information.  Of those, approximately 30,000 files were "accessed" by the Seagate Backup between January 31 and February 5, 2019, the days leading up to Gambill's resignation from Chandler.  By way of examples:[4]

Dave & Busters:

| | Name | Created | Modified | Record changed | Accessed |
|---|---|---|---|---|---|
| 11 | ~$D&B Master Sign Report 2-01-2019.xlsx | 2/5/2019 16:17 | 2/5/2019 14:00 | 2/5/2019 14:00 | 2/5/2019 16:17 |
| 34 | 0816769AR11 DAVE _and_ BUSTER'S Interior Sign Family [hgit | 2/5/2019 16:18 | 2/1/2019 16:37 | 2/1/2019 16:37 | 2/5/2019 16:18 |
| 35 | 2019-01-29 DB Fairfield Revised DD Packet_Interior Signage. | 2/5/2019 16:04 | 2/1/2019 16:23 | 2/1/2019 16:23 | 2/5/2019 16:04 |
| 36 | 0823199A DAVE & BUSTER'S Fairfield, CA Interior.pdf | 2/5/2019 16:04 | 2/1/2019 16:22 | 2/1/2019 16:22 | 2/5/2019 16:04 |
| 37 | D&B Master Sign Report 2-01-2019.pdf | 2/5/2019 16:16 | 2/1/2019 15:47 | 2/1/2019 15:47 | 2/5/2019 16:16 |

| | Name | Created | Modified | Record changed | Accessed |
|---|---|---|---|---|---|
| 15 | 0822756AR02 DAVE BUSTER'S Concord, CA Exterior.pdf | 2/5/2019 16:01 | 2/4/2019 18:54 | 2/4/2019 18:54 | 2/5/2019 16:01 |
| 16 | RE DAVE BUSTER'S - 0823031AR02 - CONCORD- INT.txt | 2/5/2019 16:01 | 2/4/2019 18:38 | 2/4/2019 18:38 | 2/5/2019 16:01 |
| 17 | RE DAVE BUSTERS - 0822756AR02 - CONCORD- EXT.txt | 2/5/2019 16:01 | 2/4/2019 18:38 | 2/4/2019 18:38 | 2/5/2019 16:01 |
| 18 | 820340 DB Thousand Oaks Closing Docs.pdf | 2/5/2019 16:14 | 2/4/2019 18:30 | 2/4/2019 18:30 | 2/5/2019 16:14 |
| 19 | 0821799AR05 DAVE&BUSTER'S Gloucester, NJ Interior.pdf | 2/5/2019 16:05 | 2/4/2019 18:03 | 2/4/2019 18:03 | 2/5/2019 16:05 |
| 20 | D&B Concord, CA Interior Proposal 823031.pdf | 2/5/2019 16:01 | 2/4/2019 17:38 | 2/4/2019 17:38 | 2/5/2019 16:01 |
| 21 | D&B Concord, CA Exterior Proposal 822756.pdf | 2/5/2019 16:01 | 2/4/2019 17:34 | 2/4/2019 17:34 | 2/5/2019 16:01 |
| 22 | D&B Master Sign Report 2-01-2019.xlsx | 2/5/2019 16:16 | 2/4/2019 13:58 | 2/4/2019 13:58 | 2/5/2019 16:16 |

Levi Strauss:

| | Name | Created | Modified | Record changed | Accessed |
|---|---|---|---|---|---|
| 5052 | C141237R4 Levis Sign Family.pdf | 1/31/2019 19:50 | 6/13/2018 15:25 | 1/31/2019 22:06 | 1/31/2019 19:50 |
| 5053 | C141237R4 Levis Sign Family.pdf | 1/31/2019 19:41 | 6/13/2018 15:25 | 1/31/2019 22:06 | 1/31/2019 19:41 |
| 5054 | C141237R4 Levis Sign Family.cdr | 1/31/2019 19:41 | 6/13/2018 15:25 | 1/31/2019 22:06 | 1/31/2019 19:41 |
| 5055 | C141237R4 Levis Sign Family.cdr | 1/31/2019 19:50 | 6/13/2018 15:25 | 1/31/2019 22:06 | 1/31/2019 19:50 |
| 16006 | LEVI'S Wall Sign Exhibit.cdr | 1/31/2019 19:37 | 4/6/2017 9:14 | 1/31/2019 22:06 | 1/31/2019 19:37 |
| 16007 | LEVI'S Wall Sign Exhibit.cdr | 1/31/2019 19:46 | 4/6/2017 9:14 | 1/31/2019 22:06 | 1/31/2019 19:46 |
| 19437 | 0817428A LEVI'S OUTLET Sign Family.cdr | 1/31/2019 19:36 | 9/15/2016 18:04 | 1/31/2019 22:06 | 1/31/2019 19:36 |
| 19438 | 0817428A LEVI'S OUTLET Sign Family.cdr | 1/31/2019 19:46 | 9/15/2016 18:04 | 1/31/2019 22:06 | 1/31/2019 19:46 |
| 19439 | 0817428A LEVI'S OUTLET Sign Family.pdf | 1/31/2019 19:46 | 9/15/2016 17:27 | 1/31/2019 22:06 | 1/31/2019 19:46 |
| 19440 | 0817428A LEVI'S OUTLET Sign Family.pdf | 1/31/2019 19:36 | 9/15/2016 17:27 | 1/31/2019 22:06 | 1/31/2019 19:36 |

Shake Shack:

---

[4] Gambill's Seagate Backup Plus Drive contains literally thousands of files copied directly from Chandler's network about dozens of Chandler customers.  The files listed in this Complaint are a fractional sample only.

| 1 | Name | | Created | Modified | Record changed | Accessed |
|---|---|---|---|---|---|---|
| 5404 | 0820610AR03 Shake Shack Family of Signs.pdf | | 1/31/2019 19:45 | 5/21/2018 13:20 | 1/31/2019 22:06 | 1/31/2019 19:45 |
| 5405 | 0820610AR03 Shake Shack Family of Signs.pdf | | 1/31/2019 19:40 | 5/21/2018 13:20 | 1/31/2019 22:06 | 1/31/2019 19:40 |
| 5726 | 0820610AR02 Shake Shack Family of Signs.cdr | | 1/31/2019 19:40 | 5/18/2018 16:06 | 1/31/2019 22:06 | 1/31/2019 19:40 |
| 5727 | 0820610AR02 Shake Shack Family of Signs.cdr | | 1/31/2019 19:45 | 5/18/2018 16:06 | 1/31/2019 22:06 | 1/31/2019 19:45 |
| 9359 | Shake Shack Family of Signs - Troy.pdf | | 1/31/2019 19:40 | 1/9/2018 16:45 | 1/31/2019 22:06 | 1/31/2019 19:40 |
| 9360 | Shake Shack Family of Signs - Troy.pdf | | 1/31/2019 19:45 | 1/9/2018 16:45 | 1/31/2019 22:06 | 1/31/2019 19:45 |

Lazy Dog:

| 1 | Name | Created | Modified | Record changed | Accessed |
|---|---|---|---|---|---|
| 3917 | 0815508AR05 LAZY DOG Standards.cdr | 1/31/2019 19:37 | 8/7/2018 14:16 | 1/31/2019 22:06 | 1/31/2019 19:37 |
| 3918 | 0815508AR05 LAZY DOG Standards.cdr | 1/31/2019 19:48 | 8/7/2018 14:16 | 1/31/2019 22:06 | 1/31/2019 19:48 |
| 3919 | 0815508AR04 LAZY DOG Standards.cdr | 1/31/2019 19:37 | 8/7/2018 14:15 | 1/31/2019 22:06 | 1/31/2019 19:37 |
| 3920 | 0815508AR04 LAZY DOG Standards.cdr | 1/31/2019 19:48 | 8/7/2018 14:15 | 1/31/2019 22:06 | 1/31/2019 19:48 |
| 10057 | 082XXXXA_EXHIBIT LAZY DOG BLADE SIGN.pdf | 1/31/2019 19:47 | 11/17/2017 16:44 | 1/31/2019 22:06 | 1/31/2019 19:47 |
| 10058 | 082XXXXA_EXHIBIT LAZY DOG BLADE SIGN.pdf | 1/31/2019 19:36 | 11/17/2017 16:44 | 1/31/2019 22:06 | 1/31/2019 19:36 |

BJs Restaurant:

| 1 | Name | Created | Modified | Record changed | Accessed | |
|---|---|---|---|---|---|---|
| 6495 | 0815503A BJ's STANDARDS.cdr | 1/31/2019 19:49 | 4/23/2018 18:45 | 1/31/2019 22:06 | 1/31/2019 19:49 | |
| 7017 | BJ's Thousand Oaks Shop Drawing 05615.pdf | 2/5/2019 16:13 | 4/3/2018 10:33 | 4/3/2018 10:33 | 2/5/2019 16:13 | |
| 7018 | BJ's from City 2415_001.pdf | 2/5/2019 16:13 | 4/3/2018 10:32 | 4/3/2018 10:32 | 2/5/2019 16:13 | |
| 18114 | 0817655AR2 LAZY DOG Logo Exhibit.cdr | 1/31/2019 19:37 | 12/12/2016 9:09 | 1/31/2019 22:06 | 1/31/2019 19:37 | |
| 18115 | 0817655AR2 LAZY DOG Logo Exhibit.cdr | 1/31/2019 19:48 | 12/12/2016 9:09 | 1/31/2019 22:06 | 1/31/2019 19:48 | |

41.     In furtherance of their efforts to wrongfully solicit current customers away from Chandler and to First & Main, Mueller and Gambill implemented a two-part scheme:

- Before their departure from Chandler, Mueller unilaterally increased prices for certain Chandler customers so that First & Main could offer lower prices and entice such customers to switch their business from Chandler to First & Main; and

- After their departure from Chandler, First & Main, through Mueller and Gambill, submitted proposals to Chandler's current customers using Chandler's confidential and proprietary information, including design drawings and standards, in order to avoid incurring the time and expense necessary to develop their own proposals, seamlessly transfer these customers over to their new business, and show such customers that they would be receiving the same product offered by Chandler but at a lower price.

42.     By way of example only, on January 15, 2019, prior to Mueller's resignation on February 1, 2019, Chandler received a request for proposal from Lazy Dog on five separate

projects.  On that same day, Mueller sent an email to another Chandler employee instructing the employee to "pad the manufacture and install costs by an additional 5-10%" when submitting Chandler's proposal.

43.     In response to Chandler's proposal, on January 30, 2019, Lazy Dog's Director of Design and Construction sent an email to Mueller informing Mueller that the increased pricing was "very concerning" to Lazy Dog.  On that same day, Mueller responded to Lazy Dog's Director of Design and Construction by requesting an in-person meeting for February 1, 2019 (the day of Mueller's resignation from Chandler) and sent the following message as part of the calendar invite:

> Wow! Your timing is amazing! I was just going to send you an urgent request to meet for about 10 mins on Fri A [sic] to review the same. I have some very simple solutions. In the meantime, just put the proposals on hold. Could you and Jackie meet with me at 10:30 or 11A this Fri. It will be a game changer, I promise! Please confirm.
> Thanks!

44.     After Mueller's resignation, on February 8, 2019, one of Lazy Dog's senior project managers sent Mueller a request for proposal to Mueller's First & Main email address, requesting proposals for Lazy Dog locations in Allen, Texas, Houston Cypress, Texas, and Corona, California.

45.     On February 12 and February 13, 2019, First & Main, through Mueller and Gambill, communicated with a third-party graphic designer Mueller enlisted to help prepare the proposals for the Lazy Dog projects.

46.     On February 12, 2019, Mueller instructed Gambill to inform the graphic designer that she could copy the applicable design drawings and standards from a Dropbox folder Mueller set up.

47.     On February 12 and February 13, 2019, the graphic designer sent Mueller and Gambill emails detailing her progress on the projects and attached screenshots of the design drawings for approval.

48.     Other than removing Chandler's logo at the top and replacing it with First & Main's logo, the design drawings attached to these emails, and which were to be used in First & Main's proposals to Lazy Dog, were identical to the confidential and proprietary design drawings created by Chandler.  In fact, the design drawings include a notation showing they were created on December 14, 2018, prior to First & Main's existence.  The drawings also include a Drawing Number that is unique and specific to Chandler design drawings.  Finally, the revision notes, included as part of the design drawings, prove that three different designers at Chandler worked on the design drawings.

49.     Through the wrongful acts detailed above, Defendants have violated contractual, fiduciary, statutory, and common law duties. Mueller and Gambill have used Chandler's confidential and proprietary information to call on and solicit several valuable customers of Chandler, including Dave & Busters, Levi Strauss, and Lazy Dog.

50.     Mueller and Gambill used Chandler's confidential and proprietary information in an attempt to divert business opportunities away from Chandler and to First & Main.

51.     As a direct result of Defendants' wrongful acts, Chandler has been significantly harmed.

52.     All conditions precedent to Chandler's recovery and Defendants' liability have occurred, have been performed, or have been waived.  FED. R. CIV. P. 9(c).

### COUNT ONE: BREACH OF CONTRACT – EMPLOYEE
### CONFIDENTIALITY AGREEMENTS
### (Against Mueller and Gambill)

53.     Mueller and Gambill each independently entered Employee Confidentiality Agreements with Chandler, which are valid and enforceable contracts.

54.     Chandler performed, tendered performance of, or was excused from performing its contractual obligations under the Employee Confidentiality Agreements.

55.     Pursuant to the terms of the Employee Confidentiality Agreements, Mueller and Gambill undertook certain obligations, including:

- agreeing to "forever keep secret and inviolate all proprietary information and customer information which shall come into his/her possession";

- agreeing to "not disclose the same to any other person or organization for so long as such proprietary information and customer information are not generally known by, or accessible to, the public"; and

- agreeing that they "will not use any proprietary information or customer information for his/her benefit, or directly or indirectly, for the benefit of any person or organization other than the Company and its affiliates."

56.     Mueller and Gambill materially breached the Employee Confidentiality Agreements by:

- using Chandler's confidential and proprietary information, including customer lists, cost margins and other pricing information, design drawings and standards, technical product information, marketing strategies, forecasts, and other business records, to solicit current customers away from Chandler and to First & Main, including Shake Shack, Dave and Busters, Lazy Dog, Levi Strauss, and BJ's Restaurant;

- using Chandler's confidential and proprietary information, including customer lists, cost margins and other pricing information, design drawings and standards, technical product information, marketing strategies, forecasts, and other business records, to divert business opportunities away from Chandler and to First & Main; and

- transferring significant amounts of Chandler's confidential and proprietary information from their work computers to personal external hard drives for

the purpose of using such information to benefit themselves personally and their new venture, First & Main.

57.     As a direct and proximate result of Mueller and Gambill's material breaches of the Employee Confidentiality Agreements, Chandler has sustained damages in an amount to be determined at trial.

## COUNT TWO: BREACH OF CONTRACT – COMPANY AGREEMENT
### (Against Mueller)

58.     The Company Agreement is a valid and enforceable contract by and between Mueller and Chandler.

59.     Chandler performed, tendered performance of, or was excused from performing its contractual obligations under the Company Agreement.

60.     Pursuant to Section 7.6 of the Company Agreement, Mueller agreed to hold in confidence and not disclose any of Chandler's confidential or trade secret information to any person other than another member of the company.

61.     Mueller materially breached Section 7.6 of the Company Agreement by:

- using Chandler's confidential and proprietary information, including customer lists, cost margins and other pricing information, design drawings and standards, technical product information, marketing strategies, forecasts, and other business records, to solicit current customers away from Chandler and to First & Main, including Shake Shack, Dave and Busters, Lazy Dog, Levi Strauss, and BJ's Restaurant;

- using Chandler's confidential and proprietary information, including customer lists, cost margins and other pricing information, design drawings and standards, technical product information, marketing strategies, forecasts, and other business records, to divert business opportunities away from Chandler and to First & Main; and

- transferring significant amounts of Chandler's confidential and proprietary information from his work computer to personal external hard drives for the purpose of using such information to benefit himself personally and his new venture, First & Main.

62.     Pursuant to Section 11.1(b) of the Company Agreement, Mueller agreed that, while a member of Chandler and for a period of two years after he ceased to be a member of Chandler, he would not, for any reason whatsoever:

    (1)    engage in any manner in any Company Business Opportunity [defined as any business opportunity within the scope of marketing, development, creation, or installation of custom signage solutions] other than through [Chandler],

    (2)    call upon or otherwise communicate with any person who is, at the time, or was at any time within twelve (12) months prior thereto an employee of [Chandler] for the purpose or with the intent of enticing such employee away from or out of the employ of [Chandler] or directly or indirectly hiring such person as an employee or independent contractor,

    (3)    seek to divert from doing or continuing to do business with [Chandler] or any of its subsidiaries, any supplier, customer or any other peron that has a business relationship with [Chandler] or with which [Chandler] is actively planning or pursuing a business relationship, or

    (4)    assist others in engaging in any of the foregoing actions described in clauses (1), (2), or (3) above.

63.     Mueller materially breached Section 11.1(b) of the Company Agreement by:

- forming First & Main, with the intent and purpose of directly competing with Chandler in the signage industry;

- soliciting Gambill and other Chandler employees to leave Chandler and join his new venture;

- soliciting current customers away from Chandler and to First & Main, including Shake Shack, Dave and Busters, Lazy Dog, Levi Strauss, and BJ's Restaurant;

- diverting business opportunities away from Chandler and to First & Main; and

- assisting Gambill in engaging in the activities described above.

64.     As a direct and proximate result of Mueller's material breaches of the Company Agreement, Chandler has sustained damages in an amount to be determined at trial.

### COUNT THREE: BREACH OF CONTRACT – COMPUTER
### SYSTEMS AGREEMENT
### (Against Gambill)

65.     The Computer Systems Agreement is a valid and enforceable contract by and between Gambill and Chandler.

66.     Chandler performed, tendered performance of, or was excused from performing its contractual obligations under the Computer Systems Agreement.

67.     Pursuant to the terms of the Computer Systems Agreement, Gambill agreed to only use Chandler's computing resources for business purposes and to refrain from engaging in several activities, including:

- soliciting non-company business for personal gain or profit;

- revealing or publicizing confidential or proprietary information which includes, but is not limited to: financial information, new business and product ideas, marketing plans or strategies, databases and the information contained therein, customer lists, technical product information, computer software source codes, computer/network access codes and business relationships; and

- wasting time on non-Company business.

68.     Gambill materially breached the Computer Systems Agreement by:

- using Chandler's confidential and proprietary information, including customer lists, cost margins and other pricing information, design drawings and standards, technical product information, marketing strategies, forecasts, and other business records, to solicit current customers away from Chandler and to First & Main, including Shake Shack, Dave and Busters, Lazy Dog, Levi Strauss, and BJ's Restaurant;

- using Chandler's confidential and proprietary information, including customer lists, cost margins and other pricing information, design drawings and standards, technical product information, marketing strategies, forecasts, and other business records, to divert business opportunities away from Chandler and to First & Main; and

- transferring significant amounts of Chandler's confidential and proprietary information from his work computer to personal external hard drives for the

purpose of using such information to benefit himself personally and his new venture, First & Main.

69.     As a direct and proximate result of Gambill's material breaches of the Computer Systems Agreement, Chandler has sustained damages in an amount to be determined at trial.

### COUNT FOUR: BREACH OF CONTRACT – PROMISSORY NOTE
### (Against Mueller)

70.     The Note is a valid and enforceable contract by and between Mueller and Chandler.

71.     Chandler is the owner and holder of the Note.

72.     Mueller signed the Note and agreed to pay any unpaid principal and all accrued and unpaid interest relating to the Note upon the termination of Mueller's employment with Chandler.

73.     As of February 8, 2019, $67,782.76 is due and owing on the Note, with interest accruing at a rate of 5%, compounded quarterly.

74.     Despite demand, Mueller has failed and refused, and continues to fail and refuse, to pay the amounts due and owing on the Note.

75.     As a direct and proximate result of Mueller's material breaches of the Note, Chandler has sustained damages in an amount to be determined at trial.

### COUNT FIVE: MISAPPROPRIATION OF TRADE SECRETS UNDER 18 U.S.C. § 1836
### (Against Mueller and Gambill)

76.     Chandler owns confidential and proprietary information which constitutes trade secrets, including customer lists, cost margins and other pricing information, design drawings and standards, technical product information, marketing strategies, forecasts, and other business records ("**Chandler's Property**"), which are used in, or intended for use in, interstate or foreign commerce.

77.     This information is not known outside Chandler, and Chandler has taken reasonable steps to keep such information secret.  This information gives Chandler a competitive advantage

over others in the signage industry, and it derives independent economic value from not being generally known to others who could obtain economic value from its disclosure.

78.     Mueller and Gambill misappropriated Chandler's trade secrets by improperly transferring large amounts of data from their work computers to personal external hard drives for the purpose of using such information to directly compete with Chandler.  These actions were in direct violation of confidential, contractual, and fiduciary obligations owing to Chandler.

79.     As a direct and proximate result of Mueller and Gambill's misappropriation of Chandler's trade secrets, Chandler has sustained damages in an amount to be determined at trial.

80.     Because Mueller and Gambill's misappropriation was willful and malicious, Chandler also seeks an award of exemplary damages.

## COUNT SIX: BREACH OF FIDUCIARY DUTY
### (Against Mueller)

81.     As a member and officer of Chandler, Mueller owes Chandler fiduciary duties, including duties of loyalty, due care, good faith, candor, and full disclosure.

82.     Mueller breached his fiduciary duties to Chandler by, among other things:

- forming First & Main, with the intent and purpose of directly competing with Chandler in the signage industry;

- soliciting Gambill and other Chandler employees to leave Chandler and join his new venture;

- soliciting current customers away from Chandler and to First & Main, including Shake Shack, Dave and Busters, Lazy Dog, Levi Strauss, and BJ's Restaurant;

- diverting business opportunities away from Chandler and to First & Main; and

- transferring significant amounts of Chandler's confidential and proprietary information from his work computer to personal external hard drives for the purpose of using such information to benefit himself personally and his new venture, First & Main.

83. As a direct and proximate result of Mueller's breaches of his fiduciary duties, Chandler has suffered, and continues to suffer, substantial injury, for which Chandler seeks damages in amount to be determined at trial.

84. Furthermore, because Mueller breached his fiduciary duties intentionally, willfully, wantonly, maliciously and without justification or excuse, Chandler is also entitled to recover punitive damages from Mueller in an amount to be determined at trial.

### COUNT SEVEN: TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS
### (Against all Defendants)

85. Chandler has valid and enforceable contracts with customers, including Shake Shack, Dave and Busters, Lazy Dog, Levi Strauss, and BJ's Restaurant.

86. Defendants willfully and intentionally interfered with these contracts by attempting to solicit these customers away from Chandler and to First & Main. These actions violated Mueller's obligations under Section 11.1(b) of the Company Agreement as well as Gambill's Computer Systems Agreement.

87. As a direct and proximate result of Defendants' tortious interference, Chandler has sustained damages in an amount to be determined at trial.

88. Because the tortious acts and conduct of Defendants were intentional, willful, wanton, malicious, and without justification or excuse, Chandler is also entitled to recover exemplary damages from Defendants in an amount to be determined at trial.

### COUNT EIGHT: UNJUST ENRICHMENT
### (Against all Defendants)

89. Defendants have wrongfully secured or passively received a benefit by using Chandler's confidential and proprietary information to solicit Chandler's current customers and divert business opportunities away from Chandler and to First & Main.

90.     Defendants secured this benefit by fraud or by taking undue advantage of Chandler, and it would be unconscionable to allow Defendants to retain ill-gotten benefits at the expense of Chandler.

91.      Accordingly, Chandler seeks disgorgement of ill-gotten gains that Defendants obtained as a result of these wrongful actions.

## COUNT NINE: CONSPIRACY
### (Against Mueller and Gambill)

92.     Mueller and Gambill conspired to use Chandler's confidential and proprietary information to start a competing business by taking Chandler's current employees and long-time clients.

93.     In furtherance of this agreement, Mueller and Gambill unlawfully (i) solicited Chandler's employees to join their new venture, (ii) solicited current customers, including Shake Shack, Dave and Busters, Lazy Dog, Levi Strauss, and BJ's Restaurant, to leave Chandler and begin doing business with First & Main, (iii) solicited business opportunities away from Chandler and toward First & Main, and (iv) transferred significant amounts of Chandler's Property from their work computers to personal external hard drives.

94.     As a proximate result of this conspiracy, Chandler has suffered, and will continue to suffer, injuries and will continue to suffer substantial and irreparable harm.  Mueller and Gambill's actions were done intentionally, knowingly, and maliciously, entitling Chandler to exemplary damages.

## REQUEST FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY AND PERMANENT INJUNCTION
### (Against all Defendants)

95.     Chandler requests the Court issue a temporary restraining order and preliminary and permanent injunction mandating Defendants immediately return Chandler's Property and

prohibiting Defendants from using or accessing Chandler's Property to (i) solicit other Chandler employees to leave Chandler and join First & Main, (ii) solicit current customers away from Chandler and to First & Main, or (iii) divert business opportunities away from Chandler and to First & Main.

96.     Chandler will suffer immediate and irreparable injury without adequate remedy at law if the above temporary restraining order and preliminary injunction is not issued.  Additionally, as part of Section 7.6 of the Company Agreement, Mueller agreed that a breach of that provision may cause irreparable injury to Chandler for which monetary damages (or other remedy at law) are inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of Mueller to comply with such agreement, and (ii) the uniqueness of Chandler's and each member's business and the confidential nature of the information described in Section 7.6 of the Company Agreement.  Mueller also agreed that Section 7.6 may be enforced by specific performance.

97.     For the reasons stated above, Chandler is likely to succeed on the merits of its lawsuit against Defendants.  Chandler would suffer a substantial injury if the injunctive relief sought herein is denied, whereas the Defendants would suffer minimally if the injunctive relief is granted.  The injunctive relief sought herein would not adversely affect public policy or the public interest.

98.     Although not required,[5] Chandler is willing to post a reasonable bond for the relief sought.  In support of this application for a temporary restraining order and preliminary and

---

[5] As part of Section 11.1(b) of the Company Agreement, Mueller acknowledged and agreed that (i) damages at law would be an inadequate remedy for the breach of Section 11.1(b), (ii) Chandler may obtain temporary and permanent injunctive relief restraining Mueller from such breach, (iii) a temporary injunction may be granted immediately upon the commencement of such suit, and (iv) any requirement for posting bond to obtain injunctive relief was expressly waived.

permanent injunction, Chandler offers the affidavit of Gary Stevens, which is attached as Exhibit A and fully incorporated herein by reference.

## ATTORNEYS' FEES

99.     Chandler is entitled to reimbursement of its reasonable attorneys' fees incurred as a result of bringing this action pursuant to 18 U.S.C. § 1836(b)(3)(D), Section 38.001 of the Texas Civil Practice and Remedies Code, and the terms of the Company Agreement and the Note.

## JURY DEMAND

100.     Chandler requests a trial by jury of all issues so triable.

## PRAYER

**WHEREFORE,** Chandler requests that Defendants be summoned to appear and answer herein, that the Court issue a temporary restraining order without notice and a preliminary injunction as set forth herein, and that, on final trial, the Court enter judgment for Chandler and against Defendants and award the following relief:

(i)     actual, compensatory, consequential, exemplary, and punitive damages;

(ii)     disgorgement of the ill-gotten gains that Defendants obtained as a result of Defendant's unlawful conduct;

(iii)     reasonable attorneys' fees and costs of court;

(iv)     permanent injunctive relief;

(v)     pre-judgment and post-judgment interest at the highest lawful rates; and

(vi)     such additional relief, at law and in equity, to which Chandler may be justly entitled.

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By: _/s/ Beverly A. Whitley_
    Beverly A. Whitley
    Texas Bar No. 21374500
    bwhitley@bellnunnally.com
    Daniel P. Elms
    Texas Bar No. 24002049
    delms@bellnunnally.com
    R. Kent Love
    Texas Bar No. 24102114
    klove@bellnunnally.com
    2323 Ross Avenue, Suite 1900
    Dallas, Texas 75201
    214-740-1400 Telephone
    214-740-1499 Facsimile

    **ATTORNEYS FOR PLAINTIFFS**

# Exhibit A

## AFFIDAVIT OF GARY STEVENS

**STATE OF TEXAS** §

§

**COUNTY OF TARRANT** §

**BEFORE ME,** the undersigned authority, on this day personally appeared Gary Stevens, who is personally known to me, and first being duly sworn, according to law, upon his oath deposed and said:

1.      "My name is Gary Stevens.  I am over twenty-one years of age and fully competent to give this Affidavit.  I have personal knowledge of the facts stated in this Affidavit and affirm that the facts contained herein are true and correct.

2.      "I am the chief executive officer of Chandler Signs Holdings, LLC.

3.      "True and correct copies of the Company Agreement and the Subscription and Contribution Agreement which form, in part, the basis of Chandler's lawsuit against Mueller are attached hereto as Exhibits 1 and 2, respectively.

4.      "On or around May 28, 1997, Chandler hired Mueller as a salesperson, with the duties of selling additional services to Chandler's national accounts.  Over the years, Mueller was promoted from his initial role with the company, becoming Chandler's Director of Business Development and eventually Chandler's Vice President.  As part of his position within the company, Mueller was entrusted with access to Chandler's confidential and proprietary information.

5.      "As a condition of Mueller's employment with Chandler, Mueller agreed to be bound by various policies and agreements, including a confidentiality policy.  A true and correct copy of the Employee Confidentiality Agreement is attached hereto as Exhibit 3 and fully incorporated herein by reference.

6.      "On May 29, 2012, Mueller also agreed in writing to be bound by the policies contained in Chandler's company policy handbook.  Chandler's Non-Disclosure Policy prohibited Mueller from improperly using or disclosing Chandler's trade secrets or other confidential business information, including, *inter alia*, customer lists, customer preferences, financial information, marketing strategies, pending projects and proposals, proprietary production processes, open jobs, subcontractor information, vendors, and suppliers.

7.      "Under Chandler's Internet Usage Policy, Mueller agreed to refrain from (i) using Chandler's time and resources for personal gain, and (ii) sending or posting confidential material, trade secrets, or proprietary information outside of the organization.

8.      "Finally, under Chandler's Property Return Policy, Mueller agreed to return all Chandler property on or before his last day of work, including computers, cell phones, client lists, and other materials.

9.      "These policies and agreements are part of the methods Chandler uses to ensure the continued confidentiality and secrecy of its business information.

10.      "On December 22, 2016, Chandler and Mueller entered an amendment to the Company Agreement wherein Mueller agreed to be bound by all of the terms and conditions set forth in the Company Agreement.  A true and correct copy of this amendment is attached hereto as Exhibit 4 and fully incorporated herein by reference.

11.      "Mueller and Chandler also entered a side agreement on December 22, 2016, whereby Mueller could be relieved of his obligations under Section 11.1(b) if, upon termination of his employment, Mueller irrevocably relinquished any and all rights to receive, review or have access to Chandler's business records, files, financials, and any other internal information and data of Chandler.  Mueller did not relinquish access to Chandler's confidential and proprietary

information upon his termination.   Rather, upon his departure from Chandler, Mueller took Chandler's confidential, proprietary, and trade secret information and used the same to compete against Chandler.

12.   "On or around May 19, 2008, Chandler hired Gambill as a project manager to oversee all phases of the sales process for certain national accounts.  Like Mueller, Gambill was entrusted with Chandler's confidential and proprietary information and, in exchange, agreed to be bound by various policies and agreements.

13.   "As a condition of Gambill's employment with Chandler, on February 10, 2009, Gambill entered the Employee Confidentiality Agreement with Chandler.  On May 25, 2012, Gambill also agreed to be bound by the terms of Chandler's Non-Disclosure Policy, Internet Usage Policy, and Property Return Policy.

14.   "In addition, Gambill entered a separate computing systems and internet use policy May 19, 2008, whereby Gambill agreed to only use Chandler's computing resources for business purposes and to refrain from engaging in certain activities.   A true and correct copy of the Computer Systems Agreement is attached hereto as Exhibit 5 and fully incorporated herein by reference.

15.   "Chandler issued company laptop computers to both Mueller and Gambill for use on business matters during their employment at Chandler.  Both Mueller and Gambill took those laptop computers with them upon their departures from Chandler, and returned them only after written demand from Chandler's counsel.

16.   "After receiving its computers from Mueller and Gambill, Chandler authorized a professional forensic audit of the various activities on those machines.  The statements contained in paragraphs 32-40 of the complaint concerning the results of the audit are true and correct.

**Affidavit of Gary Stevens—Page 3**

17.     "On January 15, 2019, prior to Mueller's resignation on February 1, 2019, Chandler received a request for proposal from Lazy Dog on five separate projects.  On that same day, Mueller sent an email to another Chandler employee instructing the employee to "pad the manufacture and install costs by an additional 5-10%" when submitting Chandler's proposal.

18.     "In response to Chandler's proposal, on January 30, 2019, Lazy Dog's Director of Design and Construction sent an email to Mueller informing Mueller that the increased pricing was "very concerning" to Lazy Dog.  On that same day, Mueller responded to Lazy Dog's Director of Design and Construction by requesting an in-person meeting for February 1, 2019 (the day of Mueller's resignation from Chandler) and sent the following message as part of the calendar invite:

> Wow! Your timing is amazing! I was just going to send you an urgent request to meet for about 10 mins on Fri A [sic] to review the same. I have some very simple solutions. In the meantime, just put the proposals on hold. Could you and Jackie meet with me at 10:30 or 11A this Fri. It will be a game changer, I promise! Please confirm.
> Thanks!

19.     "After Mueller's resignation, on February 8, 2019, one of Lazy Dog's senior project managers sent Mueller a request for proposal to Mueller's First & Main email address, requesting proposals for Lazy Dog locations in Allen, Texas, Houston Cypress, Texas, and Corona, California.

20.     "On February 12 and February 13, 2019, First & Main, through Mueller and Gambill, communicated with a third-party graphic designer Mueller enlisted to help prepare the proposals for the Lazy Dog projects.

21.     "On February 12, 2019, Mueller instructed Gambill to inform the graphic designer that she could copy the applicable design drawings and standards from a Dropbox folder Mueller set up.

22.    "On February 12 and February 13, 2019, the graphic designer sent Mueller and Gambill emails detailing her progress on the projects and attached screenshots of the design drawings for approval.

23.    "Other than removing Chandler's logo at the top and replacing it with First & Main's logo, the design drawings attached to these emails, and which were to be used in First & Main's proposals to Lazy Dog, were identical to the confidential and proprietary design drawings created by Chandler.  The design drawings include a notation showing they were created on December 14, 2018, prior to First & Main's existence.  The drawings also include a Drawing Number that is unique and specific to Chandler design drawings.  The revision notes, included as part of the design drawings, prove that three different designers at Chandler worked on the design drawings.

24.    "As a direct result of Defendants' acts described above, Chandler is in significant immediate danger of suffering irreparable harm because ongoing client relationships, once lost, cannot be readily recaptured and because it is difficult if not impossible to quantify the damages from the acts described above.

25.    "Chandler's confidential and proprietary information is not known outside Chandler, and Chandler has taken reasonable steps to keep such information secret.  This information gives Chandler a competitive advantage over others in the signage industry who do not have access to it.

26.    "With each day that passes, Defendants have the ability to continue to improperly use Chandler's confidential and proprietary information to acquire Chandler clients and divert business opportunities away from Chandler and to First & Main.  Chandler would suffer a substantial injury if the injunctive relief sought herein is denied.

27.     "Although a bond is not required pursuant to the terms of the Company Agreement, if the Court finds that a bond is appropriate in this case, Chandler is willing to post a reasonable bond for the temporary restraining order and preliminary injunction sought."

**FURTHER AFFIANT SAYETH NAUGHT.**

Gary Stevens

**SUBSCRIBED AND SWORN TO BEFORE ME** this 1st day of March, 2019.

Notary Public, State of Texas

10625.00020/4375049_1.docx

**Affidavit of Gary Stevens—Page 6**

# Exhibit 1

*Execution Version*

AMENDED AND RESTATED

LIMITED LIABILITY COMPANY AGREEMENT

OF

CHANDLER SIGNS HOLDINGS, LLC

A DELAWARE LIMITED LIABILITY COMPANY

JANUARY 4, 2016

**THE UNITS (AS DEFINED HEREIN) GOVERNED BY THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN AND IN THE OTHER INVESTMENT DOCUMENTS (AS DEFINED HEREIN).**

# TABLE OF CONTENTS

**ARTICLE 1.    DEFINITIONS AND CONSTRUCTION** ....................................................1

    *1.1    Definitions*..............................................................................................................*1*

    *1.2    Construction*..........................................................................................................*2*

**ARTICLE 2.    ORGANIZATION** ...........................................................................................2

    *2.1    Formation; Continuation*.....................................................................................*2*

    *2.2    Name* ....................................................................................................................*2*

    *2.3    Offices* ..................................................................................................................*2*

    *2.4    Purposes*...............................................................................................................*2*

    *2.5    Foreign Qualification* ..........................................................................................*2*

    *2.6    Term* ....................................................................................................................*3*

    *2.7    No State Law Partnership* .....................................................................................*3*

    *2.8    Title to Company Assets*........................................................................................*3*

**ARTICLE 3.    REPRESENTATIONS, WARRANTIES AND COVENANTS** ...................3

    *3.1    Representations, Warranties and Covenants of Each Member* ...............................*3*

**ARTICLE 4.    MEMBERS; UNITS** .......................................................................................4

    *4.1    Members*................................................................................................................*4*

    *4.2    Units*.....................................................................................................................*5*

    *4.3    Preemptive Rights*................................................................................................*7*

    *4.4    Transfers of Units* ................................................................................................*8*

    *4.5    Additional Terms Relating to Members* ...............................................................*11*

**ARTICLE 5.    CAPITAL CONTRIBUTIONS**......................................................................13

    *5.1    Effective Date Capital Contributions*...................................................................*13*

    *5.2    Subsequent Capital Contributions* .......................................................................*13*

    *5.3    Return of Capital Contributions* ..........................................................................*13*

    *5.4    Advances by Members*...........................................................................................*14*

**ARTICLE 6.    DISTRIBUTIONS; ALLOCATIONS** ...........................................................14

    *6.1    Operating Distributions*........................................................................................*14*

    *6.2    Liquidity Event Distributions*................................................................................*15*

    *6.3    Tax Distributions* .................................................................................................*15*

    *6.4    Miscellaneous Matters Regarding Distributions*...................................................*16*

    *6.5    Capital Accounts*..................................................................................................*16*

    *6.6    Allocations of Profits and Losses*..........................................................................*17*

    *6.7    Special Allocations*...............................................................................................*17*

i

**ARTICLE 7.     MANAGEMENT** ...............................................................**20**

    *7.1     Management by Directors*.................................................................20
    *7.2     Board of Directors*...........................................................................21
    *7.3     Meetings of the Members* ..............................................................25
    *7.4     Provisions Applicable to All Meetings*...........................................26
    *7.5     Officers*...........................................................................................27
    *7.6     Confidentiality*................................................................................29

**ARTICLE 8.     EXCULPATION AND INDEMNIFICATION** ...........................................**30**

    *8.1     Exculpation* ....................................................................................30
    *8.2     Indemnification* ..............................................................................31
    *8.3     Advance Payment* ...........................................................................32
    *8.4     Indemnification of Employees and Agents*.....................................32
    *8.5     Appearance as a Witness* ...............................................................33
    *8.6     Nonexclusivity of Rights*.................................................................33
    *8.7     Insurance*.........................................................................................33

**ARTICLE 9.     TAXES; REPORTS; BANK ACCOUNTS** ....................................**33**

    *9.1     Tax Returns* .....................................................................................33
    *9.2     Tax Partnership* ..............................................................................34
    *9.3     Tax Elections* ..................................................................................34
    *9.4     Tax Matters Member*.......................................................................34
    *9.5     Class B Units Issued in Exchange for the Performance of Services*......35
    *9.6     Financial Reports*............................................................................36
    *9.7     Bank Accounts*.................................................................................36

**ARTICLE 10.     DISSOLUTION, WINDING-UP AND TERMINATION**............................**36**

    *10.1     Dissolution* ...................................................................................36
    *10.2     Winding-Up and Termination* .......................................................37
    *10.3     Deficit Capital Accounts*...............................................................38
    *10.4     Certificate of Cancellation* ...........................................................38

**ARTICLE 11.     RIGHT OF COMPETITION**.................................................................**38**

    *11.1     Right of Competition* .....................................................................38

**ARTICLE 12.     GENERAL PROVISIONS** .................................................................**40**

    *12.1     Books*..............................................................................................40
    *12.2     Offset*..............................................................................................40
    *12.3     Notices*............................................................................................40
    *12.4     Entire Agreement; Supersedure* .....................................................40
    *12.5     Effect of Waiver or Consent* ..........................................................40
    *12.6     Amendment or Restatement*............................................................41
    *12.7     Binding Effect*................................................................................41

*12.8*   *Governing Law; Submission to Jurisdiction*........................................................*41*
*12.9*   *Severability* ..................................................................................................*42*
*12.10*  *Further Assurances* .......................................................................................*42*
*12.11*  *Waiver of Certain Rights* ...............................................................................*42*
*12.12*  *Directly or Indirectly* ....................................................................................*42*
*12.13*  *Counterparts* ................................................................................................*42*
*12.14*  *Spouse Acknowledgement* ..............................................................................*42*

SCHEDULES:

    SCHEDULE 1        MEMBERS AND CAPITAL COMMITMENTS

EXHIBITS:

    EXHIBIT A        DEFINED TERMS

ANNEXES:

    ANNEX A        TRANSFEREE TAX REPRESENTATIONS

# GLOSSARY OF DEFINED TERMS

The location of the definition of each capitalized term used in this Agreement is set forth in this Glossary

Act Exhibit A
Adjusted Capital Account ................... Exhibit A
Affiliate ................................................. Exhibit A
Agreement ........................................... Exhibit A
Allocation Year .................................... Exhibit A
Annual Tax Distribution Date .................. 6.3(a)
authorized person ........................................7.5
Available Cash ........................................ 6.3(a)
Blocker Company ................................ Exhibit A
Blocker Company Interests ..........................4.8
Blocker Company Investors ..........................4.8
Board ...................................................... 7.1(a)
Book Value .......................................... Exhibit A
Business Day ........................................ Exhibit A
Business Line ....................................... Exhibit A
Capital Account ................................... Exhibit A
Capital Call Amount ....................................5.2
Capital Call Notice ......................................5.2
Capital Contribution ............................ Exhibit A
Capital Southwest ................................ Exhibit A
Capital Stock ........................................ Exhibit A
Certificate ................................................Recitals
Change of Control ........................................4.4
Change of Control Affiliate ..........................4.4
Class A Member ................................... Exhibit A
Class A Units ..................................... 4.2(d)(i)
Class A&C Percentage ......................... Exhibit A
Class B Member ................................... Exhibit A
Class B Participation Threshold ........... Exhibit A
Class B Percentage ............................... Exhibit A
Class B Units ...................................... 4.2(d)(ii)
Class C Member ................................... Exhibit A
Class C Participation Threshold ........... Exhibit A
Class C Units ...................................... 4.2(d)(iii)
Code ..................................................... Exhibit A
Company ....................... Introductory Paragraph
Company Business Opportunity .......... Exhibit A
Company Minimum Gain ................... Exhibit A
Company Nonrecourse Liabilities ....... Exhibit A
Company Sale ........................................4.4(a)(i)
Competing Member ................................ 11.1(b)
Control ................................................. Exhibit A
Controlled by ....................................... Exhibit A
Controlling ........................................... Exhibit A
Conversion Transaction ....................... Exhibit A

CP Investments .................................... Exhibit A
Cumulative Available Funds ........................ 6.1
Depreciation ......................................... Exhibit A
Directors ................................................... 7.1(a)
Dissolution Event ...................................10.1(a)
Dos Rios ............................................... Exhibit A
Dos Rios Directors ....................................7.2(a)
Dos Rios Partnerships ......................... Exhibit A
Dos Rios-A .......................................... Exhibit A
Effective Date ............... Introductory Paragraph
Electing Member .........................................5.2
Election Period ....................................... 4.3(b)
Election Statement ......................................5.2
Eligible Investor ................................. Exhibit A
Entity ................................................... Exhibit A
Exempted Units .................................... Exhibit A
Family Member .................................... Exhibit A
First Notice ............................................ 4.3(b)
Fiscal Year ........................................... Exhibit A
Fourth IRR Threshold ......................... Exhibit A
Fund Indemnitors ...................................... 8.2(b)
Incentive Unit Agreement ................... Exhibit A
including ...................................................... 1.2
Indemnitee .................................................8.2(a)
Initial IRR Threshold .......................... Exhibit A
Institutional Minority Investors .......... Exhibit A
Internal Restructure ............................. Exhibit A
Investment Documents ........................ Exhibit A
Investor Group .......................................11.1(a)
Investor Group Member ..........................11.1(a)
IPO .............................................................. 4.6
IRR ....................................................... Exhibit A
IRR Threshold ..................................... Exhibit A
Law ....................................................... Exhibit A
Liquidity Event .................................... Exhibit A
Losses ................................................... Exhibit A
Main Street .......................................... Exhibit A
Management Director ................................7.2(a)
Member ................................................ Exhibit A
Member Minimum Gain ...................... Exhibit A
Member Nonrecourse Debt .................. Exhibit A
Member Nonrecourse Debt Minimum Gain
................................................ Exhibit A
Member Nonrecourse Deduction ......... Exhibit A
Membership Interest ............................ Exhibit A

Minimum Gain......................................Exhibit A
Minority Members ................................4.4(a)(i)
New Units ...............................................4.3(a)
Non-offset Tax Distributions ..............Exhibit A
Nonrecourse Deductions......................Exhibit A
Observer...................................................7.2(b)
Observers .................................................7.2(b)
Officers .........................................................7.5
Original Agreement ...............................Recitals
Over-Allotment Amount ...........................4.3(b)
Participating Class B Unit....................Exhibit A
Percentage Interest ...............................Exhibit A
Permitted Transfer ...............................Exhibit A
Permitted Transferee ...........................Exhibit A
Person.....................................................Exhibit A
Pro Rata Share.......................................Exhibit A
Proceeding................................................ 8.2(a)
Profits.....................................................Exhibit A
Proposed Purchaser..................................4.3(a)
Proposed Sale....................................... 4.4(a)(iii)
Purchase Agreement ...........................Exhibit A
Quabbin..................................................Exhibit A
Quabbin Affiliate ..................................Exhibit A
Quabbin Directors....................................7.2(a)
Regulatory Allocations ............................6.7(e)

Requesting Purchaser ............................... 4.3(b)
Requisite Consent ................................Exhibit A
Resulting Corporation..........................Exhibit A
Secondary IRR Threshold....................Exhibit A
Securities ...............................................Exhibit A
Securities Act........................................Exhibit A
Selling Member Group ..........................4.4(a)(i)
Subordinated Note Purchase Agreement .Exhibit A
Subsidiary .............................................Exhibit A
Tag Overallotment Notice ...................4.4(a)(ii)
Tag-Along Members............................4.4(a)(ii)
Tax Distributions .......................................6.3(a)
Tax Matters Member ................................9.4(a)
Third IRR Threshold ...........................Exhibit A
Transfer..................................................Exhibit A
Transferred.............................................Exhibit A
Transferring ...........................................Exhibit A
Transferring Members ........................4.4(a)(ii)
Treasury Regulations...........................Exhibit A
Under Common Control with ............. Exhibit A
Unit...........................................................4.2(a)
Unit Schedule ...........................................4.2(b)
Unrecovered Capital ............................Exhibit A

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**CHANDLER SIGNS HOLDINGS, LLC**

*A Delaware Limited Liability Company*

This **AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** of Chandler Signs Holdings, LLC, a Delaware limited liability company (the "***Company***"), dated as of January 4, 2016 and effective as of January 1, 2016 (the "***Effective Date***"), is adopted, executed and agreed to, for good and valuable consideration, by the Members (as defined below).

## RECITALS

**WHEREAS**, the Company was formed as a Delaware limited liability company by the filing, on August 25, 2015, of a certificate of formation under and pursuant to the Act (such certificate of formation, as amended or restated from time to time in accordance with this Agreement, is referred to herein as the "***Certificate***") and the execution of the Limited Liability Company Agreement of the Company, dated effective as of August 25, 2015 (the "***Original Agreement***") by Dos Rios (as defined below) as the sole initial member;

**WHEREAS**, in order to reflect the capitalization of the Company in accordance with the terms of the Purchase Agreement, the admission of certain new Members to the Company and the issuance of Units to such Members, the parties hereto desire to amend and restate the Original Agreement in its entirety on the terms herein provided; and

**WHEREAS**, pursuant to and in accordance with this Agreement, the Class A Units (as defined below) shall be available for issuance in exchange for certain Capital Contributions (as defined below); the Class B Units (as defined below) shall be designated as profits interests and available for issuance to key members of management to provide incentives to achieve the Company's operating and financial objectives; and the Class C Units (as defined below) shall be designated as profits interests and available for issuance to Quabbin and its Affiliates, which originated and helped execute this transaction and will provide management services to the Company.

**NOW**, **THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members and the Company hereby agree as follows:

## ARTICLE 1.
## DEFINITIONS AND CONSTRUCTION

***1.1*** ***Definitions***.  In addition to terms defined in the body of this Agreement, capitalized terms used herein shall have the meanings given to them in Exhibit A.  The Glossary, which follows the Table of Contents, sets forth the location in this Agreement of the definition for each capitalized term used herein.

**1.2** **Construction**.  Unless the context requires otherwise: (a) the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine, and neuter; (b) references to Articles and Sections refer to articles and sections of this Agreement; (c) references to Exhibits and Schedules are to exhibits and schedules attached to this Agreement, each of which is made a part of this Agreement for all purposes; (d) references to money refer to legal currency of the United States of America; and (e) the word "*including*" means "including without limitation."

## ARTICLE 2.
## ORGANIZATION

**2.1** **Formation; Continuation**.  The Company was formed as a limited liability company under the Act pursuant to the filing of the Certificate.  The Members confirm that Jennie Simmons is an "authorized person" within the meaning of Section 18-201 of the Act for the limited prior purpose of filing the Certificate.  The Company is hereby continued pursuant to this Agreement and the Act.

**2.2** **Name**.  The name of the Company is "*Chandler Signs Holdings, LLC*" and all Company business must be conducted in that name or such other names that comply with the Law and as the Board may select.

**2.3** **Offices**.  The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate in the manner provided by Law.  The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate in the manner provided by Law.  The principal office of the Company in the United States shall be at 205 Wild Basin Road S., Building 3, Suite 100, Austin, TX 78746 or such other place as the Board may designate, which need not be in the State of Delaware.  The Company may have such other offices as the Board may designate from time to time.

**2.4** **Purposes**.  The purposes of the Company are to engage in any business or activity for which a limited liability company may be organized and that is not forbidden by the Law of the jurisdiction in which the Company engages in that business or activity.

**2.5** **Foreign Qualification**.  Prior to the Company's conducting business in any jurisdiction other than Delaware, the Company shall satisfy all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction.  At the request of the Company, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business, and each Member hereby grants each Officer of the Company a limited power-of-attorney to execute any such documents on its behalf.

2

**2.6     Term**.   The existence of the Company commenced upon the filing of the Certificate, and the Company shall have a perpetual existence unless and until dissolved and terminated in accordance with Article 10.

**2.7     No State Law Partnership**.   The Members do not intend for the Company to be a partnership (including a limited partnership) or joint venture, and no Member shall be a partner or joint venturer of any other Member by reason of this Agreement or any Incentive Unit Agreement, in each case, for any purpose other than federal and state tax purposes, and this Agreement shall not be construed to suggest otherwise.

**2.8     Title to Company Assets**.   Title to Company assets, whether real, personal or mixed and whether tangible or intangible, shall be deemed to be owned by the Company as an entity, and no Member, Director or Officer, individually or collectively, shall have any ownership interest in the Company's assets or any portion thereof.

### ARTICLE 3.
### REPRESENTATIONS, WARRANTIES AND COVENANTS

**3.1     Representations, Warranties and Covenants of Each Member**.   Each Member (as to itself only) represents and warrants to the Company and the other Members as follows:

(a)     Organization; Existence.   Such Member, if such Member is an Entity, is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation.

(b)     Power; Qualification.   Such Member has full power and authority to execute and deliver this Agreement and the other Investment Documents to which it is a party and to perform its obligations hereunder and thereunder, and the execution and delivery by such Member of this Agreement and the other Investment Documents to which it is a party, and the performance of all obligations hereunder and thereunder have been duly authorized by all necessary action.

(c)     Authority; Enforceability.   This Agreement and each other Investment Document to which such Member is a party has been duly and validly executed and delivered by such Member and, assuming due execution and delivery of this Agreement by the other Parties hereto, constitutes the binding obligation of such Member enforceable against such Member in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar Laws affecting creditors' rights generally, and by principles of equity.

(d)     No Conflicts.   The execution, delivery, and performance by such Member of this Agreement and the other Investment Documents to which such Member is a party will not, with or without the giving of notice or the lapse of time, or both, (i) violate any provision of Law to which such Member is subject, (ii) violate any order, judgment, or decree applicable to such Member or (iii) conflict with, or result in a breach or default under, any term or condition of its certificate of incorporation or by-laws, certificate of limited partnership or partnership agreement, certificate of formation or limited liability company agreement, or trust agreement as applicable, or any material agreement or instrument to which such Member is a party.

(e)  <u>Investment Matters</u>.  Such Member is acquiring Units in the Company for its own account, for investment purposes, and not with a view to or in connection with the resale or other distribution of such Units.  Such Member is an "Accredited Investor" as such term is defined in Rule 502(a) of Regulation D of the Securities Act, or such Member (a) has adequate means of providing for current needs and personal contingencies and has no need to sell the Units in the foreseeable future (that is, at the time of this Agreement, such Member can afford to hold the Units for an indefinite period of time), (b) has sufficient knowledge and experience in business and financial matters to be able to evaluate the risks and merits of an investment in the Units, and (c) has the capacity to protect his, her or its own interests.  Such Member is a member of the Company's management or is otherwise familiar with the Company, its financial condition and operations.  Each such Member understands that he, she or it must bear the economic risk of this investment indefinitely unless the Units issued to such Member are registered pursuant to the Securities Act, or an exemption from registration is available.  Each such Member understands that the Company has no present intention of registering the Units issued to such Member.  Each such Member also understands that there is no assurance that any exemption from registration under the Securities Act will be available and that, even if available, such exemption may not allow such Member to transfer all or any portion of the Units issued to such Member under the circumstances, in the amounts or at the times that such Member might propose.

(f)  <u>No Brokers</u>.  Such Member has not dealt with any agent or broker in connection with the transactions contemplated by this Agreement and no agent, broker, or other Person acting pursuant to express or implied authority of such Member is entitled to a commission or finder's fee, or will be entitled to recover on any claim against any Member or the Company for a commission or finder's fee, in connection with the transactions contemplated by this Agreement and the Investment Documents.

(g)  <u>Units Subject to Agreements</u>.  Such Member understands that the Units shall, upon their issuance by the Company, without any further action on the part of the Company or such Person, be subject to the terms, conditions and restrictions contained in this Agreement and, with respect to any Class B Units held thereby, the Incentive Unit Agreement governing such Class B Units.

**ARTICLE 4.**
**MEMBERS; UNITS**

**_4.1  Members_**.  (a)  <u>Existing Members</u>.  Each of the Persons listed on <u>Schedule 1</u> hereto is hereby admitted as a Member as of the Effective Date.  The Company will maintain a customary unit ledger accurately reflecting, to the knowledge of the Company, the record holders of all Units, the number and class or series of Units held thereby and the Capital Contributions made by each Member.

(b)  <u>Additional Members</u>.  In addition to the Persons listed on <u>Schedule 1</u>, the following Persons shall be deemed to be Members and shall be admitted as Members without any further action by the Company, the Board or any Member: (i) any Person to whom Units are Transferred by a Member so long as such Transfer is made in compliance with this Agreement and any applicable Incentive Unit Agreement and (ii) any Person to whom the Company issues Units after the Effective Date so long as the Board designates such Person as a "Member," which

4

designation must be evidenced by an adoption of this Agreement by such Person and the Company.

(c)    Cessation of Members.  Any Person admitted or deemed admitted as a Member pursuant to Section 4.1(a) or Section 4.1(b) shall cease to have the rights of a Member under this Agreement at such time as such Person no longer owns, beneficially and of record, any Units, but such Person shall remain bound by the terms of Article 12 beginning with Section 12.2, and by the terms of any applicable Incentive Unit Agreement.

4.2    Units.  (a)  Units; Class and Series.  Membership Interests of the Company shall be issued in unit increments (each, a "*Unit*").  The Company may issue fractional Units.  Subject to satisfying the Class A Members' pre-emptive rights set forth in Section 4.3, and the other terms and conditions of this Agreement, the Company may issue from time to time such number of Class A Units, Class B Units and Class C Units as the Board reasonably determines to be in the best interests of the Company, with such designations, preferences and rights as are set forth in Section 4.2(d) or, with respect to additional series of Class A Units, otherwise as shall be fixed by the Board.  The Board, in so fixing the designations, rights and preferences of any series of Class A Units, may specify such Units to be senior, junior, or *pari passu* with any Units then outstanding or to be issued thereafter.  Subject to Section 12.6, the Board is hereby authorized to take all actions that it deems necessary or appropriate in connection with the (i) issuance of Class A Units, Class B Units and Class C Units, and (ii) the designation, creation and issuance of additional series of Class A Units and the fixing of the designations, preferences and rights applicable thereto including recommending to the Members an amendment to this Agreement to properly reflect in this Agreement the designations, preferences and rights of such new series of Class A Units relative to the designations, preferences and rights governing any other series or classes of Units.  Subject to Section 12.6, the Members acknowledge and agree that any such amendment may amend or entirely restate the voting, distribution and allocation provisions of this Agreement, as well as any other terms hereto; *provided* that, notwithstanding anything herein to the contrary, no such amendment or restatement shall affect the relative distribution and allocation provisions as between the existing Units.  Each Member will vote in favor of, or execute written consents in favor of, any amendment described in and consistent with this Section 4.2(a) that has been recommended to it by the Board, provided that such amendment must comply in all respects with Section 12.6.  For the avoidance of doubt, each Member hereby acknowledges and agrees that the Class A Units, Class B Units and Class C Units represent Units of different classes under this Agreement.

(b)    Schedules.  Upon the issuance or Transfer of Units from time to time, the Company shall amend Schedule 1 to reflect the record holders of Units and such other information as the Company determines is necessary or advisable to include on such Schedule 1 to reflect the ownership of the Units; *provided* that information relating to the number of Units held of record by each Member and the series or class of Units held thereby may be separately reflected on the Company's unit ledger maintained at the principal executive offices of the Company.  Contemporaneously with creating a new class or series of Units, the Company shall amend this Agreement by providing a notice of amendment to all Members, which notice shall include the form of amendment to this Agreement.  Any such amendment will take the form of a new Schedule 1 to be attached to and become part of this Agreement, and such Schedule will identify the effective date of such Schedule, the new class or series of Units created and set forth

the designations, rights and preferences thereof (each, a "***Unit Schedule***") including, with respect to each series of Class B Units, a Class B Participation Threshold applicable to such series. The Members shall take such action as requested by the Board or the Company to give full effect to any such amendment. Schedule 1 accurately reflects the number of Class A Units, Class B Units and Class C Units outstanding as of the Effective Date.

(c)     Unit Certificates.  The Units shall be uncertificated.  The Units shall not be governed by Article 8 of the Uniform Commercial Code.  The Company will maintain a unit ledger that includes information relating to number of Units held of record by each Member and the series or class of Units held thereby and such ledger shall be maintained at the principal executive offices of the Company.

(d)     Initial Designation and Issuances of Units.

(i)     A class of Units designated as "***Class A Units***" is hereby created. Subject to Section 4.3 and Section 5.2, the Company is authorized to issue such number of Class A Units to such Persons and for such consideration as the Board determines from time to time. Class A Units may, in the Board's discretion, be classified in series designations beginning with Class A-1 Units and continuing with consecutively numbered series.  The Company has 16,500,000 Class A-1 Units issued and outstanding on the Effective Date.

(ii)     A class of Units designated as "***Class B Units***" is hereby created. The Company, as approved by the Board, is authorized to issue Class B Units, from time to time, to key individuals to provide incentives to achieve the Company's operating and financial objectives.  The Company, as approved by the Board, is authorized to issue 100,000 Class B Units as of the date hereof, and thereafter such additional number of Class B Units as determined by the Board.  The Class B Units are intended to be "profits interests" within the meaning of IRS Revenue Procedures 93-27 and 2001-43.  Accordingly, no Member receiving Class B Units shall be required to make a capital contribution in connection with the receipt of such Class B Units. Each Class B Unit shall have a Class B Participation Threshold assigned to it by the Board at the time of issuance of such Class B Unit.  No individual shall be entitled to receive Class B Units solely because the Company has the authority to issue them.  Each person to which the Company issues Class B Units from time to time shall agree to be bound by this Agreement and shall enter into an Incentive Unit Agreement, if required by the Board, between the Company and such person which may contain vesting, forfeiture, termination and transfer provisions, as determined by the Board.  Class B Members shall have no voting rights or rights of approval, veto or consent or similar rights over any actions of the Company.

(iii)     A class of Units designated as "***Class C Units***" is hereby created. The Company, as approved by the Board, is authorized to issue, and shall issue, 100,000 Class C Units to Quabbin as of the date hereof.  The authorization and/or issuance of any additional Class C Units shall require the prior written consent of Quabbin.  The Class C Units are intended to be "profits interests" within the meaning of IRS Revenue Procedures 93-27 and 2001-43. Accordingly, no Member receiving Class C Units shall be required to make a capital contribution in connection with the receipt of such Class C Units.  Each Class C Unit shall have a Class C Participation Threshold assigned to it by the Board at the time of issuance of such Class C Unit. Class C Members shall have no voting rights or rights of approval, veto or consent or similar

rights over any actions of the Company with respect to their Class C Units, except for such actions which otherwise disproportionately affect the Class C Units as described in <u>Section 12.6</u>.

(iv)    All Class A Units (other than any series designated as non-voting) shall vote together as a single class on all matters on which the holders of Class A Units are entitled to vote.  Holders of Class A Units (other than any series designated as non-voting) shall have one vote per Class A Unit held of record thereby.  Unless otherwise provided in a Unit Schedule governing a class or series of Units that does not exist as of the Effective Date, all voting power ascribed to ownership interests in the Company shall be reserved for, and allocated to, the Class A Units.

### 4.3    *Preemptive Rights*.

(a)    Except for Units issued in accordance with <u>Section 5.2</u> and the issuance of Exempted Units, prior to the Company issuing, or permitting any of its Subsidiaries to issue, any Securities (collectively, the "***New Units***") to a proposed purchaser (the "***Proposed Purchaser***"), each Eligible Investor shall have the right to purchase the number of New Units as provided in this <u>Section 4.3</u>.

(b)    The Company shall give each Eligible Investor at least twenty (20) days' prior notice (the "***First Notice***") of any proposed issuance of New Units, which notice shall set forth in reasonable detail the proposed terms and conditions thereof, including whether such New Units shall be issued as Class A Units or a new class of Units or other Securities, and shall offer to each Eligible Investor the opportunity to purchase its Pro Rata Share (which Pro Rata Share shall be calculated as of the date of such notice) of the New Units at the same price, on the same terms and conditions and at the same time as the New Units are proposed to be issued by the Company or its Subsidiaries.  If any Eligible Investor wishes to exercise its preemptive rights, it must do so by delivering an irrevocable written notice to the Company within twenty (20) days after delivery by the Company of the First Notice (the "***Election Period***"), which notice shall state the dollar amount of New Units such Eligible Investor (each, a "***Requesting Purchaser***") would like to purchase up to a maximum amount equal to such Eligible Purchaser's Pro Rata Share of the total offering amount plus the additional dollar amount of New Units such Requesting Purchaser would like to purchase in excess of its Pro Rata Share (the "***Over-Allotment Amount***"), if any, if other Eligible Investors do not elect to purchase their full Pro Rata Share of the New Units.  The rights of each Requesting Purchaser to purchase a dollar amount of New Units in excess of each such Requesting Purchaser's Pro Rata Share of the New Units shall be based on the relative Pro Rata Shares of the New Units of those Requesting Purchasers desiring Over-Allotment Amounts and not based on the Requesting Purchasers' relative Over-Allotment Amounts.

(c)    If all of the New Units are not fully subscribed by the Requesting Purchasers, the Company shall have the right to either (i) accept the partial subscriptions from the Requesting Purchasers and issue and sell the unsubscribed-for portion of the New Units to the Proposed Purchaser at any time during the ninety (90) days following the termination of the Election Period pursuant to the terms and conditions set forth in the First Notice or (ii) cancel the entire offering (in which case any new offering will again be subject to the terms of this <u>Section 4.3</u>).  The Board may, in its reasonable discretion, impose such other reasonable and customary

terms and procedures such as setting a closing date, rounding the number of Units covered by this <u>Section 4.3</u> to the nearest whole Unit and requiring customary closing deliveries in connection with any preemptive rights offering.

(d)     The Members acknowledge that, under certain circumstances, the Company may require capital on an accelerated basis such that the full preemptive right process described above cannot be completed in a timely manner.  In such case, the Company may work with some, rather than all, of the Eligible Investors, to raise the required funds in the required timeframe so long as, within sixty (60) days after the completion of the offering, the Company makes the same investment opportunity available, including without limitation the opportunity to oversubscribe for such New Units in accordance with <u>Section 4.3(c)</u>, to all Eligible Investors that were not offered the opportunity in connection with the closing of the initial offering.  The Company may elect to make such same investment opportunity available to such other Eligible Investors either by requiring the initial subscribers to sell down a portion of their investment or by issuing additional New Units.

(e)     The rights granted to any Class A Member under this <u>Section 4.3</u> may be transferred by such Class A Member to any Affiliate of such Class A Member.

*4.4     Transfers of Units*.  No Member may Transfer Units, in whole or in part, other than Transfers (i) constituting Permitted Transfers or (ii) effected in accordance with this <u>Section 4.4</u>; *provided*, *however*, that notwithstanding anything herein to the contrary a Transfer by a Member shall be null and void *ab initio* if (A) following the proposed Transfer, the Company would be treated as a publicly traded partnership within the meaning of Section 7704 of the Code, (B) the transferee (unless such transferee is a Permitted Transferee) fails to deliver to the Company the representations set forth in <u>Annex A</u> and all documents required pursuant to <u>Section 4.4(c)</u> or (C) such Transfer would result in the violation of any applicable federal or state securities laws.  Members shall bear any costs the Company reasonably incurs in connection with Transfers of any of their Units. In order to effectuate the purpose of this <u>Section 4.4</u>, each Member (other than Capital Southwest and Main Street Capital and each of their respective Permitted Transferees) agrees that, if a Member (other than Capital Southwest and Main Street Capital and each of their respective Permitted Transferees) is an Entity, there shall be no Change of Control (as defined below) of such Member, or any Entity that itself is a direct or indirect owner of more than fifty percent (50%) of the outstanding voting securities of any such Member that is an Entity without Requisite Consent, which shall not be unreasonably withheld.   For purposes of this <u>Section 4.4</u>, "***Change of Control***" shall mean the sale of all or substantially all the assets of such Entity to one or more third parties who are not otherwise an Affiliate, director, officer, member, manager, shareholder or employee of such Entity (a "***Change of Control Affiliate***"); any merger, consolidation or acquisition of such Entity with, by or into another Person other than a Change of Control Affiliate; or any change in the ownership of more than fifty percent (50%) of the voting equity interests of such Entity in one or more related transactions other than such changes in which a Change of Control Affiliate acquires such voting equity interests in such Entity.

(a)     <u>Drag-Along and Tag-Along Rights</u>.

(i)       In the event that Members holding fifty percent (50%) or more of the then-issued and outstanding Class A Units propose to Transfer, to a third party that is not an Affiliate, officer, director, employee or agent (or Affiliate of any such officer, director, employee or agent) of any Member, an amount of such Class A Units that comprises in the aggregate more than fifty percent (50%) of the then issued and outstanding Class A Units (the "***Selling Member Group***"), then the Selling Member Group shall have the right to require all, but not less than all, other Members (the "***Minority Members***") to sell the same proportionate part of their Units as the Selling Member Group sells, free and clear of all encumbrances of any kind whatsoever, based on the same pricing structure and on the same terms as the Selling Member Group is Transferring its Units in such proposed Transfer (such proposed Transfer, a "***Company Sale***"), *provided* that any consideration or proceeds received by the Members as a result of a Transfer pursuant to this Section 4.4(a) shall be allocated among all Members in accordance with the distribution provisions set forth in Section 6.2.   The rights granted pursuant to this Section 4.4(a)(i) shall be exercised upon the provision of twenty (20) days' written notice to the Minority Members, and the Minority Members shall be deemed to have waived any and all applicable dissenter's rights such Minority Members may have concerning the Transfer.

(ii)      In the event that Members holding any Class A Units propose to Transfer any Class A Units to any Person other than to a Permitted Transferee in one or a series of related transactions other than a Permitted Transfer (the "***Transferring Members***"), then such Transferring Members shall be required to offer to all the other Members (the "***Tag-Along Members***") an election to participate in the proposed Transfer, based on the same pricing structure and on the same terms as the Transferring Members are Transferring their Units in such proposed Transfer, a portion of each Tag-Along Member's Units equal to the total Units proposed to be Transferred in the proposed Transfer multiplied by a fraction, the numerator of which are the aggregate Units owned by such Tag-Along Member and the denominator of which is the aggregate number of Units owned by the Transferring Members and the Tag-Along Members.   Such election shall be made by the Tag-Along Members within fifteen (15) days after such offer is made by the Transferring Members to the Tag-Along Members by providing written notice to the Transferring Members of such election within such fifteen (15) day time period.   No later than three (3) Business Days after the expiration of such fifteen (15) day time period, the Transferring Members shall notify each Tag-Along Member in writing of the number of Class A Units and/or New Units being Transferred in the Transfer contemplated in this clause (ii) (the "***Tag Overallotment Notice***").   Each participating Tag-Along Member shall have a right of overallotment such that if any other Tag-Along Member fails to exercise its right to participate in a Transfer pursuant to this clause (ii), each participating Tag-Along Member may sell its Pro Rata Share of the Class A Units and/or New Units the non-participating Tag-Along Members would have otherwise been entitled to sell in such Transfer by giving written notice to the Transferring Members within three (3) Business Days of receipt of the Tag Overallotment Notice.

(iii)     Notwithstanding the foregoing, a Member will not be required to comply with Section 4.4(a)(ii) in connection with any proposed Company Sale (the "***Proposed Sale***"), unless:

1.        subject to Section 4.8 below, any representations and warranties to be made by such Member, individually, in connection with the Proposed Sale are

limited solely to representations and warranties related to such individual Member's authority, ownership and the ability to convey title to such Member's Units, including, but not limited to, representations and warranties that (i) the Member holds all right, title and interest in and to the Units such Member purports to hold, free and clear of all liens and encumbrances, (ii) the obligations of the Member in connection with the transaction have been duly authorized, if applicable, (iii) the documents to be entered into by the Member have been duly executed by the Member and delivered to the acquirer and are enforceable against the Member in accordance with their respective terms; and (iv) neither the execution and delivery of documents to be entered into in connection with the transaction, nor the performance of the Member's obligations thereunder, will cause a breach or violation of the terms of any agreement, law or judgment, order or decree of any court or governmental agency;

2.      the liability for indemnification or payment in connection with a purchase price or other closing adjustment, if any, of such Member in the Proposed Sale and for the inaccuracy of any representations and warranties made by the Company or its Members in connection with such Proposed Sale, (A) is several and not joint with any other Person (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the Company as well as breach by any Member of any of identical representations, warranties and covenants provided by all Members), and (B) shall be limited to such Member's applicable share (determined based on the respective proceeds payable to each Member in connection with such Proposed Sale in accordance with the provisions of <u>Section 6.2</u>) of a negotiated aggregate indemnification amount and purchase price or other closing adjustment amount that applies equally to all Members but that in no event exceeds the amount of consideration otherwise payable to such Member in connection with such Proposed Sale for its Units, except with respect to claims related to fraud by such Member, the liability for which need not be limited as to such Member;

3.      upon the consummation of the Proposed Sale, each holder of Units shall receive the same proportion of the aggregate consideration from such Transfer that such holder would have received if such aggregate consideration had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth in <u>Section 6.2</u> as in effect immediately prior to such Transfer (for the avoidance of doubt, this means that differences in the liquidation preference payable with respect to the Class A Units and Class C Units and differences in the Class B Participation Thresholds with respect to the Class B Units will be taken into account), and if a holder of Units receives consideration from such Transfer in a manner other than as contemplated by such rights and preferences or in excess of the amount to which such holder is entitled in accordance with such rights and preferences, then such holder shall take such action as is necessary so that such consideration shall be immediately reallocated among and distributed to the holders of Units in accordance with such rights and preferences;

4.      upon the consummation of the Proposed Sale, each holder of Units will receive the same form of consideration for their Units of such class or series as is received by other holders in respect of their Units of such same class or series; *provided, however,* that, notwithstanding the foregoing, if the consideration to be paid in exchange for the Units includes any securities and due receipt thereof by any holder would require under applicable law (x) the registration or qualification of such securities or of any person as a broker or dealer or agent with respect to such securities; or (y) the provision to such of any information

10

other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the Securities Act, the Company may cause to be paid to any holder who is not an "accredited investor" in lieu thereof, against surrender of the Units, as applicable, which would have otherwise been sold by such holder, an amount in cash equal to the fair value (as determined in good faith by the Board) of the securities which such holder would otherwise receive as of the date of the issuance of such securities in exchange for such Units; and

                5.      upon the consummation of the Proposed Sale, no Minority Member shall be required to agree to any covenant not to compete or any covenant not to solicit.

        (b)      Unless an assignee of Units becomes a Member in accordance with the provisions of Section 4.4(c), such assignee shall not be entitled to any of the rights granted to a Member hereunder in respect of such Units, other than the right to receive allocations of income, gain, loss, deduction, credit and similar items and distributions to which the assignor would otherwise be entitled, to the extent such items are assigned.

        (c)      An assignee of the Units of a Member, or any portion thereof, shall become a Member entitled to all of the rights of a Member in respect of such Units only if (i) the assignment to such Person was a Permitted Transfer, (ii) (A) the assignor gives the assignee such right, or (B) the Board consents in writing to such substitution (which consent shall not be unreasonably withheld); and (iii) the assignee executes and delivers such instruments, in form and substance reasonably satisfactory to the Board, to effect such substitution and to confirm the agreement of the assignee to be bound by all of the terms and provisions of this Agreement.

    *4.5*    *Additional Terms Relating to Members*.  No Member (i) shall be liable for the debts, obligations or liabilities of the Company or (ii) may be expelled from the Company or otherwise removed as a Member (other than in the event that such Member ceases to hold Units).

    *4.6*    *Conversion Transaction*.  In connection with an initial public offering of the Company's Securities approved by the Board (an "***IPO***"), the Members will enter into or adopt such voting, registration rights or similar agreements and documents as will be necessary and appropriate to preserve the substance of the agreements of the Members herein contemplated with respect to registration rights, *mutatis mutandis*.  In no event will any Member be required to take any type or amount of equity Securities that it is not legally permitted to hold.  In connection with any Conversion Transaction, each Member shall be entitled to receive a relative number of shares of common stock of the Resulting Corporation that results in it owning a percentage of the shares of such Resulting Corporation that corresponds to its Percentage Interest.  Each Member agrees to the Transfer of its Units in accordance with the terms of a Conversion Transaction as provided by the Board.  In addition, the Members agree to take such actions as may be reasonably requested by the Board or as requested by the managing underwriter of the IPO in order to consummate the IPO.  Notwithstanding the foregoing, no Member shall, without such Member's consent, be required to join in any indemnification obligations in connection with any Conversion Transaction (which obligations shall be several and not joint and several) in excess of the lesser of: (a) a pro rata portion (based on equity proceeds) of the aggregate indemnification applicable to all Members in the above-referenced Transfer or IPO; and (b) the net cash proceeds from the above-referenced Transfer or IPO to be

received by such Member; *provided*, *however*, that no Member shall have any liability for the individual representations or warranties of any other Member in such transaction; *provided*, *further*, that to the extent that any Member's liability for indemnification exceeds the net cash proceeds paid to such Member in connection with such a Transfer or IPO, such excess shall only be required to be satisfied out of the non-cash portion of the proceeds (and any proceeds received therefrom) and not from assets of the Member not received or receivable in connection with such Transfer or IPO.

**4.7     Registration Rights**.  The Members agree that any registration rights agreement to be entered into in connection with a Conversion Transaction pursuant to Section 4.6 above will be in a reasonably customary form for such agreements and will provide that (a) each Member and its Affiliates shall be entitled to unlimited "piggy-back" registration rights on each such demand registration and any other registrations of the Company (subject to customary exceptions), (b) any cutback provision applicable to "piggy-back" registration rights will be no less favorable to the Members and their respective Affiliates than such provision is to Members holding fifty percent (50%) or more of the then-issued and outstanding Class A Units, (c) the fees and expenses of such registration (except for any applicable underwriter discount) will be paid by the Company, and (d) the Members shall at all times have rights under such registration rights agreement that are no less favorable than the rights afforded to any other Person that is provided with registration rights with respect to the Company's Securities.

**4.8     Transfer of Blocker Company Interests**.  Notwithstanding anything to the contrary herein, in connection with a Transfer pursuant to Section 4.4 or any other Transfer hereunder, each holder of Securities of a Blocker Company (the "***Blocker Company Investors***") may elect to Transfer its Securities in such Blocker Company (such interests in such Blocker Company, the "***Blocker Company Interests***") in lieu of selling its Units and/or New Units of the Company, in which case (a) the provisions of Section 4.4 and the other applicable provisions of this Agreement, shall apply to such sale of Blocker Company Interests *mutatis mutandis*, (b) such Transfer will be made on the same terms and conditions as a sale of the underlying Units and/or New Units, *provided* that the holder of Securities of such Blocker Company shall provide reasonable representations and warranties that the Blocker Company was formed for purposes of holding its equity interests in the Company, does not hold any assets other than the Units, has no liabilities, has not engage in any activities or operations other than holding the Units, and such other representations and warranties regarding the Blocker Company as shall be reasonably requested, and (c) without limiting the foregoing, (i) the number of such Blocker Company Interests to be acquired by the purchaser in such Transfer shall bear the same proportion to the aggregate outstanding Blocker Company Interests of such Blocker Company as the number of Units and/or New Units that would have been sold by the Blocker Company pursuant to Section 4.4 or otherwise under this Agreement, bears to the total number of Units and/or New Units held by such Blocker Company, and (ii) the price to be paid for such Blocker Company Interests in such Transfer shall be the same as the price that would have been paid for the corresponding number of Units and/or New Units that would have been sold by such Blocker Company pursuant to Section 4.4 or otherwise under this Agreement.

12

## ARTICLE 5.
## CAPITAL CONTRIBUTIONS

**5.1** **Effective Date Capital Contributions**.  Each Class A Member admitted as of the Effective Date has made a Capital Contribution to the Company as of the Effective Date in the amount set forth on Schedule 1 hereto.

**5.2** **Subsequent Capital Contributions**.  The Members acknowledge and agree that the Board may determine that the Company requires capital in excess of the amounts funded pursuant to Section 5.1.  At any time after the Effective Date, if the Board determines that the Company requires additional capital, the Board shall provide the Members holding Class A Units with a written notice (a "*Capital Call Notice*") which shall set forth the aggregate amount of additional capital determined by the Board to be required and the class of Units (*i.e.*, Class A Units or a new class or series of Units) proposed to be issued in exchange therefor (the "*Capital Call Amount*").  Each Eligible Investor holding Class A Units shall have the right, but not the obligation, to contribute cash to the Company up to such Member's Pro Rata Share of the Capital Call Amount.  Within fifteen (15) Business Days of the receipt of the Capital Call Notice, each Eligible Investor holding Class A Units shall provide a written statement (an "*Election Statement*") to the Board that sets forth the portion of such Member's Pro Rata Share of the Capital Call Amount, if any, such Member is electing to contribute to the Company.  If an Eligible Investor fails to provide an Election Statement to the Board within fifteen (15) Business Days after the receipt of the Capital Call Notice, such Member shall be deemed to have elected not to contribute any portion of such Member's Pro Rata Share of the Capital Call Amount (but only such Capital Call Amount and not any other subsequent Capital Call Amount required pursuant to this Section 5.2).  If any Eligible Investor elects not to contribute such Member's entire Pro Rata Share of the Capital Call Amount, each Eligible Investor that elected to contribute its entire Pro Rata Share of the Capital Call Amount (an "*Electing Member*") shall have the right, but not the obligation, to contribute cash to the Company (in the ratio that each such Electing Member's Pro Rata Share bears to the Pro Rata Shares of all Electing Members) in an amount necessary to fund each non-electing Member's full Pro Rata Share of the Capital Call Amount (such aggregate amount, a "*Capital Call Deficiency*").  In the event that the cash contributions by the Electing Members are insufficient to fund a Capital Call Deficiency, each Electing Member shall have the option to contribute additional cash to the Company (in the ratio that each such Electing Member's Pro Rata Share bears to the Pro Rata Shares of all Electing Members) in an amount necessary to fund the Capital Call Deficiency in full.  The Company shall issue to each Electing Member an amount of Class A Units or new class or series of units equal to (i) the amount of cash contributed by such Electing Member, as applicable, to fund the Capital Call Deficiency divided by (ii) the fair market value per Class A Unit or new class or series of units, as applicable, determined as of the date of the applicable Capital Call Notice by the Board.  Subject to the provisions of this Section 5.2 and Section 12.6 and in compliance with Section 4.3, the Company may, without any further consent required of the Members, amend or restate this Agreement (including the distribution and allocations provisions hereof) to reflect the terms of such new capital.

**5.3** **Return of Capital Contributions**.  A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions.  An unpaid Capital Contribution is not a liability of the Company or

of any Member.  A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

*5.4*     *Advances by Members*.  Any Member that agrees to do so with the consent of the Board may advance (as a loan and not as a Capital Contribution) monies to or on behalf of the Company on such terms as the Board and such Member mutually agree.

## ARTICLE 6.
## DISTRIBUTIONS; ALLOCATIONS

*6.1*     *Operating Distributions*.  Except for distributions in connection with a Liquidity Event (which shall be governed by Section 6.2 and not this Section 6.1) and Tax Distributions (which shall be governed by Section 6.3 and not this Section 6.1), to the extent the Company has funds on hand available for distribution to the holders of Units (after payment of all then-due obligations of the Company and the establishment of reasonable reserves for the Company's liabilities, obligations, working capital and other anticipated needs, including Tax Distributions, as determined by the Board in its sole discretion), the Company is not restricted by contract or Law from making a distribution to the holders of Units and any such distribution is actually approved by the Board (funds from time to time, on a cumulative basis, satisfying all of the foregoing criteria are referred to as "*Cumulative Available Funds*"), then distributions of Cumulative Available Funds shall be made according to the following methodology and the following order of priority:

(a)     First, to the holders of Class A Units in proportion to their Unrecovered Capital amounts until such holders have received an amount that is equal to one hundred percent (100%) of each such holder's Unrecovered Capital;

(b)     Second, the Class B Percentage to the holders of Participating Class B Units, and the Class A&C Percentage to the holders of Class A Units and Class C Units in the following order of priority:

(i)     First, one hundred percent (100%) to the holders of Class A Units, until the Initial IRR Threshold is achieved;

(ii)     Second, one hundred percent (100%) to the holders of Class C Units until the amount distributed under this clause (ii) equals seven and a half percent (7.5%) of the sum of the amount distributed to the holders of Class A Units under clause (i) plus the amount received by the holders of Class C Units under this clause (ii);

(iii)     Third, seven and a half percent (7.5%) to the holders of Class C Units and ninety-two and a half percent (92.5%) to the holders of Class A Units, until the Secondary IRR Threshold is achieved;

(iv)     Fourth, one hundred percent (100%) to the holders of Class C Units until the aggregate amount distributed to the holders of Class C Units under clause (ii), clause (iii) and this clause (iv) equals ten percent (10%) of the sum of (x) the aggregate amount distributed to the holders of Class A Units under clause (i) and clause (iii) plus (y) the aggregate amount received by the holders of Class C Units under clause (ii), clause (iii) and this clause (iv);

14

(v)     Fifth, ten percent (10%) to the holders of Class C Units and ninety percent (90%) to the holders of Class A Units, until the Third IRR Threshold is achieved;

(vi)     Sixth, one hundred percent (100%) to the holders of Class C Units until the aggregate amount distributed to the holders of Class C Units under clause (ii), clause (iii), clause (iv), clause (v) and this clause (vi) equals fifteen percent (15%) of the sum of (x) the aggregate amount distributed to the holders of Class A Units under clause (i), clause (iii), and clause (v) plus (y) the aggregate amount received by the holders of Class C Units under clause (ii), clause (iii), clause (iv), clause (v) and this clause (vi);

(vii)     Seventh, fifteen percent (15%) to the holders of Class C Units and eighty-five percent (85%) to the holders of Class A Units, until the Fourth IRR Threshold is achieved;

(viii)     Eight, one hundred percent (100%) to the holders of Class C Units until the aggregate amount distributed to the holders of Class C Units under clause (ii), clause (iii), clause (iv), clause (v), clause (vi), clause (vii), and this clause (viii) equals twenty percent (20%) of the sum of (x) the aggregate amounts distributed to the holders of Class A Units under clause (i), clause (iii), clause (v), and clause (vii) plus (y) the aggregate amount distributed to the holders of Class C Units under clause (ii), clause (iii), clause (iv), clause (v), clause (vi), clause (vii) and this clause (viii); and

(ix)     Thereafter, twenty percent (20%) to the holders of Class C Units and eighty percent (80%) to the holders of Class A Units.

**6.2     *Liquidity Event Distributions***.  Distributions of the net proceeds of any Liquidity Event shall be made in accordance with Section 6.1.

**6.3     *Tax Distributions***.  (a)  For each Fiscal Year, to the extent the Company has cash and is not restricted contractually or by Law from distributing it and as long as, after giving effect to each payment proposed under this Section 6.3, the Company is not, or is not reasonably likely to be, in violation of any covenants under any of its credit facilities (the "***Available Cash***"), the Company shall make distributions of cash to the Members in such amounts and proportions as the Board shall determine in its reasonable discretion in order for the Members to satisfy their federal, state and local income tax liability with respect to the income, gain, loss, deductions or other similar items allocated to such Members pursuant to this Agreement at a rate equal to the highest marginal applicable tax rate for the applicable tax year, however denominated (the "***Tax Distributions***").  The Board shall use its commercially reasonable efforts to timely provide the Members with a reasonable estimate of their quarterly tax liabilities. Tax Distributions shall be made on or before the earliest of: (i) the 15th day after the Members' Form K-l (or its successor thereto) is issued by the Company to the Members for such Fiscal Year; or (ii) the 15th day after the Company files its U.S. federal income tax return for such Fiscal Year (the "***Annual Tax Distribution Date***").   The Board of Directors may determine to make distributions pursuant to this Section 6.3(a) on a quarterly basis or in other increments throughout the Fiscal Year, but in no event later than the Annual Tax Distribution Date.  The Company shall use commercially reasonable efforts to provide each Member not later than thirty

(30) days after the end of each applicable fiscal quarter a good faith estimate of the Tax Distributions for the then-current fiscal year.

(b)      Solely to the extent distributions made to a Member pursuant to this Section 6.3 in a given Fiscal Year exceed the Non-offset Tax Distributions, such amounts shall constitute an advance against distributions to be made to such Member under Section 6.1 and Section 6.2 and accordingly shall reduce, dollar-for-dollar, amounts otherwise distributable to the Member under Section 6.1 or Section 6.2 until the amount of such advance has been fully recouped, and the amount so distributed shall be deemed to have been distributed as of the actual date of distribution pursuant to this Section 6.3 for purposes of making the calculations required by this Agreement.  For the avoidance of doubt, Tax Distributions in a given Fiscal Year up to the Non-offset Tax Distributions shall not be treated as an advance, shall not reduce subsequent distributions made to the Members under Section 6.1 or Section 6.2 and shall not be taken into consideration for purposes of calculating whether a return of Unrecovered Capital or an IRR Threshold has been achieved.

(c)      The Board may, in the exercise of its reasonable business judgment, file a group or composite return for one or more states.  Any amounts paid to a state taxing authority in respect of a Member pursuant to such return shall be treated as a partial distribution pursuant to this Section 6.3 to such Member (and, for the avoidance of doubt, shall reduce the amount of the actual distribution to such Member pursuant to this Section 6.3).

### 6.4      *Miscellaneous Matters Regarding Distributions*.

(a)      No distribution under Sections 6.1, 6.2 or 6.3 shall be declared and paid unless, after the distribution is made, the fair market value of the Company's assets is at least equal to all of the Company's liabilities.

(b)      The Company is authorized to withhold from distributions to a Member, or with respect to allocations to a Member, and to pay over to a foreign, federal, state or local government, any amounts required to be withheld pursuant to the Code or any provisions of any other foreign, federal, state or local Law.  All amounts withheld with respect to a Member shall be treated as amounts distributed to that Member.

(c)      Any amounts that are distributable to holders of a specific class of Units shall be apportioned among such holders in proportion to their respective ownership of such Units.

### 6.5      *Capital Accounts*.  The Company shall maintain a Capital Account for each Member in accordance with the requirements of Treasury Regulation Section 1.704-1(b) and the definition of "Capital Account" set forth on Exhibit A.  The Members acknowledge and agree that the allocation provisions set forth in Section 6.6 and Section 6.7 are intended to comply with Code Section 704(b) and the Treasury Regulations issued thereunder, including Treasury Regulation Section 1.704-1(b) and Treasury Regulation Section 1.704-2, and shall be interpreted and applied in a manner consistent with such intent.  In this regard, the Board shall have the power and authority to adjust the allocations made pursuant Section 6.6 and Section 6.7 as necessary or appropriate to achieve such intent.

16

**6.6** **Allocations of Profits and Losses**.  (a)   After giving effect to the special allocations set forth in <u>Section 6.7</u>, Profits and Losses (and/or to the extent necessary, individual items of income, gain, loss, and deduction) for any Allocation Year of the Company shall be allocated to the Members in such amounts as may be necessary or appropriate to cause the Capital Account balances of the Members (as adjusted through the end of such Allocation Year) to equal, as nearly as possible, (i) the amounts such Members would receive if (A) all cash on hand at the end of such year were distributed to the Members under <u>Section 6.2</u>, (B) all assets on hand at the end of such year were sold for cash at the Book Values reflected for such assets on the books of the Company, (C) all liabilities of the Company were satisfied in cash in accordance with their terms (limited in the case of Company Nonrecourse Liabilities and Member Nonrecourse Debt to the Book Value of the property securing such liabilities), and (D) any remaining cash was distributed to the Members under <u>Section 6.2</u>, less (ii) the sum of (A) such Member's share of Company Minimum Gain determined pursuant to Treasury Regulation Section 1.704-2(g) computed immediately prior to the hypothetical sale described in clause (i) of this <u>Section 6.6(a)</u>, (ii) such Member's share of Member Nonrecourse Debt Minimum Gain determined pursuant to Treasury Regulation Section 1.704-2(i)(5), computed immediately prior to the hypothetical sale described in clause (i) of this <u>Section 6.6(a)</u>, and (iii) the amount, if any, that such Member is obligated to contribute to the capital of the Company computed after the hypothetical events described in clause (i) of this <u>Section 6.6(a)</u>.  For purposes of this <u>Section 6.6(a)</u>, all Units shall be treated as vested.

(b)   <u>Allocation Method</u>.  The Tax Matters Member shall make the foregoing allocations set forth in <u>Section 6.6(a)</u> as of the last day of each Fiscal Year; *provided, however*, that if during any Fiscal Year there is a change in any Member's Membership Interest, the Tax Matters Member shall make the foregoing allocations as of the date of each such change in a manner which takes into account the varying interests of the Members and in a manner the Tax Matters Member reasonably deems appropriate

(c)   <u>Loss Limitation</u>.  The Losses allocated pursuant to <u>Section 6.6(a)</u> shall not exceed the maximum amount of Losses that can be allocated to a Member without causing or increasing a deficit balance in the Member's Adjusted Capital Account.  All Losses in excess of the limitations set forth in this <u>Section 6.6(c)</u> shall instead be allocated to Members having positive Adjusted Capital Account balances remaining at such time in proportion to such balances.

**6.7** **Special Allocations**.  Except as otherwise provided herein, for purposes of any applicable federal, state or local income tax law, rule or regulation items of income, gain, deduction, loss, credit and amount realized shall be allocated to the Members as follows:

(a)   All recapture of income tax deductions resulting from the disposition of Company property (e.g., under Sections 1245, 1250 and 1254 of the Code) shall, to the maximum extent possible, be allocated to the Member to whom the deduction that gave rise to such recapture was allocated hereunder to the extent that such Member is allocated any gain from the disposition of such property.

(b)   Notwithstanding any of the foregoing provisions of this <u>Section 6.7</u> to the contrary:

17

(i)      If there is a net decrease in Company Minimum Gain for an Allocation Year, then there shall be allocated to each Member items of income and gain for that year (and, if necessary, for succeeding years) equal to that Member's share of the net decrease in Company Minimum Gain (within the meaning of Treasury Regulation Section 1.704-2(g)(2)), subject to the exceptions set forth in Treasury Regulation Section 1.704-2(f)(2), (3), and (5).  The foregoing is intended to be a "minimum gain chargeback" provision as described in Treasury Regulation Section 1.704-2(f) and shall be interpreted and applied in all respects in accordance with that Treasury Regulation.

(ii)      If during an Allocation Year there is a net decrease in Member Nonrecourse Debt Minimum Gain, then, in addition to the amounts, if any, allocated pursuant to the preceding paragraph, each Member with a share of that Member Nonrecourse Debt Minimum Gain (determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) shall, subject to the exceptions in Treasury Regulation Section 1.704-2(i)(4), be allocated items of income and gain for the year (and, if necessary, for succeeding years) equal to that Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain.  The foregoing is intended to be a "chargeback of partner nonrecourse debt minimum gain" required by Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted and applied in all respects in accordance with that Treasury Regulation.

(iii)      Any Nonrecourse Deductions for any Allocation Year or other period shall be allocated between the Members in accordance with the number of Class A Units, Class B Units and Class C Units held by such Member.

(iv)      Any Member Nonrecourse Deductions for any Allocation Year or other period shall be specially allocated to the Member who bears (or is deemed to bear) the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(v)      To the extent and in a manner that reasonably reflects the purpose and intention of this Agreement, as determined by the Board, in the event of an exercise of a noncompensatory option (within the meaning and for purposes of Treasury Regulation Section 1.721-2(f)) to acquire Units, Profits and Losses (and then existing Capital Accounts) shall be allocated (or reallocated) in a manner that satisfies the requirements of Treasury Regulation Section 1.704-1(b)(4)(ix) and Treasury Regulation Section 1.704-1(b)(2)(iv)(s).  Furthermore, if, in the event that a Capital Account reallocation is required under Treasury Regulation Section 1.704-1(b)(2)(iv)(s)(3) as a result of the exercise of a noncompensatory option, the Company shall make corrective allocations pursuant to Treasury Regulation Section 1.704-1(b)(4)(x).

(c)      If any Member receives any adjustments, allocations or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate the deficit in such Member's Capital Account (as determined in accordance with Treasury Regulation Section 1.704-1(b)(2)(ii)(d)) created by such adjustments, allocations or distributions as promptly as possible; *provided* that an allocation pursuant to this paragraph shall be made only to the extent that a Member would have a deficit Capital Account balance (as

determined as provided in the prior clause), after all other allocations provided for in this <u>Section 6.7</u> have been tentatively made as if this paragraph were not in the Agreement.  This paragraph is intended to qualify with the "qualified income offset" requirement in the Treasury Regulations.

(d)     In the event any Member has a deficit in its Adjusted Capital Account at the end of any Allocation Year, or in the event any Member would have a deficit in its Adjusted Capital Account in connection with the receipt of distributions made to the Member in accordance with <u>Section 10.2(c)</u>, such Member shall be specially allocated items of income and gain in the amount of such deficit as rapidly as possible, *provided* that an allocation pursuant to this paragraph shall be made if and only to the extent that such Member would have a deficit to its Adjusted Capital Account after all other allocations provided for in this Agreement have been tentatively made as if <u>Section 6.7(c)</u> and this paragraph (d) were not in this Agreement.

(e)     With the exception of <u>Section 6.7(f)</u> and <u>Section 6.7(g)</u> the allocations set forth in this <u>Section 6.7</u> (collectively, the "***Regulatory Allocations***") are intended to comply with certain requirements of the Treasury Regulations.  The Members intend that, to the extent possible, all Regulatory Allocations that are made be offset either with other Regulatory Allocations or with special allocations pursuant to this <u>Section 6.7</u>.  Therefore, notwithstanding any other provisions of this <u>Section 6.7</u> (other than the Regulatory Allocations), the Board shall make such offsetting special allocations in whatever manner they determine appropriate so that, after such offsetting allocations are made, each Member's Adjusted Capital Account balance is, to the extent possible, equal to the Adjusted Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to the remaining sections of this <u>Section 6.7</u>.

(f)     In accordance with Section 704(c) of the Code and the Treasury Regulations, income and deductions with respect to any property the Book Value of which differs from such property's adjusted tax basis shall, solely for federal income tax purposes, be allocated among the Members in a manner to take into account any variation between the adjusted tax basis of such property to the Company and the Book Value.  In making such allocations, the Board shall use such method or methods authorized under Treasury Regulations Section 1.704-3 as the Board shall determine to be appropriate, consistent with other provisions of this <u>Section 6.7</u>.  Except as provided above, all items of Company income, gain, loss, deduction, and credit, as determined for federal income tax purposes, shall be divided among the Members, to the maximum extent possible, in the same manner in which they share the corresponding items determined for purposes of maintaining Capital Accounts.  Allocations pursuant to this <u>Section 6.7(f)</u> are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provisions of this Agreement.

(g)     All items of income, gain, loss, deduction, and credit allocable to any Membership Interest that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the Fiscal Year during which each was recognized as the owner of such Membership Interest, without regard to the results of the Company operations during any particular portion of that Fiscal Year and without regard to whether cash distributions were made to the transferor or the transferee during that Fiscal Year; *provided*, *however*, that this allocation must be made in accordance with a method permissible under Section 706 of the Code

and the applicable Treasury Regulations; *provided*, *further*, that the Board, in its reasonable discretion, shall determine the allocation to be made in accordance the Treasury Regulations in the event the Company engages in transactions that create significant items of income, gain, loss, deduction and credit outside of the ordinary course of business.

**ARTICLE 7.**
**MANAGEMENT**

> **7.1**    ***Management by Directors***.

>> (a)    <u>Governing Authority</u>.  The Company shall be managed by "managers" (as such term is used in the Act) according and subject to the remaining provisions of this <u>Article 7</u> and, except as expressly provided in this Agreement, no Member by virtue of having the status of a Member shall have any management power over the business and affairs of the Company or actual or apparent authority to enter into contracts on behalf of, or to otherwise bind, the Company.  The "managers" are referred to as "***Directors***" throughout this Agreement.  The business and affairs of the Company shall be managed by the Directors acting exclusively through the Board of Directors of the Company (the "***Board***") in accordance with and subject to this Agreement.  Under the direction of the Board, the day-to-day activities of the Company shall be conducted on the Company's behalf by the Officers, who shall be agents of the Company.

>> (b)    <u>Power of the Board</u>.  In addition to the powers that now or hereafter can be granted under the Act and to all other powers granted under any other provision of this Agreement, the Board shall have full power and authority to do all things on such terms as they may deem necessary or appropriate to conduct, or cause to be conducted, the business and affairs of the Company and any of its Subsidiaries, including (subject to any applicable voting requirements or consent or approval rights of any Person, if any, including those contained in this Agreement or applicable law):

>>> (i)    the making of any expenditures, the lending or borrowing of money, the assumption or guarantee of, or other contracting for, indebtedness and other liabilities, the issuance of evidences of indebtedness and the incurring of any other obligations;

>>> (ii)    the making of tax, regulatory and other filings, or rendering of periodic or other reports to governmental or other agencies having jurisdiction over the business or assets of the Company or any of its Subsidiaries;

>>> (iii)    the merger or other combination of the Company or any of its Subsidiaries with or into another Person or the conversion of the Company or any of its Subsidiaries from a limited liability company to any other business entity;

>>> (iv)    the use of the assets of the Company or any of its Subsidiaries (including cash on hand) for any purpose consistent with the terms of this Agreement and the repayment of obligations of the Company or any of its Subsidiaries;

>>> (v)    the negotiation, execution and performance of any contracts, conveyances or other instruments;

(vi)      the distribution of Company cash or other property;

(vii)     the selection, engagement and dismissal of Officers, employees and agents, attorneys, accountants, engineers, consultants and contractors and the determination of their compensation and other terms of employment or hiring;

(viii)    the maintenance of insurance for the benefit of the Company or any of its Subsidiaries;

(ix)      the acquisition or disposition of assets;

(x)       the formation of, or acquisition of an interest in, or the contribution of property to, any Person;

(xi)      the control of any matters affecting the rights and obligations of the Company or any of its Subsidiaries, including the commencement, prosecution and defense of actions at law or in equity and otherwise engaging in the conduct of litigation and the incurring of legal expense and the settlement of claims and litigation;

(xii)     the indemnification of any Person against liabilities and contingencies to the extent permitted by Law and this Agreement;

(xiii)    the voting of equity interests of the Company in any other Person, including any Subsidiary;

(xiv)    the authorization and issuance of Units, *provided* that any issuance of Units are based on the fair market value of the Company as determined in good faith by the Board; and

(xv)     the approval of operating budgets and capital expenditure budgets.

(c)      <u>Major Decisions</u>.  Notwithstanding the foregoing provisions of this <u>Section 7.1</u>, the Company shall not, nor shall it permit any Subsidiary of the Company to, without first obtaining the approval of the Institutional Minority Investors holding a majority-in-interest of the Units then held by the Institutional Minority Investors:

(i)       enter into any transaction by and between the Company or any of its Subsidiaries, on the one hand, and any Member or Affiliate of a Member, or any officer, director, employee or agent of a Member (or Affiliate of any such party), on the other hand, *provided*, that such decision shall also require the unanimous approval of the Board; *provided, further*, that this <u>Section 7.1(c)(i)</u> shall not apply to (A) any employment agreements or amendments or modifications thereto with members of management (excluding any employment agreements with the Dos Rios Partnerships or their Affiliates or any officer, director, employee or agent of the Dos Rios Partnerships) or (B) the lease with respect to the Company's Dallas facility, provided that such lease is entered into in good faith and on arm's-length and customary market terms;

(ii)     enter into any amendment to the Certificate or the certificate of incorporation, by-laws, shareholders agreement or other constitutional documents governing the Company or any of its Subsidiaries in a manner that would materially disproportionately or adversely affect the Institutional Minority Investors;

(iii)     effect any change in the tax elections or accounting methods, principles or practices of the Company or any of its Subsidiaries that would materially adversely affect the Institutional Minority Investors;

(iv)     effect any non-pro rata purchase or redemption of the Units or the equity of any of the Company's Subsidiaries;

(v)     declare or pay any non-pro rata dividend or other distribution with respect to the Units or the equity of any of the Company's Subsidiaries (other than an inter - company dividend or distribution); or

(vi)     approve or pay, directly or indirectly, any compensation to Directors, unless such Director is an independent third party unaffiliated with any Member; *provided*, that this Section 7.1(c)(vi) shall not apply to expenses contemplated by Section 7.2(h) or compensation payable to Quabbin under the terms of that certain Advisory Services Agreement, dated as of the date hereof, by and between the Company and Quabbin.

### 7.2     *Board of Directors*.

(a)     Composition; Initial Directors.  The Board shall consist of natural persons who need not be Members or residents of the State of Delaware.  From and after the Effective Date unless changed in accordance with this Section 7.2, the Board shall be composed of up to five (5) individuals.  So long as Quabbin or a Quabbin Affiliate is a Member of the Company, Quabbin shall have the right to designate two (2) Directors to the Board (such designees, the "*Quabbin Directors*").  The initial Quabbin Directors shall be Charles J. Wahle and Steven A. Leese.  The Dos Rios Partnerships shall have the right to designate two (2) Directors to the Board (such designees, the "*Dos Rios Directors*").  The initial Dos Rios Directors shall be Pat M. (Bo) Baskin, Jr. and John K. (Jay) Turner.  The fifth Director on the Board shall be jointly appointed by Quabbin and the Dos Rios Partnerships (such designee, the "***Management Director***").  The initial Management Director shall be Gary Lee Stevens, who shall serve as the Management Director so long as he is employed as Chief Executive Officer by the Company or its Affiliates.  If Gary Lee Stevens is for any reason no longer serving as Chief Executive Officer, Gary Lee Stevens will no longer serve on the Board, and his replacement shall be jointly appointed by Quabbin and the Dos Rios Partnerships as described above for the Management Director.  Commencing on the Effective Date, the Board shall be composed of such designees, each of whom shall serve until his successor is duly selected in accordance with this Agreement and qualified or until such individual's death, resignation or removal. The size of the Board may only be increased upon the unanimous approval of the Directors; *provided, however*, that if a new Member joins the Company in connection with a bona-fide Company equity financing and contributes more than twenty percent (20%) of the aggregate Capital Contributions of the Company then to date, then Dos Rios shall have the right in its sole discretion to increase the size of the Board for the purpose of giving such new Member representation on the Board as is

proportionate to such Member's Capital Contributions so long as such new Member is not an Affiliate of Dos Rios.  If a vote of the Members is required to appoint a Director, each Member agrees to vote for the Directors designated in accordance with this Section 7.2(a).

(b)     Board Observers.  The Dos Rios Partnerships shall have the right to appoint up to three (3) persons to attend the meetings of the Board, CP Investments shall have the right to appoint one (1) person to attend the meetings of the Board (provided that a member of CP Investments is not currently serving on the Board at such time), and each of Capital Southwest and Main Street Capital or their designee(s) shall have the right to appoint one (1) person to attend the meetings of the Board, in each case, as non-voting observers (each, an "*Observer*" and collectively, the "*Observers*").  Notwithstanding the forgoing, the Board, due to circumstances as determined by the Board, may hold a special meeting without providing notice to the Observers and may withhold any information and exclude any such Observer from any such meeting or portion thereof to the extent that access to such information or attendance at such meeting or portion thereof would, in the Board's reasonable judgment acting in good faith, (i) reasonably be expected to adversely affect the attorney-client privilege between the Company or any of its Subsidiaries and its counsel as to any pending or threatened litigation, employment issues or other matters as to which counsel is involved, or (ii) give rise to, or create a potential for, a conflict of interest.  Notice of the time and place of any such meeting shall be given to each of the Dos Rios Partnerships, CP Investments (provided it has the right to appoint an Observer), and the Institutional Minority Investors in the same manner and at the same time as notice is given to the directors which notice shall to the extent reasonably practicable be given at least five (5) Business Days prior to any such meeting.  Each of the Dos Rios Partnerships, CP Investments (provided it has the right to appoint an Observer), and the Institutional Minority Investors shall be given copies of all notices, reports, minutes, consents and other documents and materials related to such meetings at the time and in the manner as are provided to the Board, except to the extent such information is permitted to be excluded for reasons comparable to the exclusions provided above.  The Company shall reimburse each of the Institutional Minority Investors for all reasonable out-of-pocket costs and expenses incurred by them in connection with their Observers traveling to and from and attending such meetings.  Each Observer shall be entitled to participate in discussions and reasonably consult with, and make proposals and furnish advice to, the Board; *provided* that the Board shall not be under any obligation to take any action with respect to any proposals made or advice furnished by an Observer. The Board shall have the right (in its sole discretion) to exclude such Observers from all or any portion of a meeting of the Board. In no event shall the lack of attendance by the Observers at a meeting of the Board for which they received proper notice under this Section 7.2(b) invalidate any action taken by the Board at such meeting.

(c)     Removal; Vacancies.  Any Director may only be removed from the Board, with or without cause, by the Member(s) who designated such Director to serve on the Board; *provided* that the Quabbin Director shall automatically be removed in event that Quabbin and all Quabbin Affiliates cease to be Members of the Company.  Subject to Section 7.2(a) and the Dos Rios Partnerships' right to appoint certain Directors in the event that Quabbin and all Quabbin Affiliates cease to be Members, any vacancy subsequently occurring on the Board may be filled by the Member(s) entitled to appoint the applicable Directors.

(d)　　Quorum; Required Vote for Board Action.　Subject to other voting requirements applicable to the Board contained in this Agreement, a quorum for the transaction of business at a meeting of the Board shall exist when a majority of the Directors are present (*provided* that at least both Dos Rios Directors and at least one Quabbin Director, as applicable, are present in person or by proxy).　All decisions of the Board shall require the affirmative vote of a majority of the Directors present at a meeting at which a quorum is present.　Each Dos Rios Director shall have two (2) votes each, and each of the Quabbin Director and the Management Director shall have one (1) vote each.　If any Dos Rios Director is absent from a meeting, the other Dos Rios Directors(s) present at the meeting (*provided* a quorum is present) shall have the proxy of such missing Dos Rios Director and shall be entitled to vote on such missing Dos Rios Director's behalf.

(e)　　Location; Order of Business.　The Board may hold its meetings and may have an office and keep the books of the Company, in such place or places, within or without the State of Delaware, as the Board may from time to time determine by resolution.　At all meetings of the Board business shall be transacted in such order as shall from time to time be determined by resolution of the Board.

(f)　　Meetings of the Board; Notices.　Regular meetings of the Board shall be held at least quarterly and at such places as shall be designated from time to time by resolution of the Board.　Special meetings of the Board may be called by the chairperson of the Board, if any, or any two Directors on at least two (2) Business Days' personal, written, facsimile or wireless notice (*e.g*., email) to each Director, with such notice containing a statement of the purposes for such special meeting.

(g)　　Chairman.　All meetings of the Board shall be presided over by the chairman of the meeting, who shall be a Person designated by a majority of the Directors present at the meeting.　The chairman of any meeting of the Board shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as determined by him to be in order.　The initial chairman shall be Pat M. (Bo) Baskin, Jr.

(h)　　Compensation; Expense Reimbursement.　All Directors shall be entitled to be reimbursed by the Company for their respective reasonable out-of-pocket costs and expenses incurred in the course of their services as such including reasonable travel expenses.　Nothing in this Section 7.2(h) shall be construed to preclude any Director from serving the Company in any other capacity and receiving compensation therefor.　The Company may compensate Directors on terms approved by the Board; *provided, however*, that any employees of the Company serving on the Board shall not be eligible to receive any compensation for their Board service.

(i)　　Committees of the Board.

(i)　　The Board may, by resolution passed by a majority of all of the Directors, designate one or more committees, including an audit, compensation, disclosure, governance, executive and nomination committee, each such committee consisting of one or more of the Directors; *provided* that at least one (1) Quabbin Director shall be entitled to serve on any such committee.　Subject to Section 7.1(c), Section 7.1(d) and the other terms and

24

provision of this Agreement, any such designated committee shall have and may exercise such of the powers and authority of the Board in the management of the business and affairs of the Company as may be provided in such resolution.

(ii) Any committee designated in accordance with this Section 7.2(i) shall choose its own chairman, shall keep regular minutes of its proceedings and report the same to the Board when requested, shall fix its own rules or procedures, and shall meet at such times and at such place or places as may be provided by such rules or procedures, or by resolution of such committee or Board.  At every meeting of any such committee, the presence of a majority of all the members thereof shall constitute a quorum, and the affirmative vote of a majority of the members present shall be necessary for the adoption of any resolution.  A representative of the Dos Rios Partnerships and, in the event a Quabbin Director elects not to serve on the applicable committee, of Quabbin, shall each have the right to attend the meetings of any such designated committee.

(iii) The Board may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee, and in the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not constituting a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of the absent or disqualified member; *provided* that notwithstanding the foregoing, only a Quabbin Director and Quabbin shall have the right to disqualify or otherwise remove a Quabbin Director from a committee.

(iv) Each of the Members agrees to take such action, or refrain from taking such action, as is within its reasonable control to effect the provisions of this Section 7.2, including causing any Director nominated thereby to take or refrain from taking action for the foregoing purpose.

### 7.3    *Meetings of the Members*.

(a) Place of Meetings.  All meetings of the Members shall be held at the principal office of the Company, or at such other place within or without the State of Delaware as shall be specified or fixed in the notices (or waivers of notice) thereof.

(b) Quorum; Required Vote for Member Action; Adjournment of Meetings.  Except as expressly provided otherwise by this Agreement, the holders of a majority of the Class A Units, present in person or represented by proxy thereat shall constitute a quorum at any such meeting for the transaction of business.  Unless otherwise required by this Agreement, the affirmative vote of the holders of a majority of the outstanding Units (other than Units specifically designated as non-voting) present or represented by proxy shall constitute the act of the Members.  The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of sufficient Members to destroy the quorum.

(c) Annual Meetings.  An annual meeting of the Members, for the transaction of such business as may properly be considered at the meeting, may be held at such place, within

25

or without the State of Delaware, on such date, and at such time as the Board shall fix and set forth in the notice of the meeting.

      (d)    <u>Record Date</u>.

      (i)    The Board shall give at least five (5) days' personal, written, facsimile or wireless notice (*e.g.*, email) of any meetings of the Members of the Company.  For the purpose of determining Members entitled to notice of or to vote at any meeting of Members, or any adjournment thereof, or entitled to consent to any matter, or entitled to exercise any rights in connection with any change, conversion or exchange of Units, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing such record date is adopted by the Board, and which record date shall not be more than sixty (60) nor less than ten (10) days prior to the date of such meeting.  If no record date is fixed by the Board, the record date for determining Members entitled to notice of, or to vote at, a meeting of Members shall be the close of business on the day next preceding the day on which notice of such meeting is given, or, if notice is waived in accordance with this Agreement, the close of business on the day next preceding the day on which the meeting of Members is held.

      (ii)    If, in accordance with this Agreement, action without a meeting of Members is permitted to be taken, the Board may fix a record date for determining Members entitled to consent in writing to such action, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than five (5) days' subsequent to the date upon which the resolution fixing the record date is adopted by the Board.  If no record date has been fixed by the Board, the record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or to an Officer of the Company having custody of the book in which proceedings of meetings of Members are recorded.

      (iii)    A determination of Members of record entitled to notice of, or to vote at, a meeting of Members shall apply to any adjournment of the meeting; *provided*, *however*, that the Board may fix a new record date for the adjourned meeting.

      (e)    <u>Non-Voting Members</u>.  Notwithstanding anything to the contrary in this <u>Section 7.3</u>, to the maximum extent permitted by Law, the Company is only required to send notices of meetings to Persons entitled to vote at such meetings.

      ***7.4***    ***Provisions Applicable to All Meetings***.  In connection with any meeting or written consent of the Board or any committee thereof or any meeting or written consent of the Members, the following provisions shall apply:

      (a)    <u>Place of Meeting</u>.  Any such meeting shall be held at the principal place of business of the Company, unless the notice of such meeting specifies a different place, which need not be in the State of Delaware.

26

(b)      Waiver of Notice Through Attendance.  Attendance of a Person at such meeting (including attendance by telephone pursuant to Section 7.4(e)) shall constitute a waiver of notice of such meeting, except where such Person attends the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c)      Proxies.  A Director or committee member may vote at a Board or committee meeting by a written proxy executed by that Person and delivered to another Director or committee member.  A Member entitled to vote at a Members meeting may vote at a Members' meeting by a written proxy executed by that Person and delivered to the Secretary.  A proxy shall be revocable by such Member unless it is stated to be irrevocable.

(d)      Action by Written Consent.  Any action required or permitted to be taken at such a meeting may be taken without a meeting and without a vote if a consent or consents in writing, setting forth the action so taken, is signed by the Directors or by the Members, as the case may be, having not fewer than the minimum number of votes that would be necessary to take the action at a meeting at which all of the Directors or Members entitled to vote on the action were present and voted.  Subject to Section 7.4(f), notice of actions taken by written consent shall be delivered to the Directors, committee members or Members, as applicable, no later than the tenth (10th) Business Day following the date the requisite consent is obtained.

(e)      Meetings by Telephone.  Directors, members of any committee of the Board, or the Members, as applicable, may participate in and hold any meeting by means of conference telephone, video conference or similar communications equipment by means of which all Persons participating in the meeting can hear each other, one or more of which means of participation the Company shall provide to the Directors, members of any committee of the Board, and Members, as applicable, with respect to each such meeting, and the votes of any Directors, members of any committee of the Board, or the Members, as applicable, participating by conference telephone, video conference or similar communications equipment shall be given full effect.

(f)      Board Materials.  The Company and Board, as applicable, shall provide each Director with copies of all notices, minutes, consents (and requests therefor) and other materials and information that the Company or Board provides to any other Director, at the same time as when provided to such other Director.

**7.5      _Officers_**.  The Board may appoint certain agents of the Company to be referred to as "officers" of the Company ("**_Officers_**") and designate such titles (such as Chief Executive Officer, Vice-President, Secretary and Treasurer) as are customary for corporations under Delaware Law, and such Officers shall have the power, authority and duties described in this Section 7.5 or as determined by resolution of the Board.  Any two or more offices may be held by the same person.  In addition to or in lieu of Officers, the Board may authorize any person to take any action or perform any duties on behalf of the Company (including any action or duty reserved to any particular Officer) and any such person may be referred to as an "**_authorized person_**."  An employee or other agent of the Company shall not be an authorized person unless specifically appointed as such by the Board.

(a)     The Chief Executive Officer shall serve at the pleasure of the Board and subject to the terms of any applicable employment agreement.  The Chief Executive Officer will exercise executive authority over the operations of the Company, implementing the policies and strategic direction established by the Board.   Subject to such limitations and/or specific delegations of authority that may be established from time to time by the Board, the Chief Executive Officer shall supervise and direct the Company's officers and employees, shall have authority to execute account agreements and banking resolutions required by financial institutions, and shall fulfill the duties and responsibilities typical to the position of president of a Delaware corporation, including without limitation interviewing, hiring, and training management and officer level employees; planning, assigning, and directing work; appraising performance; rewarding and disciplining employees; addressing complaints and resolving problems; directing subordinate officers and managers to achieve the Company's strategic and financial goals and conducting himself or herself at all times in a manner that reflects the Company's standards and integrity.

(b)     The Company may have one or more Vice Presidents, who shall serve at the pleasure of the Board and subject to the terms of any applicable employment agreements. The Vice Presidents shall be subject to the immediate supervision of the Chief Executive Officer, and shall exercise the duties and responsibilities delegated to them from time to time by the Board and the Chief Executive Officer.

(c)     The Company may have a Secretary, who shall serve at the pleasure of the Board and subject to the terms of any applicable employment agreement.  The Secretary shall be subject to the immediate supervision of the Chief Executive Officer, and shall exercise the duties and responsibilities typical to the position of secretary of a Delaware corporation, including, without limitation, maintaining the Company's organic records and unit ownership records, taking and maintaining on a current basis the minutes of meetings of the Company's Board and Members, taking all administrative actions necessary for the issuance of unit certificates to unit owners, and maintaining the Company's business records in a current and orderly manner.

(d)     The Company may have a Treasurer, who shall serve at the pleasure of the Board and subject to the terms of any applicable employment agreement.  The Treasurer shall be subject to the immediate supervision of the Chief Executive Officer, and shall exercise the duties and responsibilities typical to the position of treasurer of a Delaware corporation, including, without limitation having charge and custody of and being responsible for all funds of the Company and depositing all such funds in the name of the Company in such banks, trust companies or other depositories as shall be selected by the Board; receiving and giving receipts for moneys due and payable to the Company from any source; and, in general, performing such other duties as from time to time may be assigned by the Board or the Chief Executive Officer. The Treasurer shall render to the Board, whenever the same shall be required, an account of all transactions accomplished as the Treasurer and of the financial condition of the Company.  The Treasurer shall, if required to do so by the Board, give the Company a bond in such amount and with such surety or sureties as may be ordered by the Board, for the faithful performance of the duties of office and for the restoration to the Company, in the case of death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind belonging to the Company which are held or controlled by the Treasurer.

**7.6    *Confidentiality***.  The Members acknowledge that they may receive information from or regarding the Company or the other Members in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company, the other Members or Persons with whom they do business.  Each Member shall hold in confidence and not disclose any information it receives regarding the Company or the other Members that is identified as being confidential and may not disclose it to any Person other than another Member, Director or Observer except for disclosures (a) compelled by law or required or requested by subpoena or request from a court, regulator or a stock exchange (but the Member shall notify the Company or the Member affected by such disclosure, as applicable, promptly of any request for that information before disclosing it if practicable), (b) required by a national securities exchange on which the Member or its controlling affiliate is listed, (c) to Affiliates, advisers or representatives of the Member (*provided* that such Affiliates, advisors, or representatives are informed of the confidential nature of such information, and that the disclosing Member remains liable for any breach by its Affiliates, advisors and/or representatives), (d) of information that the Member also has received from a source independent of the Company or other Member, as applicable, that the Member reasonably believes obtained that information without breach of any obligation of confidentiality, (e) to any Person to which such Member offers to sell any of its Units so long as the Transferring party first enters into a confidentiality agreement with the proposed transferee, in form reasonably acceptable to the Company (for which the Company will promptly supply a form upon request by any Member), (f) of information in connection with litigation against the Company or any Member to which the disclosing Member is a party (but the Member shall notify the Company or the Member affected by such disclosure, as applicable, as promptly as practicable prior to making such disclosure, if practicable), (g) to any bank, financial institution, S&P, Moody's, Fitch and/or other ratings agency, as such Member reasonably deems necessary or appropriate in connection with such Member obtaining financing; *provided, however*, that such financial institution or ratings agency shall be informed of the confidentiality of such information or (h) permitted by the Company.  The Members agree that breach of the provisions of this Section 7.6 may cause irreparable injury to the Company or the other Members for which monetary damages (or other remedy at law) are inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Member to comply with such provisions and (ii) the uniqueness of the Company's and each other Member's business and the confidential nature of the information described in this Section 7.6.    Accordingly, the Members agree that the provisions of this Section 7.6 may be enforced by specific performance.  Notwithstanding anything in this Section 7.6 or elsewhere in this Agreement to the contrary, each Member further understands and acknowledges that each of Capital Southwest and Main Street Capital and their respective Affiliates will have (A) certain regulatory disclosure requirements which are necessary in order to maintain compliance with the rules and regulations of the Securities and Exchange Commission and (B) certain disclosure requirements and practices that are required as a publicly-traded investment company, and as each such Member approves and consents to the disclosure of Confidential Information for such purposes, and nothing in this Section 7.6 shall prohibit Capital Southwest or Main Street Capital or any of their respective Affiliates from disclosing Confidential Information to the Securities and Exchange Commission.

## ARTICLE 8.
## EXCULPATION AND INDEMNIFICATION

*8.1*     *Exculpation*.

(a)     No Member, Director or Officer of the Company or Director or Officer who is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be liable to the Company or any Member for monetary damages arising from any actions taken, or actions failed to be taken, in his or her capacity as such except for acts or omissions which are fraudulent, not in good faith or which involve intentional misconduct or a knowing violation of Law. Notwithstanding anything to the contrary in this Agreement, to the maximum extent permitted by Law, the Company or any Member, as applicable, shall bear the burden of establishing a prima facie case that a Member, Director or Officer thereof breached the standard of care set forth above in this <u>Section 8.1</u>.  In addition, by resolution of the Board, the Company may, but is not obligated to, exculpate any employee or agent of the Company to the same degree that a Member, Director or Officer is exculpated under this <u>Section 8.1</u>.

(b)     It is the intent of this <u>Section 8.1</u> to restrict the liability and fiduciary duties of the Members and the Directors to the maximum extent permitted by applicable law.  A Member or Director shall have no liability hereunder for failing to act if such act required the consent of some or all of the Directors or Members and the required consent to such action was not granted.  Any amendment, modification or repeal of this <u>Section 8.1</u> or any provision in this <u>Section 8.1</u> shall be prospective only and shall not in any way affect the limitations on any Member's or Director's liability to the Company and the Members and Directors under this <u>Section 8.1</u> as in effect immediately prior to such amendment, modification or repeal with respect to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when claims relating to such matters may arise or be asserted.

(c)     In furtherance of this limitation of fiduciary duties of the Members and Directors, but not by way of limitation, the following provisions shall apply:

(i)     subject to <u>Article 11</u>, it will not constitute a breach of fiduciary or other duty for a Member or Director or any of their respective Affiliates to engage in any business activity, including, without limitation, activities of the type conducted by the Company, even if in direct competition with the Company;

(ii)     it will not constitute a breach of fiduciary or other duty for Members or Directors to resolve any conflicts of interest in accordance with the terms of this Agreement or an agreement, approved in accordance with <u>Section 7.1(c)</u>, with the other Members or Directors;

(iii)     it will not constitute a breach of fiduciary or other duty for the Members or Directors to engage attorneys, accountants and other advisors on behalf of the Company even though such Persons may also be retained from time to time by a Member or

Director or any of a Member's or Director's officers, directors, unitholders, members or partners, and such Persons may be engaged with respect to any matter in which the interest of the Company and a Member or Director may differ, or may be engaged by both the Company and a Member or Director with respect to any other matter.  No Members or Directors shall be responsible for any misconduct or negligence on the part of any such attorney, accountant or other advisor; and

(iv)    it will not constitute a breach of fiduciary or other duty for a Member or Director to contract or enter into any agreement or arrangement with the Company with respect to any Company property or any aspect of the operations of the Company so long as the terms and provisions of any such agreement or arrangement are arms-length and have been approved in accordance with <u>Section 7.1(c)</u>.

**8.2    *Indemnification*.**

(a)    Subject to the limitations set forth in this <u>Article 8</u>, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "***Proceeding***"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that it, or a Person of whom it is the legal representative, is or was a Director or Officer or while a Director or Officer is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be, except as permitted below in this <u>Section 8.2</u>, indemnified by the Company to the fullest extent permitted by the Delaware General Corporation Law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said Law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including attorneys' fees) actually incurred by such Person (an "***Indemnitee***") in connection with such Proceeding, and indemnification under this <u>Article 8</u> shall continue as to an Indemnitee who has ceased to serve in the capacity which initially entitled such Indemnitee to indemnity hereunder.  Notwithstanding anything to the contrary in this <u>Section 8.2</u>, an Indemnitee shall not be entitled to indemnification hereunder if it is determined by a nonappealable order of a court of competent jurisdiction that, with respect to the matter for which such Indemnitee seeks indemnification, such Indemnitee did not act in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had reasonable cause to believe his conduct was unlawful.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Indemnitee did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

(b)      The Company hereby acknowledges that an Indemnitee may have certain rights to indemnification, advancement of expenses and/or insurance provided by one or more other parties and certain affiliates thereof (collectively, the "*Fund Indemnitors*").  The Company hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to Indemnitee are primary and any obligation of the Fund Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by Indemnitee are secondary), (ii) that it shall be required to advance the full amount of expenses incurred by Indemnitee and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement (or any other agreement between the Company and Indemnitee), without regard to any rights Indemnitee may have against the Fund Indemnitors, and (iii) that it irrevocably waives, relinquishes and releases the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.  The Company further agrees that no advancement or payment by the Fund Indemnitors on behalf of Indemnitee with respect to any claim for which Indemnitee has sought indemnification from the Company shall affect the foregoing and the Fund Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of Indemnitee against the Company.   The Company and Indemnitee agree that the Fund Indemnitors are express third party beneficiaries of the terms of this Section 8.2(b).

(c)      Except as provided in Section 8.2(b), in the event of any indemnification payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee (other than against the Fund Indemnitors), who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.  Except as provided in Section 8.2(b), the Company shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable hereunder if and to the extent that Indemnitee has otherwise actually received such payment under any insurance policy, contract, agreement or otherwise.

**8.3     *Advance Payment***.  The right to indemnification conferred in this Article 8 shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by an Indemnitee entitled to be indemnified under Section 8.2 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Indemnitee's ultimate entitlement to indemnification; *provided*, *however*, that the payment of such expenses incurred by any such Indemnitee in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Indemnitee of its good faith belief that it has met the standard of conduct necessary for indemnification under this Article 8 and a written undertaking, by such Indemnitee, to repay all amounts so advanced if it shall ultimately be determined that such indemnified person is not entitled to be indemnified under this Article 8 or otherwise.

**8.4     *Indemnification of Employees and Agents***.  The Company, by adoption of a resolution of the Board, may, but shall not be obligated to, indemnify and advance expenses to an employee or agent of the Company who is not a Director or Officer to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Directors,

Officers, authorized persons and authorized signatories under this Article 8; and, the Company may, but shall not be obligated to, indemnify and advance expenses to persons who are not or were not Director, Officers, authorized persons, and authorized signatories, employees or agents of the Company but who are or were serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against such person and incurred by such person in such a capacity or arising out of its status as such an aforementioned functionary to the same extent that the Company may indemnify and advance expenses to Indemnitees under this Article 8.

     **8.5**    *Appearance as a Witness*.  Notwithstanding any other provision of this Article 8, the Company may, by adoption of a resolution of the Board, pay or reimburse expenses incurred by a Director, Officer, authorized person and authorized signatories or Member in connection with its appearance as a witness or other participation in a Proceeding at a time when it is not a named defendant or respondent in the Proceeding.

     **8.6**    *Nonexclusivity of Rights*.  The right to indemnification and the advancement and payment of expenses conferred in this Article 8 shall not be exclusive of any other right that a Director, Officer, authorized person or other Person indemnified pursuant to this Article 8 may have or hereafter acquire by vote of the Board.

     **8.7**    *Insurance*.  The Company shall purchase and maintain insurance, at its expense, to protect itself and any Person who is or was serving as a Director, Officer, authorized person, employee or agent of the Company or is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, authorized person, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article 8.

## ARTICLE 9.
## TAXES; REPORTS; BANK ACCOUNTS

     **9.1**    *Tax Returns*.  The Tax Matters Member shall prepare and timely file, or cause the Company to prepare and timely file, all federal, state and local tax returns required to be filed by the Company.  Unless otherwise agreed by the Directors, any income tax return of the Company shall be prepared by an independent public accounting firm selected by the Board.  Prior to filing any return for the Company, the Board shall provide draft copies of such return to (a) each Member that owns greater than five percent (5%) of the total number of issued and outstanding Units and (b) each of Capital Southwest and Main Street Capital and each of their respective Permitted Transferees so long as such Person or its Permitted Transferees holds any Units, and in each such case, such Members shall have twenty (20) days to review such tax returns prior to filing by the Company.  Each Member shall furnish to the Company all pertinent information in its possession relating to the Company's operations that is necessary to enable the Company's tax returns to be timely prepared and filed.  The Company shall deliver a Schedule K-1 to each of the Members as soon as practicable after the close of each taxable year, but in no event later

than March 15 of each year, together with such additional information as may be required by the Members in order for the Members to file their individual returns reflecting the Company's operations.  The Company shall bear the costs of the preparation and filing of its returns.

**9.2**     ***Tax Partnership***.  The Members acknowledge that the Company shall be treated as a partnership for Federal and state income tax purposes and will not otherwise characterize the Company for purposes of any Federal or state tax returns, statements or reports filed by them or their Affiliates.

**9.3**     ***Tax Elections***.   The Company shall make the following elections on the appropriate tax returns, and each Member shall be bound by the election and agrees to comply with all requirements of the election:

(a)     to adopt, as the Company's Fiscal Year, the calendar year unless otherwise required under the Code;

(b)     to adopt the accrual method of accounting;

(c)     if a distribution of the Company's property as described in Code Section 734 occurs or a Transfer of Membership Interests (including Units) as described in Code Section 743 occurs, on request by notice from any Member, to elect, pursuant to Code Section 754, to adjust the basis of Company's properties so long as the Tax Matters Member determines that the Code Section 754 election is in the best interests of the Company and the other Members, and so long as the Board consents to such election;

(d)     to elect to amortize the organizational expenses of the Company ratably over a period of one hundred eight (180) months as permitted by Code Section 709(b);

(e)     any election that would ensure that the Company will be treated as a partnership for Federal income tax purposes;

(f)     any election determined appropriate by the Board to ensure that any Units intended to be issued as "profits interests" in the Company continue to be so treated, or to revoke such election, as determined by the Board; and

(g)     any other election the Board may deem appropriate and in the best interests of the Members.

Neither the Company nor any Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state Law and no provision of this Agreement (including Section 2.7) shall be construed to sanction or approve such an election.

**9.4**     ***Tax Matters Member***.

(a)     Designation by the Board.  The "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code shall be Dos Rios subject to replacement by the Board.  Any Member who is designated as the "tax matters partner" is referred to herein as the

34

"*Tax Matters Member*."  The Tax Matters Member shall take such action as may be necessary to cause to the extent possible each other Member to become a "notice partner" within the meaning of Section 6231(a)(8) of the Code.  The Tax Matters Member shall inform each other Member of all significant matters that may come to its attention in its capacity as Tax Matters Member by giving notice thereof on or before the fifth (5th) Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity.

(b)     Duties and Obligations.  The Tax Matters Member shall take no action without the authorization of the Board, other than such action as may be required by Law.  Any cost or expense incurred by the Tax Matters Member in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company.  The Tax Matters Member shall not enter into any extension of the period of limitations for making assessments on behalf of the Members without first obtaining the consent of  the Board.  The Tax Matters Member shall not bind any Member to a settlement agreement without obtaining the consent of such Member.  Any Member that enters into a settlement agreement with respect to any Company item (within the meaning of Code Section 6231(a)(3)) shall notify the other Members of such settlement agreement and its terms within ninety (90) days from the date of the settlement.

(c)     Requests for Administrative Adjustments by Members.  No Member shall file a request pursuant to Code Section 6227 for an administrative adjustment of Company items for any taxable year without first notifying the other Members.  If the Board consents to the requested adjustment, the Tax Matters Member shall file the request for the administrative adjustment on behalf of the Members.  If such consent is not obtained within thirty (30) days from such notice, or within the period required to timely file the request for administrative adjustment, if shorter, any Member, including the Tax Matters Member, may file a request for administrative adjustment on its own behalf.  Any Member intending to file a petition under Code Sections 6226, 6228 or other Code Section with respect to any item involving the Company shall notify the other Members of such intention and the nature of the contemplated proceeding.  In the case where the Tax Matters Member is the Member intending to file such petition on behalf of the Company, such notice shall be given within a reasonable period of time to allow the other Members to participate in the choosing of the forum in which such petition will be filed.

(d)     Notice of Inconsistent Treatment.  If any Member intends to file a notice of inconsistent treatment under Code Section 6222(b), such Member shall give reasonable notice under the circumstances to the other Members of such intent and the manner in which the Member's intended treatment of an item is (or may be) inconsistent with the treatment of that item by the other Members.

*9.5     Class B Units and Class C Units Issued in Exchange for the Performance of Services*.  Following the promulgation, if any, of final Treasury Regulations and associated guidance by the Treasury Department and IRS regarding the tax consequences associated with the issuance or Transfer of Class B Units and Class C Units in exchange for the performance of services, the Tax Matters Member shall, with the consent of all of the Members, make the election contemplated by proposed Treasury Regulation Section 1.83-3(l) and the revenue

procedure contemplated by IRS Notice 2005-43 (or the corresponding provisions of any such final Treasury Regulations or associated guidance) in connection with the issuance or Transfer by the Company of any Class B Units or Class C Units in exchange for the performance of services.  The Company and each Member (including the Member obtaining Class B Units or Class C Units in exchange for the performance of services) shall comply with all requirements associated with any such election while the election remains effective.

**9.6     *Financial Reports*.**  Each Member that holds Units on the Effective Date and any such other Member that holds greater than ten percent (10%) of the total number of outstanding Class A Units, upon written request to the Company, shall have the right to receive promptly after the later to occur of one hundred twenty (120) days after the end of each applicable fiscal year or the completion of the Company's annual audit, audited consolidated statements of income and cash flows of the Company and its Subsidiaries for such fiscal year, and audited consolidated balance sheets of the Company and its Subsidiaries as of the end of such fiscal year, *provided* that the time period for delivery of such information pursuant to this Section 9.6 shall be subject to extension by the Board, in its sole discretion, if such financial information is not yet available for delivery or not yet in final form.

**9.7     *Information Required by Rule 144A*.**  The Company shall, upon the reasonable request of either or both of the Institutional Minority Investors, provide such Member and any qualified institution buyer designated by such Member, such financial and other information as such Member may reasonably determine to be necessary in order to permit compliance with the information requirements of Rule 144A under the Securities Act.

**9.8     *Bank Accounts*.**  The Company may establish one or more separate bank and investment accounts and arrangements, which shall be maintained in the Company's name with financial institutions and firms that the Board may determine.  The Company shall not commingle the Company's funds with the funds of any Member.

## ARTICLE 10.
## DISSOLUTION, WINDING-UP AND TERMINATION

**10.1     *Dissolution*.**

(a)     General.  Subject to Section 10.1(b), the Company shall dissolve and its affairs shall be wound up on the first to occur of the following events (each a "***Dissolution Event***"), and no other event shall cause the Company's dissolution:

(i)     the approval of the Board and the Dos Rios Partnerships; and

(ii)     the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

(b)     Continuance of the Company.  To the maximum extent permitted by the Act, the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member shall not constitute a Dissolution Event and, notwithstanding the occurrence of any such event or circumstance, the business of the Company shall be continued without dissolution.

**10.2    *Winding-Up and Termination*.**   On the occurrence of a Dissolution Event, the Board may select one or more Persons to act as liquidator or may itself act as liquidator.  The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of winding up shall be borne as a Company expense, including reasonable compensation to the liquidator if approved by the Board.  Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Board.  The steps to be accomplished by the liquidator are as follows:

(a)    <u>Accounting</u>.  As promptly as possible after dissolution and again after final winding up, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last calendar day of the month in which the dissolution occurs or the final winding up is completed, as applicable.

(b)    <u>Satisfaction of Obligations</u>.  The liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in winding up and any advances described in <u>Section 5.4</u>); *provided*, *however*, that the liquidator may establish one or more cash escrow funds (in such amounts and for such terms as the liquidator may reasonably determine) for the payment of contingent liabilities.

(c)    <u>Distribution of Assets</u>.  All remaining assets of the Company shall be distributed to the Members as follows:

(i)    the liquidator may sell any or all Company property, including to the Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of Members in accordance with the provisions of <u>Article 6</u>;

(ii)    with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of Members shall be adjusted by allocating among the Members the unrealized income, gain, loss, and deduction inherent in such property that that would be recognized if there were a taxable disposition of that property for the fair market value of that property on the date of distribution;

(iii)    all items of income, gain, loss and deduction of the Company for the year in which the Dissolution Event occurs and any subsequent year (including items described in <u>Section 10.2(c)(ii)</u>) shall be allocated among the Members in a manner that results to the nearest extent possible in the ending Capital Account balance of each Member being equal to the amount to be distributed to such Member pursuant to <u>Section 10.2(c)(iv)</u>; and

(iv)    the property of the Company shall be distributed in accordance with the distribution mechanics in <u>Section 6.2</u>.

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this <u>Section 10.2</u>.  The distribution of cash and/or property to a Member in accordance with the provisions of this <u>Section 10.2</u> constitutes a complete return to the Member

of its Capital Contributions and all the Company's property and constitutes a compromise to which all Members have consented within the meaning of Section 18-502(b) of the Act.  To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

**10.3    *Deficit Capital Accounts***.  No Member will be required to pay to the Company, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

**10.4    *Certificate of Cancellation***.  On completion of the distribution of Company assets as provided herein, the Board (or any Person or Persons as the Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to Section 2.5, and take such other actions as may be necessary to terminate the existence of the Company.   Upon the effectiveness of the Certificate of Cancellation, the existence of the Company shall cease, except as may be otherwise provided by the Act or other applicable Law.

**ARTICLE 11.**
**Right of Competition**

**11.1    *Right of Competition***.

(a)    The Company and each of the Members recognize that the Dos Rios Partnerships, Quabbin, and the Institutional Minority Investors and each of their respective Affiliates, partners, principals and co-investors (each of the Dos Rios Partnerships, Quabbin, and the Institutional Minority Investors, together with their Affiliates, are collectively referred to as an "***Investor Group***" and each Person that is an owner of such Investor Group or is in such Investor Group is referred to as an "***Investor Group Member***") invest in, serve on the board of directors and other governing boards of, serves as officers of, provide services to and have minority and controlling ownership interests in existing and future operating companies. Except for the confidentiality obligations contained in Section 7.6 and the provisions of this Section 11.1, nothing in this Agreement or the nature of the existing or any future relationship between any Investor Group Member, on the one hand, and the Company or any Member, on the other (whether such relationship is by reason of any Investor Group Member acting as a lender, owner of equity interest or warrants, landlord, service provider or otherwise), will prohibit any Investor Group Member from engaging in any activity or business opportunity whatsoever, including without limitation any activity related to the Business Line or Company Business Opportunity, for its own account, or will require any Investor Group Member to make any business opportunity, including without limitation any Company Business Opportunity, available to the Company or any Member.

(b)    Each Member, other than the Investor Group Members, (each, a "***Competing Member***") acknowledges and recognizes such Competing Member's possession of confidential information regarding the Company and its business and acknowledges and recognizes the highly competitive nature of the business of the Company.  Accordingly, in consideration of the agreements set forth in this Agreement and the other Investment Documents, the Competing Member agrees that, while the Competing Member is a Member in the Company,

38

and until the earlier to occur of (i) the sale of all or substantially all of the Units of the Company, (ii) a Dissolution Event or (iii) the expiration of two (2) years after a Member ceases to be a Member of the Company unrelated to an event described in the foregoing subclauses (i) and (ii), the Competing Member will not, for any reason whatsoever, either individually, through one or more of its Affiliates or as an officer, director, stockholder, member, manager, partner, employee, agent or principal of any other business or firm, directly or indirectly (1) engage in any manner in any Company Business Opportunity other than through the Company, (2) call upon or otherwise communicate with any Person who is, at that time, or was at any time within twelve (12) months prior thereto an employee of the Company for the purpose or with the intent of enticing such employee away from or out of the employ of the Company or directly or indirectly hiring such Person as an employee or independent contractor, (3) seek to divert from doing or continuing to do business with the Company or any of its subsidiaries, any supplier, customer or any other Person that has a business relationship with the Company or with which the Company is actively planning or pursuing a business relationship, or (4) assist others in engaging in any of the foregoing actions described in clauses (1), (2) or (3) above.

(c)     It is the desire and intent of the Members hereto that the provisions of this Section 11.1 shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, although the Competing Member considers the restrictions contained in this Section 11.1 to be reasonable for the purposes of preserving the Company's business and proprietary rights, if any particular provision of this Section 11.1 shall be adjudicated to be invalid or unenforceable, such provision shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made. It is expressly understood and agreed that, although the Competing Member considers the restrictions contained in this Section 11.1 to be reasonable, if a final determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in this Section 11.1 is unenforceable against the Competing Member, the provisions of this Section 11.1 shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable.

(d)     The Members acknowledge that damages at law would be an inadequate remedy for the breach or threatened breach by the Competing Member of any provision of this Section 11.1, and agree that, in the event of such breach or threatened breach, the Company or any other Member may obtain temporary and permanent injunctive relief (any requirements for the posting of a bond for injunction are hereby expressly waived) restraining the Competing Member from such breach or threatened breach, and, to the extent permissible under applicable statutes and rules of procedure, a temporary injunction may be granted immediately upon the commencement of any such suit. Nothing contained in this Agreement shall be construed as prohibiting the Company or any other Member from pursuing other remedies available at law or equity for such breach or threatened breach of this Section 11.1.

(e)     Except as provided above in Sections 11.1(a), (b), (c), and (d), and except for any applicable restrictions in any employment agreement between the Company and any Member or in the Purchase Agreement or any Incentive Unit Agreement, each Member, in its individual capacity or otherwise, and its respective principals and Affiliates, shall be free to

engage and conduct or participate in any business or activity whatsoever, including, without limitation, the business conducted by the Company, without any accountability or obligation whatsoever to the Company or to any other Member and each Member waives any right or claim it may have against any Member with respect to any competing business or activity or the income or profits therefrom.

## ARTICLE 12.
## GENERAL PROVISIONS

**12.1    Books**.  To the extent required by the Act, the Company shall maintain or cause to be maintained complete and accurate records and books of account of the Company's affairs at the principal office of the Company.

**12.2    Offset**.  Whenever the Company is to pay any sum to any Member, any amounts that such Member, in its capacity as a Member, owes the Company may be deducted from that sum before payment.

**12.3    Notices**.  Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be delivered to the recipient in person, by courier or mail or by facsimile or electronic mail, or similar transmission, and a notice, request or consent given under this Agreement is effective on receipt by the Person to receive it.  Notices given by facsimile or email shall be deemed to have been received (a) on the day on which the sender receives answer back confirmation if such confirmation is received before or during normal business hours of any Business Day or (b) on the next Business Day after the sender receives answer back confirmation if such confirmation is received (i) after normal business hours on any Business Day or (ii) on any day other than a Business Day.  All notices, requests and consents to be sent to a Member must be sent to or made at the addresses given for that Member in books and records of the Company or such other address as that Member may specify by notice to the other Members. Whenever any notice is required to be given by Law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**12.4    Entire Agreement; Supersedure**.  This Agreement and other agreements expressly mentioned herein (including each Incentive Unit Agreement) constitute the entire agreement of the Members, and their respective Affiliates relating to the Company and supersede all prior contracts or agreements with respect to the Company, whether oral or written.

**12.5    Effect of Waiver or Consent**.  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

**12.6   Amendment or Restatement**.   Except as expressly set forth herein, this Agreement (including the Exhibits) may be amended or restated only by a written instrument adopted, executed and agreed to by the Company (upon requisite Board approval) and the Dos Rios Partnerships; *provided, however*, that (a) any amendment or restatement that adversely affects any class or series of Units in a manner that is different to the manner in which such amendment or restatement affects any other class of Units, or series of Units within the same class of Units, shall be effective only with the consent of the Members so adversely and differently affected, (b) any amendment or restatement that affects any Member, from a financial or economic standpoint, in a manner that is adverse and different to the manner in which such amendment or restatement affects other Members, shall be effective only with the consent of the Members so adversely and differently affected, (c) any amendment to this Agreement that would (i) obligate a Member to make a Capital Contribution to the Company or (ii) cause a Member to have personal liability for Company obligations, shall be effective only with the consent of such Member, (d) any amendment or restatement of Sections 2.4 or 7.2 shall be effective only with the consent of all of holders of Units, (e) to the extent that a provision of this Agreement requires a specified vote of the Members, or the vote of some or all of the holders of a specified class or series of Units, then any amendment of that provision will also require the consent of such specified vote of the Members or the vote of the requisite holders of such specified class or series of Units, as applicable, (f) subject to Section 4.2(a), the Board may amend this Agreement without the consent of any of the holders of Units to authorize additional Class A Units and/or Class B Units and to create a new series of Class A Units, (g) any waiver, amendment, restatement or termination of Sections 4.2(a) and 11.1, this Section 12.6 and, as such terms apply to Quabbin or any Quabbin Affiliate, the initial paragraph of Section 4.4 and the definitions of "Affiliate" and "Quabbin Affiliate" hereunder, shall be effective only with the consent of Quabbin, (h) the Board may amend Schedule 1 without the consent of any Person to reflect new Members admitted in accordance with this Agreement, changes to the notice addresses and other similar relevant information.  The Certificate may be amended or restated only with the approval of the Board, *provided*, *however*, that no such amendment or restatement of the Certificate may affect any change described in the above proviso without the consent of the Member or Members whose consent would be required under such clauses if such change were being effected through an amendment or restatement of this Agreement, and (i) no amendment shall adversely affect the rights granted to any Member and no amendment shall be made to any of Section 4.3, Section 4.4, Section 4.6, Section 4.7, Section 4.8, Section 6.1, Section 6.2, Section 6.3, Section 7.2(b), Section 7.6, Section 11.1, Section 12.15 or Section 12.16 or any defined term used therein; and *provided further* that this Section 12.6 may not be amended without the consent of all Members then party to this Agreement.  Proportionate dilution, alone, caused by new Capital Contributions, the authorization and issuance of additional Class A Units and/or Class B Units, and the creation of a new series of Class A Units shall not be considered "disproportionate" for purposes of clause (a) or (b) above.

**12.7   Binding Effect**.  This Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and permitted assigns.

**12.8   Governing Law; Submission to Jurisdiction**.  This Agreement is governed by and shall be construed in accordance with the Laws of the State of Delaware, excluding any conflict-of-laws rule or principle that might refer to the governance or the construction of this Agreement to the Law of another jurisdiction.  To the fullest extent permitted by Law, the parties

hereto agree that any claim, suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement shall only be brought in the state or federal courts located in Harris County in the State of Texas and not in any other state or federal courts located in the United States of America.  Each of the parties hereby consents to the jurisdiction of such courts (and the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding that is brought in any such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient forum.

**12.9   Severability**.  If a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate or (b) any mandatory, non-waivable provision of the Act, such provision of the Certificate or the Act shall control.  If any provision of the Act provides that it may be varied or superseded in the agreement of a limited liability company (or otherwise by agreement of the members or managers of a limited liability company), such provision shall be deemed superseded and waived in its entirety if this Agreement contains a provision addressing the same issue or subject matter.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by Law.

**12.10   Further Assurances**.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be commercially reasonable or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**12.11   Waiver of Certain Rights**.  Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

**12.12   Directly or Indirectly**.  Where any provision of this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person, including actions taken by or on behalf of any Affiliate of such Person.

**12.13   Counterparts**.  This Agreement may be executed in any number of counterparts, including facsimile or other electronic transmission, with the same effect as if all signing parties had signed the same document.  All counterparts shall be construed together and constitute the same instrument.

**12.14   Expenses**.  As agreed to among the parties as of the date hereof, the Company shall pay and hold (without duplication) the Members harmless against liability for the payment of the reasonable out-of-pocket expenses of such Persons (including the reasonable fees and expenses of legal counsel or other advisors) arising in connection with the preparation, negotiation and execution of this Agreement and the other agreements executed in connection herewith, and the consummation of the transactions contemplated hereby and thereby.  With respect to the preparation, negotiation and execution of any amendments or waivers (whether or

not the same become effective) under or in respect of this Agreement, the Company shall pay for one counsel to represent all of the Members other than the Dos Rios Members (who shall be selected based on the vote of a majority of such Members), including the reasonable out-of-pocket expenses (including the reasonable fees and expenses of legal counsel) arising in connection therewith.  In the event that a dispute arises among the Members with respect to this Agreement, all of the Members other than the Dos Rios Partnerships shall be represented by the same legal counsel who shall be selected based on the vote of a majority of such Members.  With respect to the fees, costs and expenses incurred during any such dispute, the non-prevailing party shall pay all of the fees, costs and expenses of the prevailing party.

     ***12.15  Lender Rights***.   Notwithstanding anything contained herein to the contrary, nothing contained in this Agreement shall affect, limit or impair the rights and remedies of any Institutional Minority Investor or any of their respective Affiliates, funding or financing sources or any other lenders in their capacities as lenders to the Company or any of its Subsidiaries pursuant to the Subordinated Note Purchase Agreement or any other agreement under which the Company or any of its Subsidiaries has or from time to time will have borrowed money.  Without limiting the generality of the foregoing, none of the Institutional Minority Investors or any respective Affiliate thereof, in exercising its rights as a lender or other creditor, including making its decision on whether to foreclose on any collateral security, shall have any duty to consider (a) its status as a direct or indirect equityholder of the Company, (b) the interests of the Company or any of its Subsidiaries or (c) any duty it may have to any other Member of the Company

     ***12.16  Spouse Acknowledgement***.  By execution hereof, the spouse of each individual Member hereby consents to the terms of this Agreement to the extent applicable to such spouse and agrees to comply in all respects with the terms and provisions hereof.

**[*Signature Page Follows*]**

**COUNTERPART SIGNATURE PAGE**

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**CHANDLER SIGNS HOLDINGS, LLC**

The undersigned Member hereby executes the Amended and Restated Limited Liability Company Agreement (as amended, the "Agreement") of Chandler Signs Holdings, LLC (the "Company"), to be effective as of the date first written above.

CLASS A MEMBER:

**DOS RIOS PARTNERS, L.P.**

By: Dos Rios GP, LLC,
    its general partner

By: _____
Name: Pat M. (Bo) Baskin, Jr.
Title: Manager


Address and e-mail for
Notices:

    Dos Rios Partners, L.P.
    205 Wild Basin Road S.
    Building 3, Suite 100
    Austin, TX 78746
    Attention: Pat M. (Bo) Baskin, Jr.
    Fax: (512) 298-0810
    Email: bo.baskin@dosriospartners.com


    With a copy to:

    Locke Lord LLP
    600 Travis, Suite 2800
    Houston, TX 77007
    Attention: Gregory C. Hill
    Facsimile: (713) 229-2636
    Email: ghill@lockelord.com

**COUNTERPART SIGNATURE PAGE**

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**CHANDLER SIGNS HOLDINGS, LLC**

The undersigned Member hereby executes the Amended and Restated Limited Liability Company Agreement (as amended, the "Agreement") of Chandler Signs Holdings, LLC (the "Company"), to be effective as of the date first written above.

CLASS A MEMBER:

**DOS RIOS PARTNERS - A, L.P.**

By: Dos Rios GP, LLC,
    its general partner

By: _____
Name: Pat M. (Bo) Baskin, Jr.
Title: Manager


Address and e-mail for
Notices:

    Dos Rios Partners - A, L.P.
    205 Wild Basin Road S.
    Building 3, Suite 100
    Austin, TX 78746
    Attention: Pat M. (Bo) Baskin, Jr.
    Fax: (512) 298-0810
    Email: bo.baskin@dosriospartners.com


    With a copy to:

    Locke Lord LLP
    600 Travis, Suite 2800
    Houston, TX 77007
    Attention: Gregory C. Hill
    Facsimile: (713) 229-2636
    Email: ghill@lockelord.com

COUNTERPART SIGNATURE PAGE

**AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT
OF
CHANDLER SIGNS HOLDINGS, LLC**

The undersigned Member hereby executes the Amended and Restated Limited Liability Company Agreement (as amended, the "Agreement") of Chandler Signs Holdings, LLC (the "Company"), to be effective as of the date first written above.

CLASS A MEMBER:

**CSWC CHANDLER SIGNS HOLDINGS, INC.**

By: _____

Name: _Chris Rehberger_____

Title: _Secretary_____

Address and e-mail for
Notices:

_CSWC Chandler Signs Holdings, Inc._
_5400 LBJ Freeway, Suite 1300_
_Dallas, TX 75240_

Attention: _Chris Rehberger_

Facsimile: _(972) 233 - 7362_

Email: _crehberger@capitalsouthwest.com_

With a copy to:

_Schiff Hardin LLP_
_300 Crescent Court, Suite 400_
_Dallas, TX 75201_

Attention: _Larry A. Makel_

Facsimile: _(214) 981 - 9901_

Email: _lmakel@schiffhardin.com_

**COUNTERPART SIGNATURE PAGE**

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**CHANDLER SIGNS HOLDINGS, LLC**

The undersigned Member hereby executes the Amended and Restated Limited Liability Company Agreement (as amended, the "Agreement") of Chandler Signs Holdings, LLC (the "Company"), to be effective as of the date first written above.

CLASS A MEMBER:

**MAIN STREET EQUITY INTERESTS, INC.:**

By: _____
Name: David Magdol
Title:   Senior Managing Director


Address and e-mail for          1300 Post Oak Blvd.
Notices:                        Suite 800
                                Houston, TX 77056
                                Attention: Diego Fernandez
                                Facsimile: (713) 350-6042
                                Email: dfernandez@mainstcapital.com


                                With a copy to:

                                Schiff Hardin LLP
                                300 Crescent Court, Suite 400
                                Dallas, TX  75201
                                Attention: Larry A. Makel
                                Facsimile: (214) 981-9901
                                Email: lmakel@schiffhardin.com

## COUNTERPART SIGNATURE PAGE

### AMENDED AND RESTATED
### LIMITED LIABILITY COMPANY AGREEMENT
### OF
### CHANDLER SIGNS HOLDINGS, LLC

The undersigned Member hereby executes the Amended and Restated Limited Liability Company Agreement (as amended, the "Agreement") of Chandler Signs Holdings, LLC (the "Company"), to be effective as of the date first written above.

CLASS A MEMBER:

**CHANDLER PARTNERS INVESTMENTS, LLC**

By: _____
Name: Rockford V. Gray
Title: Director

Address and e-mail for
Notices:

Chandler Partners Investments, LLC
5625 Fairfax Dr.
Frisco, TX 75034
Attention: Rockford V. Gray
Facsimile:_____
Email: rasgray@tx.rr.com

With a copy to:

Key Harrington Barnes, PC
3701 Rawlins Street, Suite 950
Dallas, TX 75219-4237
Attn: M. Troy Murrell, Esq.
Fax:    (214) 615-7926
Email:tmurrell@keyharrington.com

and

Wick Phillips Gould & Martin, LLP
3131 McKinney Ave., Suite 100
Dallas, TX 75204
Attn: Steven D. Stennett
Fax:    (214) 692-6255
Email: steve.stennett@wickphillips.com

**COUNTERPART SIGNATURE PAGE**

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**CHANDLER SIGNS HOLDINGS, LLC**

The undersigned Member hereby executes the Amended and Restated Limited Liability Company Agreement (as amended, the "Agreement") of Chandler Signs Holdings, LLC (the "Company"), to be effective as of the date first written above.

CLASS A MEMBER:

**QUABBIN CHANDLER CO-INVESTORS, LLC**

By: LSW Partners, LLC
Its: Manager

By: _Steven A. Leese_

Name: _Steven A. Leese_

Title: _Manager_

| | |
|---|---|
| Address and e-mail for Notices: | Quabbin Chandler Co-Investors, LLC<br>c/o Quabbin Capital<br>160 Federal Street<br>6th Floor<br>Boston, MA  02110<br>Attention:  Steve Leese<br>Fax: (617) 330-9047<br>Email: Steve.Leese@quabbincapital.com |
| | With a copy to: |
| | Foley & Lardner LLP<br>111 Huntington Avenue<br>Boston, MA 02199-7601<br>Attention: Todd L. Boudreau<br>Fax: (617) 342-4001<br>Email: tboudreau@foley.com |

COUNTERPART SIGNATURE PAGE

AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT
OF
CHANDLER SIGNS HOLDINGS, LLC

The undersigned Member hereby executes the Amended and Restated Limited Liability
Company Agreement (as amended, the "Agreement") of Chandler Signs Holdings, LLC
(the "Company"), to be effective as of the date first written above.

CLASS C MEMBER:

**QUABBIN CHANDLER MANAGEMENT CO., LLC**

By: _Steven A. Leese_

Name: _Steven A. Leese_

Title: _Manager_


Address and e-mail for          Quabbin Chandler Management Co., LLC
Notices:                        c/o Quabbin Capital
                                160 Federal Street
                                6th Floor
                                Boston, MA  02110
                                Attention:  Steve Leese
                                Fax: (617) 330-9047
                                Email: Steve.Leese@quabbincapital.com


                                With a copy to:

                                Foley & Lardner LLP
                                111 Huntington Avenue
                                Boston, MA 02199-7601
                                Attention: Todd L. Boudreau
                                Fax: (617) 342-4001
                                Email: tboudreau@foley.com

## SCHEDULE 1

### MEMBERS, UNITS AND CAPITAL CONTRIBUTIONS

| Equity Cap Table | | | | | |
|---|---|---|---|---|---|
| Member | Class A-1 Units | Class B Units | Class C Units | Capital Contributions | Ownership Percentage |
| Dos Rios Partners - A, L.P. | ███ | -- | -- | ███ | ███ |
| Dos Rios Partners, L.P. | ███ | -- | -- | ███ | ███ |
| Main Street Equity Interests, Inc. | ███ | -- | -- | ███ | ███ |
| CSWC Chandler Signs Holdings, Inc. | ███ | -- | -- | ███ | ███ |
| Chandler Partners Investments, LLC | ███ | -- | -- | ███ | ███ |
| Quabbin Chandler Co-Investors, LLC | ███ | -- | -- | ███ | ███ |
| **Total Class A Shares** | ███ | -- | -- | ███ | **100.0%** |
| Quabbin Chandler Management Co., LLC | -- | -- | ███ | -- | NA |
| Available Management Options | -- | ███ | -- | -- | NA |
| **Total Ownership** | ███ | ███ | ███ | ███ | **100.0%** |

## EXHIBIT A

## DEFINED TERMS

"*Act*" means the Delaware Limited Liability Company Act and any successor statute, as amended from time to time.

"*Adjusted Capital Account*" means the Capital Account maintained for each Member, (a) increased by any amounts that such Member is obligated to restore or is treated as obligated to restore under Treasury Regulation Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i)(5), and (b) decreased by any amounts described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) with respect to such Member.

"*Affiliate*" of a Person means any Person Controlling, Controlled by, or Under Common Control with such Person; *provided* that as applied to Quabbin, an "Affiliate" means a Quabbin Affiliate.

"*Agreement*" means this Amended and Restated Limited Liability Company Agreement of Chandler Signs Holdings, LLC, as amended and restated from time to time, including the Exhibits and Schedules hereto.

"*Allocation Year*" means (a) the period commencing on the Effective Date and ending on December 31, 2016, (b) any subsequent 12-month period commencing on January 1, and ending on December 31, (c) any portion of the periods described in clauses (a) or (b) for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction under Article 6 or (d) the period commencing on the immediately preceding January 1, and ending on the date on which all property and assets of the Company are distributed to the Members under Article 10; *provided, however*, that if such period is not permissible for tax purposes, the Tax Matters Member shall select another period that is permissible for tax purposes.

"*Blocker Company*" means CSWC Chandler Signs Holdings, Inc., a Delaware corporation, that was formed by its Blocker Company Investors to hold, directly or indirectly, all or any portion of its Units.

"*Book Value*" means, with respect to any property, such property's adjusted basis for federal income tax purposes, except as follows:

        (a)     The initial Book Value of any property contributed by a Member to the Company shall be the fair market value of such property as determined by the Board.

        (b)     The Book Values of all properties shall be adjusted to equal their respective fair market values as determined by the Board in connection with (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution to the

Company, (ii) the grant of an interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a Member capacity, or by a new Member acting in a Member capacity or in anticipation of becoming a Member, (iii) the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for an interest in the Company, (iv) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g), or (v) any other event to the extent determined by the Board to be necessary to properly reflect Book Values in accordance with the standards set forth in Treasury Regulation Section 1.704-1(b)(2)(iv)(q); *provided, however,* that adjustments pursuant to clauses (i), (ii), (iii) and (v) shall be made only if the Board determines that such an adjustment is necessary or appropriate to reflect the relative economic interests of the Members in Company.

(c)     The Book Value of property distributed to a Member shall be the fair market value of such property as determined by the Board.

(d)     The Book Value of all property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Code Section 732(d), Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m); *provided, however,* Book Value shall not be adjusted pursuant to this clause (d) to the extent the Board determines that an adjustment pursuant to clause (b) hereof is necessary or appropriate in connection with the transaction that would otherwise result in an adjustment pursuant to this clause (d).

(e)     The Book Value of all property immediately after the acquisition of an interest in the Company by any new or existing Member upon the exercise of a noncompensatory option shall be adjusted to equal their respective gross fair market values, as determined by the Board using such method of valuation as it may adopt in good faith, in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(s).

(f)     If any noncompensatory options are outstanding upon the occurrence of an event described in (b) or (e) of this definition of "Book Value," the Company shall adjust the Book Values of its properties in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(f)(1) and Treasury Regulation Section 1.704-1(b)(2)(iv)(h)(2).

If the Book Value of property has been determined or adjusted pursuant to clauses (b) or (d) hereof, such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such property for purposes of computing Profits and Losses and other items allocated pursuant to Article 6.

"*Business Day*" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the State of Texas are authorized by Law to close.

"**Business Line**" means the marketing, development, creation and installation of custom signage solutions.

"**Capital Account**" means, with respect to any Member, the Capital Account maintained for such Member in accordance with the following provisions:

(a)     Each Member's Capital Account shall be increased by (i) the amount of money contributed by that Member to the Company, (ii) the Book Value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to) and (iii) allocations to that Member of Profits and any items of income or gain allocated to such Member pursuant to the Regulatory Allocations.

(b)     Each Member's Capital Account shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the Book Value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to), and (iii) allocations to that Member of Losses and any items of loss or deduction allocated to such Member pursuant to the Regulatory Allocations.

(c)     On the Transfer of all or part of a Member's Membership Interest, the Capital Account of the transferor that is attributable to the Transferred Membership Interest shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(l).

(d)     A Member shall have a single Capital Account that reflects all of its Membership Interest; however, the Capital Accounts shall be maintained in such manner as will facilitate a determination of the portion of each Capital Account attributable to each class or series of Units.

(e)     The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b) and Treasury Regulation Section 1.704-2, and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  In the event the Board determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or any Member), are computed in order to comply with such Treasury Regulations, the Board may make such modification.  The Board also shall make (i) any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(q); *provided, however*, that, to the extent that any such adjustment would have a material adverse effect on any Member, such adjustment pursuant to this clause (i) shall require the Member's consent, and (ii) any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

"*Capital Contribution*" means with respect to any Member, the amount of money and the initial Book Value of any property (other than money) contributed to the Company by the Member.  Any reference in this Agreement to the Capital Contribution of a Member shall include a Capital Contribution of its predecessors in interest.

"*Capital Southwest*" means CSWC Chandler Signs Holdings, Inc., a Delaware corporation.

"*Capital Stock*" means any and all units, interests, participations, or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), and any and all warrants, options, or other rights to purchase or acquire any of the foregoing.

"*Class A&C Percentage*" means one hundred percent (100%) minus the Class B Percentage.

"*Class A Member*" means the holders of Class A Units.

"*Class B Member*" means the holders of Class B Units.

"*Class B Participation Threshold*" means, with respect to a Class B Unit, an amount determined by the Board in its sole discretion at the time of issuance of such Class B Unit to be the value of the Company that shall be required to be achieved prior to such Class B Units (other than the Participating Class B Units) being eligible to participate in the distributions set forth in Section 6.1 and Section 6.2.  The Class B Participation Threshold for each Class B Unit shall be as set forth in such Class B Member's Incentive Unit Agreement and reflected on Schedule 1 attached hereto, as the same may be amended from time to time by the Board.

"*Class B Percentage*" means the product, expressed as a percentage of (a) a fraction, the numerator of which is the number of issued and outstanding Class B Units as of the date of determination, and the denominator of which is the total number of Class B Units authorized pursuant to Section 4.1(d)(ii), multiplied by (b) ten percent (10%).

"*Class C Member*" means the holders of Class C Units.

"*Class C Participation Threshold*" means, with respect to the Class C Units, the occurrence of the applicable IRR Threshold which shall be required to be achieved prior to such Class C Units being eligible to participate in the distributions set forth in Section 6.1 and Section 6.2.

"*Code*" means the United States Internal Revenue Code of 1986, as amended from time to time.  All references herein to Sections of the Code shall include any corresponding provision or provisions of succeeding Law.

"*Company Business Opportunity*" means (a) any business opportunity within the scope of the Business Line, and (b) any other business opportunity that is reasonably related to the Business Line and that comes to the attention of a Member or its Affiliate.

"**Company Minimum Gain**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(2) for the term "partnership minimum gain."

"**Company Nonrecourse Liabilities**" means nonrecourse liabilities (or portions thereof) of the Company for which no Member or any Affiliate thereof bears any economic risk of loss (within the meaning of Treasury Regulations Section 1.752-2).

"**Control**," including the correlative terms "**Controlling**", "**Controlled by**" and "**Under Common Control with**" means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person.  For the purposes of the preceding sentence, control shall be deemed to exist when a Person possesses, directly or indirectly, through one or more intermediaries (a) in the case of a corporation, more than fifty percent (50%) of the outstanding voting securities thereof; (b) in the case of a limited liability company, partnership, limited partnership or venture, the right to more than fifty percent (50%) of the distributions therefrom (including liquidating distributions); or (c) in the case of any other Person, more than fifty percent (50%) of the economic or beneficial interest therein.

"**Conversion Transaction**" means any conversion of the Company into a Delaware corporation or other merger, incorporation, recapitalization or reorganization or similar transaction of the Company into a newly formed corporation.

"**CP Investments**" means Chandler Partners Investments, LLC, a Texas limited liability company.

"**Depreciation**" means, for each Allocation Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for Federal income tax purposes with respect to property for such taxable year, except that (a) with respect to any property the Book Value of which differs from its adjusted tax basis for Federal income tax purposes and which difference is being eliminated by use of the remedial allocation method pursuant to Treasury Regulation Section 1.704-3(d), Depreciation for such taxable year shall be the amount of book basis recovered for such taxable year under the rules prescribed by Treasury Regulation Section 1.704-3(d)(2), and (b) with respect to any other property the Book Value of which differs from its adjusted tax basis at the beginning of such Allocation Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the Federal income tax depreciation, amortization, or other cost recovery deduction for such Allocation Year bears to such beginning adjusted tax basis; *provided, however*, that if the adjusted tax basis of any property at the beginning of such Allocation Year is zero, Depreciation with respect to such property shall be determined with reference to such beginning value using any reasonable method selected by the Board.

"**Dos Rios**" means Dos Rios Partners, L.P., a Delaware limited partnership.

"**Dos Rios-A**" means Dos Rios Partners – A, L.P., a Delaware limited partnership.

"**Dos Rios Partnerships**" means Dos Rios and Dos Rios-A, collectively.

"***Eligible Investor***" means any Member holding Class A Units that is an "accredited investor" under Rule 501 of Regulation D of the Securities Act and who is not in material default under this Agreement or any other Investment Document; *provided* that the Company has already notified such Member in writing describing such material default in reasonable detail and provided such Member the opportunity to cure, if curable, as determined by the Board in good faith, such material default within thirty (30) days after such written notice.

"***Entity***" means any Person other than a natural person.

"***Exempted Units***" means any (a) Units issued, sold or otherwise Transferred in connection with a public offering or Internal Restructure, (b) Units distributed or set aside ratably to all Members pro rata based on their respective Units, including any distribution issued for no consideration to all Unit holders or any split of Units, (c) Units issued, sold or otherwise transferred to sellers as consideration in connection with the Company's or any Subsidiary's acquisition of all or substantially all of another Person or another Person's line of business or division, or all or substantially all of a Person's assets, in any case, by merger, consolidation, stock purchase, asset purchase, recapitalization, or other reorganization, (d) Class B Units or Class C Units issued, sold or otherwise Transferred to or on behalf of the managers, Directors, officer or other employees of the Company or any of its Subsidiaries (who, in any event, are not also employees, directors or managers of Quabbin or any of the Dos Rios Partnerships or any of their respective Affiliates) pursuant to any employment agreement or arrangement, unit option plan, restricted unit agreement, incentive compensation plan or program or similar incentive compensation program approved by the Board, provided that the issuances pursuant to this clause (d) do not, in the aggregate and when combined with the total amount of then outstanding Units that were issued at any time (including prior to the date hereof) to any of the foregoing Persons as incentive compensation, exceed on a fully-diluted basis (assuming the vesting in full of all such New Units) a total of ten percent (10%) of the Percentage Interests, (e) Units issued, sold or otherwise Transferred to any third party that is not an Affiliate of a Member if the Board determines in its sole discretion that there are strategic reasons, not related to financing the Company or raising additional capital, to exempt such issuance, sale or Transfer from the preemptive rights terms of <u>Section 4.3</u>, (f) any Units issued, sold or otherwise Transferred to any lender (including the Members and their Affiliates) in connection with any loan or commitment to loan made by such lender to the Company or any Subsidiary thereof and (g) Class B Units issued to any Director or employee of the Company or a subsidiary thereof in connection with such person's investment in the Company made at or near the time such individual first becomes a Director or employee, as applicable, of the Company or any Subsidiary (who, in any event, are not also employees, directors or managers of Quabbin or any of the Dos Rios Partnerships or any of their respective Affiliates).

"***Family Member***" means, when used with respect to an individual, such individual's (i) spouse; (ii) children (natural or by adoption and stepchildren); (iii) children's direct descendants; and (iv) parents, and includes (x) a trust established by such individual for the benefit of all or any of the individuals described in the immediately preceding clauses (i) through (iv), or (y) an entity entirely owned by all or any of the individuals described in the immediately preceding clauses (i) through (iv) and (x), and which is controlled by such Person making a Permitted Transfer.

"*Fiscal Year*" means (i) the period commencing on the Effective Date and ending on December 31, 2016, (ii) any subsequent twelve-month period commencing on January 1 and ending on December 31, and (iii) the period commencing on the immediately preceding January 1, and ending on the date on which all property and assets of the Company are distributed to the Members under Article 10; *provided, however*, if such period is not permissible for tax purposes, the Board shall select another period as the Company's "Fiscal Year" that is permissible for tax purposes.

"*Fourth IRR Threshold*" means such time as each Class A Member has received a twenty-two and a half percent (22.5%) IRR.

"*Incentive Unit Agreement*" means any Incentive Unit Agreement between the Company and any holder of Class B Units executed after the Effective Date pursuant to which such Class B Units are granted and which provides for the Class B Participation Threshold for such Class B Units and the forfeiture and other restrictions on the ownership and transfer of such Class B Units.

"*Initial IRR Threshold*" means such time as each Class A Member has received a ten percent (10%) IRR.

"*Institutional Minority Investors*" means Capital Southwest and Main Street.

"*Internal Restructure*" means, with respect to the Company, any re-formation, conversion, transfer of assets, Transfer by Members of their Units, merger, incorporation, liquidation or other transaction undertaken in a manner that results in the Members or their Affiliates continuing to have in all material respects the same direct or indirect ownership of the Company's assets in place prior to the Internal Restructure, and preserves the relative economic interests or rights of the Members or their Affiliates in the Company or any entity (including an entity organized under the Laws of a foreign jurisdiction) that succeeds to the Company in such transaction and does not cause adverse tax consequences to any Member.

"*Investment Documents*" means this Agreement, any Incentive Unit Agreements, the Purchase Agreement and any other document, instrument, certificate or agreement executed and delivered by a Member in connection with being admitted to the Company as a Member.

"*IRR*" means the rate which will discount distributions made to the holders of Class A Units (excluding any Non-offset Tax Distributions but specifically including any Tax Distributions made pursuant to Section 6.3 to the extent they exceed the Non-offset Tax Distributions) by the Company to an amount equal to the Capital Contributions made by the holders of Class A Units.  The IRR shall be calculated on a per-Unit basis using the "xIRR" function of Microsoft Excel 2010 or any successor function thereto of equal effect. The IRR with respect to any holder of Class A Units shall be deemed to include any amount paid or received by any predecessor in interest of such holder.  For avoidance of doubt, distributions made to the holders of Class B Units shall not be taken into account for purposes of determining IRR.

"*IRR Threshold*" means the Initial IRR Threshold, the Secondary IRR Threshold, the Third IRR Threshold, and the Fourth IRR Threshold.

"**Law**" means any applicable constitutional provision, statute, act, code (including the Code), law, regulation, rule, ordinance, order, decree, ruling, proclamation, resolution, judgment, decision, declaration, or interpretative or advisory opinion or letter of a governmental authority.

"**Liquidity Event**" means: (i) a sale, merger, consolidation or other transaction involving the Company in which the Members immediately prior to such transaction receive cash or debt or equity securities, or any combination thereof, from the surviving entity and as a result of which the Members immediately prior to the consummation of such transaction do not hold a majority of the combined voting power of all voting securities of the surviving entity and a majority of the combined economic interest in the surviving entity immediately after the consummation of such transaction, (ii) the sale or financing for the purpose of making a distribution to members of all or substantially all of the assets of the Company, or (iii) a transaction effecting, or in contemplation of, liquidation, dissolution or winding up of the Company; *provided*, *however*, that neither a conversion of the form of the Company, a reorganization described in Code Section 368(a)(1)(F) of the Code nor a transfer of all or substantially all of the assets of the Company to any of its Subsidiaries shall be deemed to be a Liquidity Event *per se*.

"**Main Street**" means Main Street Equity Interests, Inc., a Delaware corporation.

"**Member**" means any Person executing this Agreement as of the Effective Date or hereafter admitted to the Company as a member as provided in this Agreement, but such term does not include any Person who has ceased to be a Member in the Company as provided in this Agreement.

"**Membership Interest**" means the interest of a Member, in its capacity as such, in the Company, including rights to distributions (liquidating or otherwise), allocations, information, all other rights, benefits and privileges enjoyed by that Member (under the Act, the Certificate, this Agreement or otherwise) in its capacity as a Member and otherwise to participate in the management of the Company; and all obligations, duties and liabilities imposed on that Member (under the Act, the Certificate, this Agreement, or otherwise) in its capacity as a Member.

"**Member Minimum Gain**" means gain attributable to Member Nonrecourse Debt determined in accordance with Treasury Regulations Section 1.704-2(i).

"**Member Nonrecourse Debt**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4) for the term "partner nonrecourse debt."

"**Member Nonrecourse Debt Minimum Gain**" has the meaning set forth in Treasury Regulations Section 1.704-2(i) for the term "partner nonrecourse debt minimum gain."

"**Member Nonrecourse Deduction**" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2) for the term "partner nonrecourse deduction."

"**Minimum Gain**" means with respect to Company Nonrecourse Liabilities, the amount of gain that would be realized by the Company if it disposed of (in a taxable transaction) all properties that are subject to Company Nonrecourse Liabilities in full satisfaction of such liabilities, computed in accordance with applicable Treasury Regulations.

"**Non-offset Tax Distributions**" means, with respect to each Fiscal Year, a portion of any Tax Distributions made to the Members pursuant to Section 6.3 in such Fiscal Year equal to the amount the Board shall determine in its sole discretion is required in order for the Members to satisfy their federal tax liability with respect to the income, gain, loss, deductions or other similar items allocated to such Members pursuant to this Agreement for such Fiscal Year; provided, that the tax rate utilized by the Board hereunder for purposes of determining the amount of Non-Offset Tax Distributions shall be 43.4%.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1).

"**Participating Class B Unit**" means a Class B Unit for which the related Class B Participation Threshold has been achieved.

"**Percentage Interest**" means, with respect to any Member, the percentage equal to the aggregate Units held by such Member divided by the aggregate Units held by of all the Members.

"**Permitted Transfer**" means a Transfer by a Member of any or all of its Units, its Membership Interests, related management rights, and rights to be a Member hereunder to one or more Permitted Transferees in which such transferee agrees in writing to be bound by the terms and provisions of this Agreement; *provided* that only with respect to a Permitted Transferee as defined in subpart (a)(iv) and (b)(iii) of the definition of Permitted Transferee, a Permitted Transfer shall not include a Transfer that results in a Transfer of more than ten percent (10%) of the then outstanding Units in one Transfer or a series of related Transfers.

"**Permitted Transferee**" means

(a)     with respect to any Class A Member (i) any Affiliate of such Class A Member, (ii) any managing director, general partner, director, stockholder, unitholder, limited partner, manager, officer or employee of such Class A Member, or any Affiliate, (iii) any permitted transferee of the Notes (as defined in the Subordinated Note Purchase Agreement), or (iv) any other Person acceptable to the Board; provided, however, that, notwithstanding the foregoing, for purposes of Quabbin and each of the Dos Rios Partnerships only, none of the Company nor any of its Subsidiaries shall be Permitted Transferees; and

(b)     with respect to any other Member (i) a "family limited partnership" of such Member or a trust created for the benefit of such Member, (ii) a Family Member of such Member or a trust created for the benefit of such Family Member of such Member, or (iii) any other Person acceptable to the Board; *provided* that, after any such Transfer to a Person identified in (i)-(ii), voting control of the Transferred Units shall remain with the Member who Transferred such Units and such Member shall ensure that such Person satisfies all of its obligations under any Investment Document.

"**Person**" means any natural person, limited liability company, corporation, limited partnership, general partnership, joint stock company, joint venture, association, company, trust,

bank trust company, land trust, business trust, or other organization, whether or not a legal entity, and any government or agency or political subdivision thereof.

"***Pro Rata Share***" means, as to each Member a fraction (expressed as a percentage), the numerator of which equals the number of Class A Units held of record by such Member, and the denominator of which equals the total number of outstanding Class A Units held by all Members.

"***Profits***" or "***Losses***" means, for each Allocation Year or other period, the taxable income or loss of the Company for such Allocation Year or other period, determined in accordance with Code Section 703(a), including all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1), with any adjustments that are necessary or appropriate in order that the Capital Accounts will be considered to be determined and maintained in accordance with the rules of Treasury Regulation Section 1.704-1(b)(2)(iv), including that (a) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss, (b) any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss, (c) in the event that the Book Value of any Company asset is adjusted pursuant to paragraphs (b) or (c) of the definition of "Book Value," the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of such asset and shall be taken into account for purposes determining Profits or Losses, (d) gain or loss from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of such property notwithstanding that the adjusted tax basis of such property differs from the Book Value for such property, and (e) to the extent that Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4) requires   an adjustment to the adjusted tax basis of any the Company asset pursuant to Code Section 734(b) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases the basis of the asset) from the disposition of such asset and shall be taken into account for purposes determining Profits or Losses; *provided, however,* that in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account depreciation, amortization, and other cost recovery deductions for such Allocation Year, computed in accordance with the definition of "Depreciation"; *provided, further*, that any items which are specially allocated pursuant to <u>Section 6.7</u> shall not be taken into account in computing Profits or Losses.  The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to <u>Section 6.7</u> shall be determined by applying rules analogous to those applicable pursuant to the foregoing requirements with such adjustments as determined appropriate by the Board.

"***Purchase Agreement***" means that certain Purchase and Redemption Agreement, dated as of even date hereof, by and among the Company, Chandler Signs, LLC, the former limited

partners of Chandler Signs, L.P., L.L.P. as listed on the signature pages attached thereto, and Rockford V. Gray in his capacity as the Partners' Representative.

"*Quabbin*" means Quabbin Chandler Management Co., LLC, a Delaware limited liability company.

"*Quabbin Affiliate*" means any Person Controlling, Controlled by, or Under Common Control with Quabbin, which shall include without limitation any current or former general partner, managing member, officer, director, member and employee of such Person and or of Quabbin, including without limitation, Quabbin Chandler Co-Investors, LLC.

"*Requisite Consent*" means:

(a)     In the event that a Change of Control results in the indirect Transfer of more than ten percent (10%) of the then outstanding Units:

(i)     if a member of CP Investments serves as a member of the Board, unanimous consent of the Board; or

(ii)     if a member of CP Investments does not serve as a member of the Board, consent of the Board and of CP Investments.

(b)     In the event a Change of Control results in the indirect Transfer of ten percent (10%) or less of the then outstanding Units, consent of the Board.

"*Resulting Corporation*" means the resulting entity from a Conversion Transaction.

"*Secondary IRR Threshold*" means such time as each Class A Member has received a fifteen percent (15%) IRR.

"*Securities*" means Units, equity interests or similar interests of the Company or its Subsidiaries (including debt securities containing equity-like features) or options or other rights to acquire Units, equity interests or similar interests of the Company or its Subsidiaries (including debt securities containing equity-like features) or any security or interest directly or indirectly convertible and/or exercisable thereinto.

"*Securities Act*" means the Securities Act of 1933, as amended from time to time.

"*Subordinated Note Purchase Agreement*" means Subordinated Note Purchase Agreement dated as of January 4, 2016 by and among Chandler Signs, LLC, Capital Southwest Corporation, as Agent for the Purchasers (as such term is defined therein), Dos Rios Partners, L.P., Dos Rios Partners - A, L.P., and Main Street Mezzanine Fund, LP.

"*Subsidiary*" means (a) any corporation or other entity (including a limited liability company) a majority of the Capital Stock of which having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions is at the time owned, directly or indirectly, with power to vote, by the Company or any direct or indirect

Subsidiary of the Company or (b) a partnership in which the Company or any direct or indirect Subsidiary is a general partner.

"***Third IRR Threshold***" means such time as each Class A Member has received a twenty percent (20%) IRR.

"***Transfer***," including the correlative terms "***Transferring***" or "***Transferred***", means any direct or indirect transfer, assignment, sale, gift, pledge, hypothecation or other encumbrance, or any other disposition (whether voluntary or involuntary or by operation of law), of Units (or any interest (pecuniary or otherwise) therein or right thereto), including derivative or similar transactions or arrangements whereby a portion or all of the economic interest in, or risk of loss or opportunity for gain with respect to, Units is transferred or shifted to another Person; *provided, however*, that an exchange, merger, recapitalization, consolidation or reorganization involving an Internal Restructure shall not be deemed a Transfer.

"***Treasury Regulations***" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to Sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar, or substitute Treasury Regulations.

"***Unrecovered Capital***" means, at the time of determination with respect to each Class A Member, the excess of (i) the aggregate amount of the Capital Contributions of such Class A Member over (ii) the aggregate amount of distributions made to such Member under (A) Section 6.1, Section 6.2 and Section 10.2(c)(iv) with respect to such holders of Class A Units, or (B) which are treated as made to such Class A Member under Section 6.1 and Section 6.2, as applicable, pursuant to Section 6.3 (but only to the extent they exceed Non-Offset Tax Distributions).

# ANNEX A
## TRANSFEREE TAX REPRESENTATIONS

The transferee is the sole beneficial owner of the interest in the Company to be registered in its name (the "***Membership Interest***");

(a)     such transferee either (i) is not a grantor trust, partnership or S corporation for U.S. federal income tax purposes or (ii) was not formed with, and will not be used for, a principal purpose of permitting the Company to satisfy the 100 member limitation contained in Treasury Regulation Section 1.7704-1(h)(1)(ii);

(b)     such transferee did not acquire, and will not transfer, its Membership Interest through (a) a national, non-U.S., regional, local or other securities exchange, (b) PORTAL or (c) over-the-counter market (including an interdealer quotation system that regularly disseminates firm buy or sell quotations by identified brokers or dealers by electronic means or otherwise);

(c)     such transferee did not acquire, and will not transfer, its Membership Interest from, to or through (a) a person, such as a broker or dealer, that makes a market in, or regularly quotes prices for, the Membership Interest or (b) a person that regularly makes available to the public (including customers or subscribers) bid or offer quotes with respect to the Membership Interest and stands ready to effect, buy or sell transactions at the quoted prices for itself or on behalf of others; and

(d)     such transferee will only transfer its Membership Interest to a buyer who provides representations similar to these.

*** 

**These representations may from time to time be revised by the Board on the advice of counsel.**

# Exhibit 2

## SUBSCRIPTION AND CONTRIBUTION AGREEMENT

This Subscription and Contribution Agreement (this "**Agreement**"), entered into on this 22nd day of December, 2016, is by and between (i) Chandler Signs Holdings, LLC, a Delaware limited liability company (the "**Company**"), and (ii) Joe Mueller (the "**Subscriber**").

WITNESSETH:

WHEREAS, the Company was formed pursuant to the filing of a certificate of formation on August 25, 2015, with the Secretary of State of the State of Delaware;

WHEREAS, certain persons entered into that certain Amended and Restated Limited Liability Company Agreement of the Company, dated as of January 4, 2016 (as amended from time to time, the "**Company Agreement**");

WHEREAS, the Subscriber is currently an employee of the Company and is being offered this opportunity to subscribe and contribute to the Company in connection with the Subscriber's employment;

WHEREAS, the Subscriber will contribute capital to the Company in exchange for certain Class A Units (as defined in the Company Agreement);

WHEREAS, concurrently with the execution of this Agreement, the Subscriber is entering into a promissory note (the "**Note**") and related security agreement (the "**Security Agreement**") with the Company, each in substantially the forms attached hereto as Exhibit A and Exhibit B, respectively;

WHEREAS, certain terms are defined in Section 10 of this Agreement;

WHEREAS, capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Company Agreement; and

WHEREAS, it is the desire of the parties hereto to set forth the specific terms and conditions of the Subscriber's contribution to the Company.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.        Subscription and Contribution by the Subscriber.  On the date hereof and upon the terms and subject to the conditions herein, the Subscriber hereby subscribes for and agrees to purchase from the Company, and the Company agrees to issue to the Subscriber, 100,000 Class A Units ("**Units**") in exchange for a capital contribution to the Company by the Subscriber in the aggregate amount of $100,000.00.  Such contribution will be made by a cash contribution by Subscriber to the Company in an amount equal to $20,000.00, and the remaining $80,000.00, by Subscriber's execution and delivery of the Note and Security Agreement.

2.      <u>Representations and Warranties of the Subscriber</u>.

(a)      <u>Representations Relating to Subscriptions</u>.  The Subscriber hereby makes the following representations and warranties to the Company:

(i)      The Subscriber understands that (A) the Units are being offered and issued under exemptions from registration provided for in the Securities Act of 1933, as amended (the **"Securities Act"**) and applicable state securities or "blue sky" laws, (B) the Subscriber is acquiring an interest in the Company without being furnished any offering literature or prospectus, and (C) this transaction has not been reviewed by the United States Securities and Exchange Commission or by any administrative agency charged with the administration of the securities or "blue sky" laws of any state.

(ii)      The Units being acquired by the Subscriber are being acquired for the Subscriber's own investment portfolio and account (and not on behalf of, and without the participation of, any other Person) with the intent of holding the Units for investment and without the intent of participating, directly or indirectly, in a distribution of the Units and not with a view to, or for resale in connection with, any distribution of the Units or any portion thereof.

(iii)      The Subscriber has been provided:

(A)      access to, and has been given an opportunity to review, all of the agreements pertaining to the initial creation and capitalization of the Company, together with all other available information relating to the Company; and

(B)      the opportunity to ask questions of and receive answers from representatives of the Company.

(iv)      The Subscriber acknowledges receipt of all information requested of the Company (including the information referred to in <u>Section 2(a)(iii)</u> above), that the Subscriber deemed necessary in order to make an informed decision concerning an investment in the Units.  The Subscriber has evaluated the risk of investing in the Units and is acquiring the Units based only upon the Subscriber's independent examination and judgment as to the prospects of the Company as determined from the information in the Subscriber's possession or obtained directly by the Subscriber from the Company.

(v)      The Subscriber acknowledges that the Units being acquired by the Subscriber were not offered to the Subscriber by means of publicly disseminated advertisements or sales literature, nor is the Subscriber aware of any offers made to other Persons by such means.

(vi)      The Subscriber is knowledgeable and experienced in finance, securities and investments and has had sufficient experience analyzing and investing in securities similar to the Units so as to be capable of evaluating the

2

merits and risks of an investment in the Units. The Subscriber is familiar with Regulation D promulgated under the Securities Act, the Subscriber is an "accredited investor" as defined in Rule 501(a) of such Regulation D, and the Subscriber is able to bear the economic risk of an investment in the Units.

(vii)   The Subscriber acknowledges that the Units are speculative investments that involve a high degree of risk and the Subscriber can sustain a complete loss of the Subscriber's investment in the Units. The Subscriber has no need for liquidity in the Subscriber's investment in the Units.

(viii)   The Subscriber acknowledges that the Units will be an illiquid investment, that the Subscriber must continue to bear the economic risk of the investment in the Units for an indefinite period and that the Units are being issued without registration for any subsequent sale under the Securities Act and applicable state securities laws.

(ix)   The Subscriber has received and carefully read and is familiar with each of the agreements and documents pertaining to the creation, organization and capitalization of the Company and understands that the Transfer of the Units is restricted under the terms of the Company Agreement and under Applicable Law, and consequently such interests may not be offered for sale, sold, or Transferred other than in accordance with the Company Agreement and pursuant to (A) an effective registration under the Securities Act or in a transaction that is otherwise in compliance with the Securities Act; and (B) evidence satisfactory to the Company of compliance with the applicable securities laws (which may require the Subscriber to provide an opinion of legal counsel satisfactory to the Company confirming compliance with such laws).

(x)   The Subscriber understands that a legend indicating that the Units have not been registered under applicable federal and state securities laws and referring to the restrictions on transferability and sale of the Units may be placed on any certificate(s) or other document delivered to the Subscriber or any substitute therefor and any transfer agent of the Company or its Affiliates may be instructed to require compliance therewith.

(xi)   The Subscriber confirms that the Subscriber has been advised to consult with the Subscriber's own attorney regarding legal matters concerning the Company and to consult with independent tax advisors regarding the tax consequences of investing in the Company.

(xii)   The Subscriber acknowledges that the Subscriber understands the meaning and legal consequences of the representations, warranties, covenants and certifications set forth in this <u>Section 2</u> and that the Company has relied and will rely upon such representations, warranties, covenants and certifications.

(b)   <u>Authorization, Execution, and Binding Effect; Consents and Approvals</u>. The Subscriber makes the following representations and warranties to the Company:

(i)      The Subscriber has full capacity, power, and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.  This Agreement has been duly executed and delivered by the Subscriber and constitutes a valid and binding agreement, enforceable against the Subscriber in accordance with its terms, except as the enforceability hereof may be subject to applicable bankruptcy, insolvency, reorganization, or other similar laws affecting creditors' rights generally and to general principles of equity.

(ii)      Neither the execution and delivery by the Subscriber of this Agreement, nor the consummation of the transactions contemplated hereby, nor compliance with any of the provisions hereof, will (A) result in a violation of any order, writ, injunction, decree, judgment or ruling of any court or Governmental Entity, or any law, rule, or regulation applicable to the Subscriber or the Subscriber's assets, (B) result in the breach of or otherwise affect any of the terms, conditions, or provisions of, any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, contract, agreement, or other instrument or commitment or obligation of the Subscriber or otherwise relating to the Subscriber's assets, or (C) require any consent or approval of, or notice to, or filing or registration with, any Person, except for those consents, approvals, notices, filings, or registrations that have been obtained, given, or made, as the case may be, and which are unconditional and in full force and effect.

(c)      Finders.   Neither the Subscriber nor any of his Affiliates has paid or become obligated to pay any fee or commission to any broker, finder, intermediary, advisor, consultant, or appraiser for or on account of the transactions contemplated by this Agreement.  The Subscriber agrees to indemnify the Company and its Affiliates and subsidiaries against, and to hold them harmless from, any claims for such brokerage or similar commission or other compensation that may be made against the Company and its Affiliates and subsidiaries or by any third party in connection with the transactions contemplated hereby, which claim is based upon such third party having acted as a broker, finder, investment banker, advisor, consultant, or appraiser or in any similar capacity on behalf of the Subscriber.

3.      Representations and Warranties of the Company.      The Company hereby represents and warrants to the Subscriber as follows:

(a)      Organization and Good Standing.   The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b)      Authorization, Execution and Binding Effect.   The Company has full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby, and no further proceedings on the part of the Company are necessary to approve and authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.  This Agreement has been duly executed and delivered by the Company and constitutes a valid and binding agreement, enforceable against the Company in accordance with its terms, except as the

4

enforceability hereof may be subject to applicable bankruptcy, insolvency, reorganization, or other similar laws affecting creditors' rights generally and to general principles of equity.

(c)      <u>Consents and Approvals</u>.   Neither the execution and delivery by the Company of this Agreement, nor the consummation of the transactions contemplated hereby, nor compliance with any of the provisions hereof, will result in a violation of any order, writ, injunction, decree, judgment or ruling of any court or Governmental Entity, or any law, rule or regulation applicable to the Company or require any consent or approval of, or notice to, or filing or registration with, any Person, except for those consents, approvals, notices, filings or registrations that have been obtained, given or made, as the case may be, and that are unconditional and in full force and effect.

4.      <u>Survival of Representations and Warranties</u>.  The representations and warranties contained in this Agreement or in any certificate, instrument, or document delivered pursuant hereto shall survive the making of this Agreement and shall continue in existence until the end of the three-year period following the Closing Date, at which time they will expire and be of no further force or effect.

5.      <u>Notices</u>.   All notices, elections, demands or other communications required or permitted to be made or given pursuant to this Agreement shall be in writing and shall be considered as properly given or made on the date of actual delivery if given by (a) personal delivery, (b) United States mail, (c) expedited overnight delivery service with proof of delivery, or (d) via facsimile or other electronic means with confirmation of delivery, addressed to the respective addressee(s).  Unless delivered in another manner permitted hereunder, notices shall be sent to each party hereto at its address set forth in the Company Agreement.  Any party hereto may change its address by giving notice in writing to the other parties of its new address.

6.      <u>Assignment</u>.   This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns, but, except as expressly herein provided, neither this Agreement nor any of the rights, interest, or obligations hereunder shall be assigned by the Subscriber without the prior written consent of the Company.

7.      <u>Complete Agreement; Agreement Controlling</u>.   This Agreement and the other Transaction Documents, contain the entire understanding of the parties with respect to the transactions contemplated hereby and supersede all prior arrangements or understandings with respect thereto.  In the event of any inconsistency between the terms of this Agreement and the Transaction Documents, the terms of this Agreement shall be controlling.   There are no restrictions, agreements, promises, warranties, covenants, or undertakings other than those expressly set forth herein or therein.

8.      <u>**GOVERNING LAW**</u>.  **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW REQUIRING THE APPLICATION OF THE LAW OF ANOTHER STATE.  ANY DISPUTE ARISING OUT OF OR RELATING TO THIS**

AGREEMENT SHALL BE SETTLED IN ACCORDANCE WITH SECTION 12.8 OF THE COMPANY AGREEMENT.

9.       <u>Cure of Invalid Provisions</u>.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, such provision shall be fully severed, and this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, and the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement; provided, however, that if such illegal, invalid, or unenforceable provision may be made legal, valid, and enforceable by limitation thereof, then the provision shall be revised and reformed to make it legal, valid, and enforceable to the maximum extent permitted by law.

10.      <u>Definitions</u>.  The following terms shall have the following meanings:

**"Affiliate"** shall mean, with respect to a particular Person, any Person controlling, controlled by, or under common control with such Person, and in the case of any Person who is an individual, such Person's immediate family members.  For purposes of this definition, "control" means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other Interest, by contract or otherwise) of a Person.

**"Applicable Law"** shall mean any statute or law or any judgment, order, decree, rule, or regulation of any court or Governmental Entity to which a specified Person or property is subject.

**"Closing"** shall mean the date of the Company's issuance of the Class A Units subscribed for herein and the completion of all transactions required in connection therewith, which shall take place at a mutually agreed location upon satisfaction of the conditions set forth herein.

**"Closing Date"** shall mean the date on which the Closing occurs.

**"Governmental Entity"** shall mean any court or tribunal in any jurisdiction (domestic or foreign) or any federal, state, municipal, domestic, foreign, or other administrative agency, department, commission, board, bureau, or other governmental authority or instrumentality.

**"Person"** (whether or not capitalized) shall mean an individual, corporation, limited liability company, association, joint stock company, trust, partnership, joint venture, unincorporated organization, a government or any department or agency thereof, or any other legal entity.

**"Transaction Documents"** shall mean, collectively, this Agreement, the Company Agreement, the Note, the Security Agreement and all other agreements, documents and instruments executed in conjunction with, or relation to, any of the foregoing.

11.     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute but one and the same instrument.

12.     <u>Interpretation</u>.   Pronouns in masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.  The word "including" (in its various forms) means including without limitation.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first set forth above.

**COMPANY:**

CHANDLER SIGNS HOLDINGS, LLC,
a Delaware limited liability company

By: _____
Name:   Pat M. (Bo) Baskin, Jr.
Title:    Director

**SUBSCRIBER:**

_____

JOE MUELLER

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first set forth above.

**COMPANY:**

CHANDLER SIGNS HOLDINGS, LLC, a Delaware limited liability company

By:

Name:

Title:

**SUBSCRIBER:**

JOE MUELLER

SUBSCRIPTION AND CONTRIBUTION AGREEMENT
SIGNATURE PAGE

## EXHIBIT A

## FORM OF NOTE

# PROMISSORY NOTE

$80,000.00                                                    December 22, 2016

FOR VALUE RECEIVED, Joe Mueller, an individual ("**Maker**"), hereby promises to pay to the order of Chandler Signs Holdings, LLC, a Delaware limited liability company (the "**Company**," together with its successors, assigns or transferees, "**Payee**"), the principal sum of $80,000.00, or so much thereof as may be outstanding hereunder, with interest thereon at the Stated Rate (hereinafter defined).  Subject to the limitations set forth herein regarding the applicable maximum nonusurious interest rate permitted to be charged on this Note, accrued and unpaid interest on the unpaid principal balance of this Note shall be compounded quarterly.  Both principal and interest are payable as hereinafter provided in lawful money of the United States of America at the address of Payee set forth below or at such other place as from time to time may be designated by the holder of this Note.  The term "**Stated Rate**" as used herein shall mean a rate equal to five percent (5%) per annum, compounded quarterly.  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the LLC Agreement (as hereinafter defined).

The amounts borrowed hereunder shall be used by Maker solely to fund Maker's required capital contribution to Payee in accordance with that certain Amended and Restated Limited Liability Company Agreement of the Company, dated January 4, 2016, as the same may be amended or restated from time to time (the "**LLC Agreement**"), and for no other purpose.

Any unpaid principal under this Note and all accrued and unpaid interest relating to the principal of this Note shall be due and payable upon the first to occur of: (a) the termination of Maker's employment with Payee, (b) the dissolution of Payee, (c) the forty-eight (48) month anniversary of the date hereof, or (d) upon acceleration as provided below (any such event being the "**Maturity Date**").

In addition to the foregoing, any unpaid principal of, and all accrued and unpaid interest under, this Note existing from time to time is subject to being offset to the fullest extent permissible by applicable law, on a dollar-for-dollar basis, against any after-tax amounts otherwise owed or distributable to Maker from Payee, including, without limitation, any distributions to Maker pursuant to Article VI of the LLC Agreement (net of any tax distributions made to Maker pursuant to Section 6.3 of the LLC Agreement); *provided, however*, that no such offset or deduction is allowed against payments to Maker from Payee in violation of any applicable law or which are subject to Section 409A of the Internal Revenue Code of 1986, as amended from time to time, and any successor statute or statutes.  In the event any principal or interest is offset against amounts owed or distributable to Maker from Payee under the LLC Agreement, the amount offset shall be treated as first paid or distributed under the LLC Agreement to Maker and thereafter repaid by Maker to Payee in respect of principal or interest under this Note, and the parties shall not take any actions inconsistent with the foregoing characterization.

Upon the occurrence of (a) an Event of Default under the Security Agreement (defined below), or (b) the merger, consolidation, sale or exchange of all of the equity interests of Payee, the sale of all or substantially all of the assets of Payee or other similar fundamental change in

Payee, Payee shall have the option of declaring all principal of this Note, and all accrued and unpaid interest thereon, to be immediately due and payable (an "**acceleration**").

This Note is secured by and entitled to the benefits of that certain Security Agreement, dated of even date herewith, as amended from time to time (the "**Security Agreement**") between Maker and Payee, as the secured party. Maker shall have the right to prepay, without penalty, at any time and from time to time, all or any part of the unpaid principal balance of this Note and/or all or any part of the unpaid interest accrued to the date of such prepayment, provided that any such principal thus paid is accompanied by accrued interest on such principal.

If, on the Maturity Date, Maker is unable to pay in full all outstanding principal, accrued but unpaid interest and/or accrued and unpaid costs and expenses to which the Payee is legally entitled under this Note, Maker shall be liable and Payee will have full recourse against any real, personal, tangible or intangible assets of Maker for such deficiency in an amount equal to (i) any accrued but unpaid interest under this Note at the Stated Rate, and (ii) the entire amount (which takes into consideration the cash amount paid pursuant to the LLC Agreement) of the sum of (A) any outstanding principal, (B) any accrued but unpaid interest under this Note in excess of the Stated Rate, and (C) any accrued and unpaid costs and expenses under this Note and under the Security Agreement.

It is the intent of Payee and Maker in the execution of this Note and all other instruments now or hereafter securing this Note to contract in strict compliance with applicable usury law. In furtherance thereof, Payee and Maker stipulate and agree that none of the terms and provisions contained in this Note, or in any other instrument executed in connection herewith, shall ever be construed to create a contract to pay for the use, forbearance or detention of money, interest at a rate in excess of the maximum interest rate permitted to be charged by applicable law. Neither Maker nor any guarantors, endorsers or other parties now or hereafter becoming liable for payment of this Note shall ever be required to pay interest on this Note at a rate in excess of the maximum interest that may be lawfully charged under applicable law, and the provisions of this paragraph shall control over all other provisions of this Note and any other instruments now or hereafter executed in connection herewith that may be in apparent conflict herewith. The holder of this Note expressly disavows any intention to charge or collect excessive unearned interest or finance charges in the event the maturity of this Note is accelerated. If the maturity of this Note shall be accelerated for any reason or if the principal of this Note is paid prior to the end of the term of this Note, and as a result thereof the interest received for the actual period of existence of the loan evinced by this Note exceeds the applicable maximum lawful rate, the holder of this Note shall, at its option, either refund to Maker the amount of such excess or credit the amount of such excess against the principal balance of this Note then outstanding and thereby shall render inapplicable any and all penalties of any kind provided by applicable law as a result of such excess interest. In the event that the said payee or any other holder of this Note shall collect monies that are deemed to constitute interest that would increase the effective interest rate on this Note to a rate in excess of that permitted to be charged by applicable law, all such sums deemed to constitute interest in excess of the lawful rate shall, upon such determination, at the option of the holder of this Note, be either immediately returned to Maker or credited against the principal balance of this Note then outstanding, in which event any and all penalties of any kind under applicable law as a result of such excess interest shall be inapplicable. By execution of this Note, Maker acknowledges that Maker believes the loan evinced by this Note to be non-usurious

2

and agrees that if, at any time, Maker should have reason to believe that such loan is in fact usurious, Maker will give the holder of this Note notice of such condition and Maker agrees that said holder shall have ninety (90) days in which to make appropriate refund or other adjustment in order to correct such condition if in fact such exists.  The term "**applicable law**" as used in this Note shall mean the laws of the State of Texas or the laws of the United States, whichever laws are applicable and allow the greater rate of interest, as such laws now exist or may be changed or amended or come into effect in the future.

Should the indebtedness represented by this Note or any part thereof be collected at law or in equity or through any bankruptcy, receivership, probate or other court proceedings or if this Note is placed in the hands of attorneys for collection after default, Maker and all endorsers, guarantors and sureties of this Note jointly and severally agree to pay to the holder of this Note in addition to the principal and interest due and payable hereon reasonable attorneys' and collection fees.

This Note shall bind Maker and any successors and assigns, and the benefits hereof shall inure to the benefit of Payee and its successors and assigns.  Payee may assign this Note to any third party.  Maker shall have no right to assign this Note without the prior written consent of Payee.

Maker and all endorsers, guarantors and sureties of this Note and all other persons liable or to become liable on this Note severally waive presentment for payment, demand, notice of demand and of dishonor and nonpayment of this Note, notice of intention to accelerate the maturity of this Note, notice of acceleration of this Note, protest and notice of protest, diligence in collecting, and the bringing of suit against any other party, and agree to all renewals, extensions, modifications, partial payments, releases or substitutions of security, in whole or in part, with or without notice, before or after maturity.

This Note and the rights and duties of the parties hereunder shall be governed for all purposes by the law of the State of Texas and the law of the United States applicable to transactions within such State.

**THIS NOTE AND ALL OTHER CREDIT DOCUMENTS EXECUTED BY ANY OF THE PARTIES SUBSTANTIALLY CONCURRENTLY HEREWITH TOGETHER CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

[*Signature Page Follows.*]

IN WITNESS WHEREOF, Maker has duly executed and delivered this Note as of the date first above written.

_____

JOE MUELLER

Address of Maker:

17 Calle Pacifica
San Clemente, CA 92673


Address of Payee:

Chandler Signs Holdings, LLC
_____
_____
_____
Attention: Chief Executive Officer


with a copy (which shall not constitute notice) to:

Dos Rios Partners, L.P.
205 Wild Basin Road S.
Building 3, Suite 100
Austin, TX 78746
Attention: Pat M. (Bo) Baskin, Jr.
Fax: (512) 298-0810
Email: bo.baskin@dosriospartners.com

# EXHIBIT B

## FORM OF SECURITY AGREEMENT

## SECURITY AGREEMENT
### (Pledge of Equity Interests)

THIS SECURITY AGREEMENT, dated December 22, 2016 (this "**Agreement**"), is made by Joe Mueller, an individual ("**Debtor**"), in favor of Chandler Signs Holdings, LLC, a Delaware limited liability company ("**Secured Party**").

### RECITALS:

WHEREAS, Debtor has executed and delivered to Secured Party a Promissory Note in the principal amount of $80,000.00 (the "**Note**"); and

WHEREAS, Secured Party desires, and Debtor has agreed, to enter into this Agreement in order to secure Debtor's obligations to Secured Party under the Note.

NOW, THEREFORE, in consideration of the foregoing and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

1.    <u>Security Interest</u>.  To secure the payment of all amounts due under the Note (the "**Obligations**"), Debtor hereby pledges and assigns to, and deposits with, Secured Party, and grants to Secured Party a continuing security interest in, all of Debtor's remedies, powers, privileges, rights, titles and interests (including all power of Debtor, if any, to pass greater title than it has itself) of every kind and character now owned or hereafter acquired, created or arising (whether as a general partner, limited partner, member, joint venturer or otherwise) in and to the following:

(i)    Secured Party and any organizational documents (including, without limitation, that certain Amended and Restated Limited Liability Company Agreement of Secured Party, dated January 4, 2016, as amended (the "**LLC Agreement**")) of Secured Party (collectively, the "**Entity Agreements**");

(ii)    all instruments, documents, chattel papers, accounts, general intangibles, profits, income, surplus, money, credits, claims, demands and other property (real or personal) and revenues of any kind or character now or hereafter relating to, accruing or arising under or in respect of any Entity Agreement or any property, real or personal, now or hereafter owned by Secured Party (the "**Property**") or paid, payable or otherwise distributed or distributable or transferred or transferable to Debtor under, in connection with or otherwise in respect of the Property or any Entity Agreement (whether by reason of Debtor's ownership interest, loans by Debtor or otherwise); and

(iii)    all accessions, appurtenances and additions to and substitutions for any of the foregoing and all products and proceeds of any of the foregoing, together with all renewals and replacements of any of the foregoing, all accounts, receivables, account receivables, instruments, notes, chattel paper, documents (including all documents of title), books, records, contract rights and general intangibles arising in connection with any of the foregoing (including all insurance and claims for

insurance affected or held for the benefit of Debtor or Secured Party in respect of the foregoing).

All of the properties and interests described above in which a security interest is created by this Agreement are herein collectively called the "**Pledged Equity Interests**" or the "**Collateral**." As of the date of the Agreement, Debtor owns 100,000 Class A Units in Secured Party.

2.    Representations, Warranties and Covenants of Debtor.

(a)    Protection of Collateral.  Debtor hereby covenants that Debtor shall:

(i)    pay, at the cost and expense of Debtor, prior to delinquency, any tax, charge, lien or assessment against the Collateral, except to the extent Debtor timely contests such items in good faith and by appropriate legal proceedings;

(ii)    defend, at the cost and expense of Debtor, any action, claim or demand affecting (i) the Collateral, (ii) the security interest granted hereby, (iii) the right, title, interest and benefit of Debtor in or to the Collateral, or (iv) the right, title, interest and benefit of Secured Party in or to the Collateral;

(iii)    deliver to Secured Party, from time to time, such financing statements as Secured Party may reasonably request, in form satisfactory to Secured Party, it being understood that Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file such financing statements or any other document or instrument that Secured Party determines to be necessary to maintain, give notice of, perfect, or otherwise assure the security interest granted hereby; and

(iv)    execute and deliver, at the cost and expense of Debtor, to Secured Party such other and further documents and instruments as reasonably shall be deemed necessary by Secured Party so as to maintain, give notice of, perfect, or otherwise assure the security interest granted hereby.

(b)    Delivery of Pledged Collateral.  Any additional instruments and writings constituting Pledged Equity Interests from time to time shall be delivered to Secured Party promptly upon the receipt thereof by or on behalf of Debtor.  All such Pledged Equity Interests delivered to Secured Party shall be held by Secured Party pursuant hereto and shall be delivered in suitable form for transfer by delivery with any necessary endorsement or shall be accompanied by fully executed instruments of transfer or assignment in blank, all in form and substance satisfactory to Secured Party.

(c)    Proceeds of Pledged Equity Interests.  If Debtor shall receive, by virtue of being or having been an owner of any Pledged Equity Interests, any

- 2 -

(i) certificate (including, without limitation, any certificate representing a dividend or distribution in connection with any increase or reduction of capital, reclassification, merger, consolidation, sale of assets, or combination, split, spin-off or split-off of equity interests), promissory note or other instrument or writing; (ii) option or right, whether as an addition to, substitution for, or in exchange for, any Pledged Equity Interests, or otherwise; (iii) dividends or distributions payable in cash (except such dividends or distributions permitted to be retained by Debtor hereunder) or in securities or other property, or (iv) dividends or other distributions in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in surplus, Debtor shall receive such certificate, promissory note, instrument, writing, option, right, payment or distribution in trust for the benefit of Secured Party, shall segregate it from Debtor's other property and shall deliver it in the exact form received, with any necessary endorsement or appropriate powers duly executed in blank, to Secured Party, to be held by Secured Party as Collateral.

(d)     <u>Secured Party's Costs</u>.  Debtor shall pay all costs necessary to obtain, preserve, perfect, defend and enforce this security interest, and preserve, defend, enforce and collect the Collateral, including but not limited to taxes, assessments, reasonable attorneys' fees and legal expenses and expenses of sales. Whether the Collateral is or is not in Secured Party's possession, and without any obligation to do so, Secured Party may, at its option, pay any such costs and expenses and discharge encumbrances on the Collateral.  Debtor agrees to reimburse Secured Party on demand for any costs so reasonably incurred.

(e)     <u>Power of Attorney</u>.  Debtor appoints Secured Party as Debtor's attorney in fact with full power in Debtor's name and behalf to do every act that Debtor is obligated to do hereunder with respect to the Collateral during any period in which an Event of Default is continuing; *provided, however*, nothing in this paragraph shall be construed to obligate Secured Party to take any action hereunder.

(f)     <u>Certain Provisions Regarding the Entity Agreements</u>.  Without the prior written consent of Secured Party, Debtor will not (i) reduce or consent to the reduction of any payment or distribution required to be made to Debtor under any Entity Agreement; (ii) revise, alter, modify, amend or change any Entity Agreement in any way, either orally or in writing or consent to any of the foregoing; (iii) waive any condition in respect of, or release any person with respect to, any Entity Agreement or the performance or observance of any obligation or condition thereunder or consent to any of the foregoing; or (iv) terminate or cancel any Entity Agreement or dissolve or agree to the termination of the entities formed under the Entity Agreements.  Debtor will (A) perform or cause to be performed all of the terms, covenants and conditions on its part to be performed under any Entity Agreement; (B) promptly notify Secured Party in writing of (x) the occurrence of any default in the observance or performance of any of the terms, covenants or conditions of any Entity Agreement; (y) the giving of any notice of any such default, and (z) the receipt of any written notice with

- 3 -

respect to any Entity Agreement; and (C) whenever required by Secured Party, at the sole cost and expense of Debtor, take all such action as may be so requested to enforce or secure the performance of any term, covenant or condition of the Entity Agreements and to exercise any right of Debtor under the Entity Agreements.  It is expressly agreed that, anything herein contained to the contrary notwithstanding, Debtor shall remain liable under the Entity Agreements to perform all of its obligations thereunder, and Secured Party shall have no obligation or liability under the Entity Agreements by reason of or arising out of this Agreement, nor shall Secured Party be required or obligated by reason of this Agreement in any manner to perform or fulfill any obligation of Debtor under or pursuant to the Entity Agreements, or to make any payment, or to make any inquiry as to the nature or sufficiency of any payment received by it pursuant to or in connection with this Agreement.

3. <u>Events of Default, Remedies, Powers and Authorizations</u>.

(a) <u>Events of Default</u>.  Each of the following events constitutes an Event of Default under this Agreement:

(i) <u>Failure to Make Payment on the Obligations</u>.  Debtor fails to pay any Obligations when due and payable;

(ii) <u>Breach of Representation, Warranty or Covenant</u>.  Any representation, warranty or covenant previously, presently or hereafter made in writing by or on behalf of Debtor in connection with this Agreement, the Note, the LLC Agreement or any other agreement under which Debtor has obligations to the Secured Party shall prove to have been false or incorrect in any material respect on any date or as of which made;

(iii) <u>Breach of Any Covenant or Contract</u>.  There occurs any default, event of default or similar event (however denominated) under this Agreement, the Note or any other agreement under which Debtor has obligations to the Secured Party (including, without limitation, any of the Entity Agreements by and between Debtor and Secured Party), or Debtor fails to duly observe, perform or comply with any covenant or any other obligation under any such agreement under which Debtor has obligations to the Secured Party and such failure is not remedied within ten (10) days after notice thereof from Secured Party to Debtor, or Debtor or any guarantor of the Obligations fails to duly observe, perform or comply with any other agreement with any party or any term or condition of any instrument (if such agreement or instrument is materially significant to Debtor or such guarantor, as applicable), and such failure is not remedied within the applicable period of grace, if any, provide in such agreement or instrument; or

(iv) <u>Bankruptcy</u>.  Debtor or any guarantor of the Obligations:

- 4 -

(A)      suffers the entry against him of a judgment, decree or order for relief by a court of competent jurisdiction in an involuntary proceeding commenced under any applicable bankruptcy, insolvency or other similar law of any jurisdiction now or hereafter in effect, including the federal Bankruptcy Code, as from time to time amended, or has any such proceeding commenced against him that remains undismissed for a period of sixty (60) days; or

(B)      commences a voluntary case under any applicable bankruptcy, insolvency or similar law now or hereafter in effect, including the federal Bankruptcy Code, as from time to time amended; or applies for or consents to the entry of an order for relief in an involuntary case under any such law; or makes a general assignment for the benefit of creditors; or fails generally to pay (or admits in writing his inability to pay) debts as such debts become due; or takes action to authorize any of the foregoing.

(b)      <u>Event of Default Remedies</u>.  If an Event of Default shall have occurred and be continuing, Secured Party may from time to time in its discretion, without limitation and without notice except as expressly provided below:

(i)      exercise in respect of the Collateral, in addition to other rights and remedies provided for herein, under the Note or otherwise available to it, all the rights and remedies of a secured party on default under the Uniform Commercial Code as then in effect in the State of Texas (the "**Code**") (whether or not the Code applies to the affected Collateral); and

(ii)      declare the principal balance of and interest accrued on the Note to be immediately due and payable.

Debtor agrees that, to the extent notice of sale shall be required by law, at least five (5) days' notice to Debtor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. Secured Party shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.  Secured Party may be the purchaser of any and all of the Collateral so sold and may apply upon the purchase price therefor any of the Debt and thereafter hold the same absolutely free from any right or claim of whatsoever kind.  Secured Party is authorized at any such sale, if Secured Party deems it advisable or is required by applicable law so to do, (i) to restrict the prospective bidders on or purchasers of any of the Collateral to a limited number of sophisticated investors who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of any of the Collateral, (ii) to cause to be placed on certificates for any or all of the Collateral a legend to the effect that such security has not been registered under the Securities Act of 1933, as

amended (the "**Act**"), and may not be disposed of in violation of the provisions of said Act, (iii) to disclaim and to refuse to give any warranty, and (iv) to impose such other limitations or conditions in connection with any such sale as Secured Party deems necessary or advisable in order to comply with said Act or any other applicable law.  Debtor covenants and agrees that it will execute and deliver such documents and take such other action as Secured Party deems necessary or advisable in order that any such sale may be made in compliance with applicable law.  Upon any such sale Secured Party shall have the right to deliver, assign and transfer to the purchaser thereof the Collateral so sold.  Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right of whatsoever kind, including any equity or right of redemption, stay or appraisal which Debtor has or may have under any rule of law or statute now existing or hereafter adopted.

(c)     Application of Proceeds.  If any Event of Default shall have occurred and be continuing, Secured Party may in its discretion apply any cash held by Secured Party as Collateral, and any cash proceeds received by Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral, to any or all of the Obligations in such order as Secured Party may elect.

(d)     Deficiency.  In the event that the proceeds of any sale, collection or realization of or upon Collateral by Secured Party are insufficient to pay all amounts to which Secured Party is legally entitled, Debtor shall be liable for the deficiency, together with interest thereon as provided in the Note or (if no interest is so provided) at such other rate as shall be fixed by applicable law, together with the costs of collection and the reasonable fees of any attorneys employed by Secured Party to collect such deficiency.

(e)     Indemnity and Expenses.  Debtor agrees to indemnify Secured Party from and against any and all claims, losses and liabilities growing out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except to the extent such claims, losses or liabilities are proximately caused by Secured Party's gross negligence or willful misconduct.  **THE FOREGOING INDEMNITY SHALL APPLY REGARDLESS OF WHETHER CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF ANY OF THE INDEMNIFIED PARTIES.**

(f)     Non-Judicial Remedies.  In granting to Secured Party the power to enforce its rights hereunder without prior judicial process or judicial hearing, Debtor expressly waives, renounces and knowingly relinquishes any legal right that might otherwise require Secured Party to enforce its rights by judicial process.  In so providing for non-judicial remedies, Debtor recognizes and concedes that such remedies are consistent with the usage of trade, are responsive to commercial necessity, and are the result of a bargain at arm's length.  Nothing herein is intended to prevent Secured Party or Debtor from resorting to judicial process at either party's option.

(g)     Other Recourse.  Debtor waives any right to require Secured Party to proceed against any other party, exhaust any Collateral or other security for the Obligations, or to have any other liable party joined with Debtor in any suit arising out of the Obligations or this Agreement or pursue any other remedy in Secured Party's power.  Debtor further waives any and all notice of acceptance of this Agreement and of the creation, modification, rearrangement, renewal or extension for any period of any of the Obligations of any other liable party from time to time.  Debtor further waives any defense arising by reason of any disability or other defense of any other liable party or by reason of the cessation from any cause whatsoever of the liability of any other liable party.  Until all of the Obligations shall have been paid in full and the obligations (if any) of Secured Party to make further advances under the Note shall have terminated, Debtor shall have no right to subrogation and Debtor waives the right to enforce any remedy that Secured Party has or may hereafter have against any other liable party, and waives any benefit of and any right to participate in any other security whatsoever now or hereafter held by Secured Party.  Debtor authorizes Secured Party, without notice or demand and without any reservation of rights against Debtor without affecting Debtor's liability hereunder or on the Obligations from time to time to (i) take or hold any other property of any type from any other party as security for the Obligations and exchange, enforce, waive and release any or all of such other property, (ii) apply the Collateral or such other property and direct the order or manner of sale thereof as Secured Party may in its discretion determine, (iii) renew, extend for any period, accelerate, modify, compromise, settle or release any of the obligations of any other liable party in respect to any or all of the Obligations or other security for the Obligations, (iv) waive, enforce, modify, amend or supplement any of the provisions of the Note with any party other than Debtor, and (v) release or substitute any other liable party.

4.     Voting Rights, Dividends, Distributions, Etc. in Respect of the Pledged Equity Interests.

(a)     So long as no Event of Default shall have occurred and be continuing:

(i)     Debtor may exercise any and all voting and other consensual rights pertaining to the Pledged Equity Interests or any part thereof for any purpose not inconsistent with the terms of this Agreement or the Note; *provided, however*, that Debtor will not exercise or refrain from exercising any such right, as the case may be, if Secured Party gives it notice that, in Secured Party's judgment, such action would have a material adverse effect on the value of the Pledged Equity Interests or the benefits to Secured Party of its security interest hereunder;

(ii)     Debtor may receive and retain any and all dividends, distributions or interest paid in respect of the Pledged Equity Interests, except as limited by and in accordance with the terms of the Note; and

(iii)    Secured Party will execute and deliver (or cause to be executed and delivered) to Debtor all such proxies and other instruments as Debtor may reasonably request for the purpose of enabling Debtor to exercise the voting and other rights that it is entitled to exercise pursuant to subsection (a)(i) of this section and to receive the dividends and distributions that it is authorized to receive and retain pursuant to subsection (a)(ii) of this section.

(b)    Upon the occurrence and during the continuance of an Event of Default:

(i)    all rights of Debtor to exercise the voting and other consensual rights that it would otherwise be entitled to exercise pursuant to subsection (a)(i) of this section shall, at the election of Secured Party, cease;

(ii)    all rights of Debtor to receive and retain the dividends, distributions and interest payments that it would otherwise be authorized to receive and retain pursuant to subsection (a)(ii) of this section shall automatically cease, and all such rights shall thereupon become vested in Secured Party, which shall thereupon have the sole right to receive such dividends, distributions and interest payments and apply same to the satisfaction of the Obligations; and

(iii)    all dividends, distributions and interest payments that are received by Debtor contrary to the provisions of subsection (b)(ii) of this section shall be received in trust for the benefit of Secured Party, shall be segregated from other funds of Debtor, and shall be forthwith paid over to Secured Party as Pledged Equity Interests in the exact form received, to be held by Secured Party as Collateral.

5.    <u>Miscellaneous</u>.

(a)    <u>Appointment of Agents; Endorsements</u>.  Secured Party has the right to appoint one or more agents to retain physical possession of the Pledged Equity Interests (to the extent applicable), which may be held (in the discretion of Secured Party) in the name of Debtor, endorsed or assigned in blank or in favor of Secured Party or any nominee of Secured Party or an agent appointed by Secured Party.  In the event of such appointment by Secured Party, Secured Party shall provide Debtor written notice of its appointment of an agent.

(b)    <u>Notices</u>.  Any notice, request, instruction or other document to be given hereunder by either party hereto to the other shall be given in writing, delivered personally, mailed by registered or certified mail, postage prepared, or sent by commercial overnight delivery service, fees prepaid, to the addresses of the parties set forth opposite their names on the signature page hereto.

(c)      <u>Benefit</u>.  This Agreement shall be binding upon and inure to the benefit of Debtor and Secured Party and their respective heirs, executors, administrators, trustees, successors and assigns.

(d)      <u>Governing Law</u>.  This Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with and governed by the laws of the State of Texas.

(e)      <u>Headings</u>.  Headings of sections and subsections are included for convenience of reference only and do not affect in any way the meaning or construction of any provision of this Agreement.

(f)      <u>Amendment</u>.  This Agreement and the Note constitute the entire agreement and understanding between Secured Party and Debtor and supersede all prior agreements and understandings between Secured Party and Debtor relating to the subject matter hereof.  The terms of this Agreement may not be modified or amended except by an agreement in writing signed by Debtor and Secured Party.

(g)      <u>Preservation of Rights</u>.  No failure on the part of Secured Party to exercise, and no delay in exercising, any right hereunder or under the Note shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. Neither the execution nor the delivery of this Agreement shall in any manner impair or affect any other security for the Obligations.  The rights and remedies of Secured Party provided herein and in the Note are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law.  The rights of Secured Party under the Note against any party thereto are not conditional or contingent on any attempt by Secured Party to exercise any of its rights under the Note against such party or against any other party.

(h)      <u>Unenforceability</u>.   Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or invalidity without invalidating the remaining portions hereof or thereof or affecting the validity or enforceability of such provision in any other jurisdiction.

(i)      <u>Survival of Agreements</u>.   All representations and warranties of Debtor herein, and all covenants and agreements herein shall survive the execution and delivery of this Agreement, the execution and delivery of the Note and the creation of the Obligations.

(j)      <u>Other Liable Party</u>.   Neither this Agreement nor the exercise by Secured Party or the failure of Secured Party to exercise any right, power or remedy conferred herein or by law shall be construed as relieving any other liable party from liability on the Obligations or any deficiency thereon.  This Agreement shall continue irrespective of the fact that the liability of any other liable party

may have ceased or irrespective of the validity or enforceability of the Note to which Debtor or any other liable party may be a party, and notwithstanding the reorganization, death, incapacity or bankruptcy of any other liable party, and notwithstanding the reorganization or bankruptcy or other event or proceeding affecting any other liable party.

(k)     Binding Effect and Assignment.   This Agreement creates a continuing security interest in the Collateral and (a) shall be binding on Debtor and his successors and permitted assigns and (b) shall inure, together with all rights and remedies of Secured Party hereunder, to the benefit of Secured Party and its successors, transferees and assigns.   Without limiting the generality of the foregoing, Secured Party may pledge, assign or otherwise transfer the Note held by it, and Secured Party may assign or otherwise transfer its rights under any the Note to any other party, and such other party shall thereupon become vested with all of the benefits in respect thereof granted to Secured Party, herein or otherwise. Any assignment by Secured Party of the Note or of Secured Party's rights under the Note will be effective without the consent of Debtor, nor shall such an assignment require prior notice to Debtor.   None of the rights or obligations of Debtor hereunder nor any rights of Debtor in the Collateral may be assigned or otherwise transferred without the prior written consent of Secured Party

(l)     **THIS AGREEMENT, THE NOTE AND THE OTHER CREDIT DOCUMENTS TOGETHER CONSTITUTE A WRITTEN AGREEMENT AND REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

(m)     Termination.   Upon the satisfaction in full of the Obligations and termination of the obligation to make any further obligations under the Note, and upon written request for the termination hereof delivered by Debtor to Secured Party, this Agreement and the security interest created hereby shall terminate and all rights to the Collateral shall revert to Debtor.   Secured Party will, upon Debtor's request (a) return to Debtor such of the Collateral as shall not have been sold or otherwise disposed of or applied pursuant to the terms hereof; and (b) execute and deliver to Debtor such documents as Debtor shall reasonably request to evidence such termination.

(n)     Defined Terms.   Capitalized terms used herein and not otherwise defined shall have the respective meanings ascribed to them in the LLC Agreement.

(o)     Counterparts.   This Agreement may be separately executed in any number of counterparts, all of which when so executed shall be deemed to constitute one and the same Agreement.

[*Signature Page Follows.*]

- 10 -

IN WITNESS WHEREOF, Debtor has caused this Agreement to be executed and delivered to Secured Party as of the date first above written.

**DEBTOR:**

_____

JOE MUELLER

Address:

17 Calle Pacifica
San Clemente, CA 92673

**SECURED PARTY:**

CHANDLER SIGNS HOLDINGS, LLC,
a Delaware limited liability company

By:_____
Name:_____
Title:_____

Address:

_____
_____
_____
Attention: Chief Executive Officer

with a copy (which shall not constitute notice) to:

Dos Rios Partners, L.P.
205 Wild Basin Road S.
Building 3, Suite 100
Austin, TX 78746
Attention: Pat M. (Bo) Baskin, Jr.
Fax: (512) 298-0810
Email: bo.baskin@dosriospartners.com

# Exhibit 3

# CHANDLER SIGNS L.P., L.L.P. CONFIDENTIALITY POLICY

**Purpose:**  The purpose of this policy is to protect the integrity of Chandler Signs', L.P., L.L.P., hereby referred to as "The Company", intellectual knowledge, information databases, and proprietary business practices through the effective and consistent application of company approved procedures and security measures as outlined.

**Scope:**  This policy applies to all Company employees accessing Company information, performing trade specific or proprietary processes, or using Company computing devices.

**Policy Statement:**    Confidential information, trade secrets and business process knowledge including:

- Sources of purchased goods / services / contracts and their respective prices;
- Customer lists, contract details and related data;
- Financial statements detailing Company performance and conditions;
- Personnel and payroll records, compensation data;
- Marketing strategies, pending projects and proposals;
- Conversations between employees relating to any of the above topics;

are all considered proprietary, critical assets of the Company, and as such, are to be protected and used properly.  Therefore, it is the policy of Chandler Signs L.P., L.L.P. that:

1. Information and business methodologies designated confidential or proprietary may not be discussed with anyone outside the Company and should only be discussed within the Company on a "Need to know" basis, and that employees are strictly prohibited from any use of proprietary information outside of conducting customary and usual business activities;

2. That all customer information, not readily available to the public through other sources shall be considered privileged and confidential information of the customer of the Company and may require clear labeling to indicate its "Confidential" status;

3. That such information, and all copies thereof, shall be returned to the customer at completion of the job, and shall not be disclosed to any person not an employee or duly authorized agent of the Company nor disclosed to employees or agents of the Company who do not need access to the information in order to perform their job duties;

4. That employees are required to avoid disclosure of non-confidential information about the Company, its employees, customers, suppliers and business practices, unless the restriction impedes normal business communications and relationships;

5. That access to Company information systems and databases requires appropriate levels of review and authorization by company management, and that employees granted access to such applications and databases will be required to sign associated computing system use agreements;

6. That employees will treat such information, associated intellectual property and its storage medium including hard copies, electronic files and storage devices, computer hardware and software, as proprietary to Chandler Signs, L.P., L.L.P., for which they are personally responsible;

7. That removal of any computer or other electronic device, any unauthorized copying of information, or any dissemination of proprietary information to persons not authorized to receive such information are prohibited;

8. That any or all of the items identified in paragraph (6) must be surrendered to the Company upon demand or at the time of separation from Chandler Signs L.P., L.L.P.;

9. That employees will direct any and all questions regarding the maintenance of proprietary information in strict confidence to their supervisor.

**Penalty for Violation of Policy:** Employees who improperly use or disclose trade secrets or confidential business information, including proprietary information and customer information will be subject to disciplinary action, including termination of employment and legal action, even if they do not actually benefit from the disclosed information.

**Covenant Regarding Confidentiality:** Employee acknowledges that he/she will have access to, and knowledge of, proprietary information and customer information, and that improper use or revelation of same by employee, whether during or after the termination of employment by the Company, could cause serious injury to the business of the Company, its affiliates, and its customers. Accordingly, employee agrees that, except as required to perform his/her duties under this agreement, or as required by law, that he/she will forever keep secret and inviolate all proprietary information and customer information which shall come into his/her possession, and will not disclose the same to any other person or organization for so long as such proprietary information and customer information are not generally known by, or accessible to, the public. Employee further agrees that he/she will not use any proprietary information or customer information for his/her own benefit, or directly or indirectly, for the benefit of any person or organization other than the Company and its affiliates.

By signing a copy of this Confidentiality Policy, employee acknowledges receipt of a copy thereof, and agrees as a condition to employee's continued employment, to be bound thereby.

Signed this ___12th___ day of ___FEB_____, 20_09_

_____
Signature of Employee

_____
Printed name of Employee

*Joe Mueller*

RECEIVED FEB 13 2009

# Exhibit 4

# FIRST ADDENDUM AND AMENDMENT TO
# AMENDED AND RESTATED COMPANY AGREEMENT
# OF
# CHANDLER SIGNS HOLDINGS, LLC

This First Addendum and Amendment (this "**Amendment**") to Amended and Restated Company Agreement of Chandler Signs Holdings, LLC, a Delaware limited liability company (the "**Company**"), is executed effective as of the 22nd day of December, 2016, by and among the undersigned parties.

WHEREAS, certain persons entered into that certain Amended and Restated Limited Liability Company Agreement of the Company, dated as of January 4, 2016 (as amended from time to time, the "**Company Agreement**");

WHEREAS, pursuant to Section 4.1(b) of the Company Agreement, additional Persons may be admitted to the Company as Members with the prior written consent of the Board;

WHEREAS, pursuant to Sections 4.2(a) and 4.2(b) of the Company Agreement, subject to Section 4.3, the Company may issue from time to time such number of Class A Units, Class B Units and Class C Units as the Board reasonably determines to be in the best interests of the Company and upon the issuance of such Units, the Company shall amend Schedule 1 attached to the Company Agreement to reflect the ownership of the Units;

WHEREAS, pursuant to that certain Subscription and Contribution Agreement, dated as of the date hereof, by and between the Company and Joe Mueller (the "**New Class A Member**"), the New Class A Member has agreed to make a Capital Contribution to the Company in exchange for certain Class A Units, as provided in more particularity in such Subscription and Contribution Agreement;

WHEREAS, the undersigned Class A Members and the Board have determined that it is desirable and in the best interests of the Company to amend the Company Agreement and to amend and restate Schedule 1 attached to the Company Agreement in its entirety in order to reflect the issuance of certain Class A Units to the New Class A Member and the admission of the New Class A Member to the Company;

WHEREAS, the New Class A Member desires to be admitted to the Company and to be bound by all of the terms and provisions of the Company Agreement, as amended hereby; and

WHEREAS, capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Company Agreement.

NOW THEREFORE, in consideration of the execution of the Company Agreement and this Amendment, and the benefits and advantages derived and to be derived therefrom and herefrom, the Company Agreement is hereby amended as follows:

Section 1.     **Addendum**.  The New Class A Member acknowledges and agrees that he has received and read the Company Agreement and that he shall be bound by, and shall have the benefit of, all of the terms and conditions set forth in the Company Agreement, as amended, as a Member holding certain Class A Units.

Section 2.     **Amendment**.  The Company Agreement is amended, as of the date hereof, by replacing the existing Schedule 1 of the Company Agreement with the Schedule 1 attached hereto.

Section 3.     **Effect**.  This Amendment constitutes an amendment to the Company Agreement.  The terms and provisions of the Company Agreement and all other documents and instruments relating and pertaining to the Company Agreement shall continue in full force and effect, as amended hereby.  In the event of any conflict between the provisions of the Company Agreement and the provisions of this Amendment, the provisions of this Amendment shall control.  The parties hereto acknowledge and agree that the attached Schedule 1 accurately reflects the names of the Members and their respective Units in the Company as of the date hereof, and the parties hereto acknowledge and agree that such Members shall have the rights and be bound by the restrictions and obligations described in the Company Agreement, as amended by this Amendment.  The Board shall attach this Amendment and the revised Schedule 1 to the Company Agreement.

Section 4.     **Consent and Waiver**.  By their execution of this Amendment, each of the undersigned Class A Members hereby approves and consents to the issuance of the Class A Units to the New Class A Member and such undersigned Members hereby waive any and all preemptive rights they may have under Section 4.3 of the Company Agreement.

Section 5.     **Counterparts**.  This Amendment may be executed in any number of counterparts, each of which shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

**[*Signature Pages Follow*]**

IN WITNESS WHEREOF, the undersigned have executed this Amendment effective as of the Effective Date.

**CLASS A MEMBERS:**

**DOS RIOS PARTNERS, L.P.**

By:    Dos Rios GP, LLC, its general partner

By: _____
Name:   Pat M. (Bo) Baskin, Jr.
Title:  Manager


**DOS RIOS PARTNERS - A, L.P.**

By:    Dos Rios GP. LLC. its general partner

By: _____
Name:   Pat M. (Bo) Baskin, Jr.
Title:  Manager


**CSWC CHANDLER SIGNS HOLDINGS, INC.**

By: _____
Name: _____
Title: _____


**MAIN STREET EQUITY INTERESTS, INC.**

By: _____
Name: _____
Title: _____

First Addendum and Amendment to
Amended and Restated Limited Liability Company Agreement of
Chandler Signs Holdings, LLC

IN WITNESS WHEREOF, the undersigned have executed this Amendment effective as of the Effective Date.

**CLASS A MEMBERS:**

**DOS RIOS PARTNERS, L.P.**

By:    Dos Rios GP, LLC, its general partner

By: _____
Name: _____
Title: _____


**DOS RIOS PARTNERS - A, L.P.**

By:    Dos Rios GP, LLC, its general partner

By: _____
Name: _____
Title: _____


*Capital Southwest Equity Investments, INC.*
~~CSWC CHANDLER SIGNS HOLDINGS, INC.~~

By: _____
Name: _____Chris Rehberger_____
Title: _____Secretary_____


**MAIN STREET EQUITY INTERESTS, INC.**

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the undersigned have executed this Amendment effective as of the Effective Date.

**CLASS A MEMBERS:**

**DOS RIOS PARTNERS, L.P.**

By:   Dos Rios GP, LLC, its general partner

    By: _____
    Name: _____
    Title: _____

**DOS RIOS PARTNERS - A, L.P.**

By:   Dos Rios GP, LLC, its general partner

    By: _____
    Name: _____
    Title: _____

**CSWC CHANDLER SIGNS HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

**MAIN STREET EQUITY INTERESTS, INC.**

By: _____
Name: David Magdol
Title: Senior Managing Director

First Addendum and Amendment to
Amended and Restated Limited Liability Company Agreement of
Chandler Signs Holdings, LLC

**CHANDLER PARTNERS INVESTMENTS, LLC**

By: _Rockford V. Gray_

Name: _ROCKFORD V. GRAY_

Title: _Managing Member_

**QUABBIN CHANDLER CO-INVESTORS, LLC**

By:     LSW Partners, LLC, its manager

By: _____

Name: _____

Title: _____

**NEW CLASS A MEMBER:**

_____

JOE MUELLER

**CHANDLER PARTNERS INVESTMENTS, LLC**

By: _____

Name: _____

Title: _____


**QUABBIN CHANDLER CO-INVESTORS, LLC**

By:    LSW Partners, LLC, its manager

    By: _____

    Name: Steven A. Leese

    Title: Manager


**NEW CLASS A MEMBER:**

_____

JOE MUELLER

First Addendum and Amendment to
Amended and Restated Limited Liability Company Agreement of
Chandler Signs Holdings, LLC

Title:

## MAIN STREET EQUITY INTERESTS, INC.

By:
Name:

Title:

## CHANDLER PARTNERS INVESTMENTS, LLC

By:
Name:

Title:

## QUABBIN CHANDLER CO-INVESTORS, LLC

By: LSW Partners, LLC, its manager

By:

Name:

Title:

## NEW CLASS A MEMBER:

JOE MUELLER

**<u>BOARD OF DIRECTORS:</u>**

_____

PAT M. (BO) BASKIN, JR.


_____

STEVEN A. LEESE


_____

GARY LEE STEVENS

_____

JOHN K. (JAY) TURNER


_____

CHARLES J. WAHLE

First Addendum and Amendment to
Amended and Restated Limited Liability Company Agreement of
Chandler Signs Holdings, LLC

**BOARD OF DIRECTORS:**

_____
PAT M. (BO) BASKIN, JR.

_____
STEVEN A. LEESE

_____
GARY LEE STEVENS

_____
JOHN K. (JAY) TURNER

_____
CHARLES J. WAHLE

First Addendum and Amendment to
Amended and Restated Limited Liability Company Agreement of
Chandler Signs Holdings, LLC

**BOARD OF DIRECTORS:**

_____
PAT M. (BO) BASKIN, JR.

_____
STEVEN A. LEESE

_____
GARY LEE STEVENS

_____
JOHN K. (JAY) TURNER

_____
CHARLES J. WAHLE

## SCHEDULE 1

### MEMBERS, UNITS AND CAPITAL CONTRIBUTIONS

| Equity Cap Table | | | | | |
|---|---|---|---|---|---|
| Member | Class A-1 Units | Class B Units | Class C Units | Capital Contributions | Ownership Percentage |
| Dos Rios Partners - A, L.P. | ████ | -- | -- | ████ | ████ |
| Dos Rios Partners, L.P. | | -- | -- | | |
| Main Street Equity Interests, Inc. | | -- | -- | | |
| Capital Southwest Equity Investments, Inc. (f/k/a CSWC Chandler Signs Holdings, Inc.) | ████ | -- | -- | ████ | ████ |
| Chandler Partners Investments, LLC | | -- | -- | | |
| Quabbin Chandler Co-Investors, LLC | | -- | -- | | |
| Joe Mueller | 100,000 | -- | -- | $100,000 | 0.60% |
| **Total Class A Shares** | ████ | -- | -- | | **100.00%** |
| Quabbin Chandler Management Co., LLC | -- | -- | ████ | -- | NA |
| Available Management Options | -- | ████ | -- | -- | NA |
| **Total Ownership** | ████ | ████ | ████ | ████ | **100.00%** |

# Exhibit 5

# Chandler Signs, L.P., L.L.P
# Computing Systems and Internet Use Policy

**Purpose:**  The purpose of this policy is to ensure that proper control is exercised over information systems, email activity and Internet access in Chandler Signs, L.P., L.L.P., herby referred to as "The Company", to protect both users and the company from its misuse.

**Scope:**  This policy applies to all users of the Company's computing equipment, information systems, website and Internet connection.

**Policy:**  The Company's computing resources may only be used for business purposes and must be consistent with the rules presented in this document.  Chandler Signs, L.P., L.L.P. has licensed and assigned Microsoft Exchange as its only email system for electronic business communication, and alternate email accounts are not to be accessed or operated over the Company's network. Authorization for use of the Company's email is granted at the discretion of Company management and access privileges can be withdrawn at any time.

Employees must be aware that all communications or documents created, received or distributed through the company email system become the property of the company and can be reviewed for content at any time by the company.  Employees do not have any personal property rights to material within the email system.

> **Note:**  Although email users have password controlled access to their email account, the ultimate privacy of messages cannot be guaranteed to anyone.  Email messages can potentially be seen by, or forwarded to people by other system users and should therefore be considered in the context of "postcards" that could be read by anyone.

Email content is governed by company policies concerning sexual and other forms of harassment as well as discriminatory issues.  Violations of these policies will be grounds for disciplinary action and any employee who becomes aware of misuse of the email system should immediately notify the Human Resource or MIS Departments.  Email accounts will be monitored where necessary.

Employees are reminded that network based backups only provide a ten day retention of email records and as such they are expected to follow proper archiving procedures when it is necessary to save electronic correspondence beyond that time frame.  A 180 day retention period is recommended for messages in users' Outlook application. And though the flexibility of the email system provides the ability to distribute documents quickly to a large number of recipients, users should limit distributions to individuals truly affected by the content.  A good measurement is to not send email documents that you would not send as paper documents.

Employees are reminded that email has become a favorite path for the introduction of computer viruses, and they should use appropriate virus scanning utilities to examine documents from sources outside the Company's network.

Company provided Internet access, like computer systems and networks, is considered a Company resource and as such, activity conducted over the Internet should be for business purposes only. Employee usage will be monitored for inappropriate or unusual activity. Users shall not:

1) Visit Internet sites that contain obscene, hateful or objectionable materials; send or receive any material that is obscene or defamatory or which is intended to annoy, harass or intimidate another person, including chat rooms, bulletin boards, and social sites such as Myspace.com;

2) Solicit email that is unrelated to business activity, or participate in "instant messaging" programs;

3) Solicit non-company business for personal gain or profit;

4) Use the Internet for any illegal purpose;

5) Represent personal opinions as those of the Company;

6) Create or post indecent remarks, proposals or materials;

7) Upload, download or otherwise transmit commercial software or copyrighted materials belonging to parties outside the Company, or the Company itself;

8) Download any electronic files without implementing the virus protection measures that have been approved and installed by the Company;

> NOTE: Personal software is not to be installed on any company computer without MIS approval.

9) Intentionally interfere with the normal operation of the network, including the propagation of computer viruses and sustained high volume network traffic such as streaming video and audio files, which can hinder others in their use of the network;

10) Reveal or publicize confidential or proprietary information which includes, but is not limited to: financial information, new business and product ideas, marketing plans or strategies, databases and the information contained therein, customer lists, technical product information, computer software source codes, computer/network access codes and business relationships;

11) Examine, change or use another person's files, output or user name for which they do not have explicit authorization;

12) Perform any other inappropriate uses identified by Company management or policy;

13) Waste time on non-Company business.

Nothing contained in this policy shall be construed to limit the Company's actions or remedies in any way with respect to any of the foregoing activities, and Chandler Signs, L.P., L.L.P. reserves the right to take any and all additional actions it may deem appropriate with respect to such activities, including without limitations, taking action to recover costs and expenses of identifying offenders.

The Company will provide certain users with laptop PCs to facilitate their computing needs while traveling on Company business. Authorization for the purchase and assignment of a laptop PC will originate with the user's department manager and include recommendation from the MIS Manager. Final authorization

will be with Company Management.  Employees should be aware that the use of a laptop computer represents an additional security risk for the company in several ways.

1) Theft or loss of the PC could result in loss of critical business information and Company data that could seriously jeopardize the Company's competitive advantages or otherwise compromise data confidentiality.

2) Offsite use should be performed cautiously to prevent unauthorized viewing of screen contents by customers, suppliers and casual observers.

3) Use of non-Company, especially wireless connections with external systems such as Bulletin Boards, Internet Service Providers and the Internet presents an additional security threat from unauthorized access and the introduction of computer viruses.

Remote users are expected to follow proper virus protection procedures when working outside the Company network.  In addition, remote users are reminded that the laptop computers are Company property, and are intended for use with Company business only.  Personal software is not to be installed on any laptop PC without approval from MIS.

**Penalty for Violation of Policy:**  These policies will be strictly enforced and any breach of policy will affect the employee's future.  Failure to comply with these requirements may result in termination and/or criminal prosecution or other legal action.  In addition, the Company reserves at all times, all rights and remedies available to it with respect to such activities at law or in equity.

**Covenant Regarding Computer System and Internet Use:**  By signing a copy of this policy, employee acknowledges they have read, understand, and will comply with the above policy and comments regarding "Computing System, Email, and Internet Usage", and  acknowledges receipt of a copy thereof, and agrees as a condition to employee's continued employment. to be bound thereby.

Signed this __19__ day of __MAY__, 200_8_

_____
Signature of Employee

PAUL  GAMBILL
_____
Printed Name of Employee

_____
Social Security Number of Employee